EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| MCG Therapy Group, LLC<br><br>Peticionario<br><br>v.<br><br>Arlene J. Maestre Rivera; AM Therapeutic Service for Children, Inc.<br><br>Recurridos | Certiorari<br><br>2026 TSPR 56<br><br>218 DPR ___ |

Número del Caso: CC-2024-0553

Fecha: 28 de mayo de 2026

Tribunal de Apelaciones:

Panel VII

Representantes legales de la parte peticionaria:

Lcdo. Jorge A. Fernández Roboredo
Lcda. Kayra A. Dávila Torres
Lcda. Catalina I. Sierra López
Lcdo. Jaime Sanabria Montañez

Representante legal de la parte recurrida:

Lcdo. Miguel A. Castro Vargas

Materia: Derecho de Contratos – Validez y eficacia frente a terceros de una cesión de contrato con una cláusula de no competencia en el contexto de una relación contractual de servicios profesionales.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| MCG Therapy Group, LLC<br><br>Peticionario<br><br>v.<br><br>Arlene J. Maestre Rivera; AM Therapeutic Service for Children, Inc.<br><br>Recurridos | CC-2024-553 | *Certiorari* |

El Juez Asociado Señor Feliberti Cintrón emitió la Opinión del Tribunal.

En San Juan, Puerto Rico, a 28 de mayo de 2026.

Nos corresponde determinar, por primera vez, la validez y eficacia frente a terceros de una cesión de contrato con una cláusula de no competencia. Esto se da en el contexto de una relación contractual de servicios profesionales, en la que una de las partes actúa como contratista independiente.

Por considerar que la cesión de contratos es compatible con nuestro ordenamiento, resolvemos que los acuerdos de no competencia son válidos, siempre que las restricciones temporales, geográficas y materiales resulten razonables, protejan los intereses legítimos del contratante y no impongan cargas desproporcionadas al profesional ni afecten el interés público. Este análisis de razonabilidad deberá realizarse conforme a las circunstancias particulares de cada caso.

Veamos el trasfondo fáctico y procesal que dio origen al presente caso.

**I**

El 26 de julio de 2022, MCG & The Able Child at Centro Multidisciplinario del Caribe, Inc. (The Able Child), una corporación con fines de lucro que ofrece servicios psicológicos a estudiantes de educación especial del Departamento de Educación de Puerto Rico (Departamento de Educación),[1] suscribió un *Contrato de Servicios Profesionales* (Contrato de Servicios Profesionales) con la Sra. Arlene J. Maestre Rivera (señora Maestre Rivera). Por virtud de este acuerdo, la señora Maestre Rivera se comprometió, **como contratista independiente**, a ofrecer servicios de evaluación y tratamiento psicológico a pacientes

---

[1] Cabe señalar que el Departamento de Educación de Puerto Rico (Departamento de Educación) suscribió un *Contrato de Servicios Profesionales* (Contrato de Servicios Profesionales Núm. 2022-EE0059) con MCG & The Able Child at Centro Multidisciplinario del Caribe, Inc. (The Able Child), con el propósito de ofrecer servicios de evaluación, reevaluación e intervención, entre otros, a niños y jóvenes de 3 a 21 años del Programa Educativo Individualizado (PEI). Dicho contrato tuvo una vigencia desde el 3 de enero de 2022 hasta el 30 de junio de 2022. *Contrato de servicios profesionales* 2022-EE0059, Apéndice del *certiorari*, pág. 137.

El Contrato de Servicios Profesionales del Departamento de Educación reconocía en su cláusula *Trigésima Octava* la validez de la cesión de dicho contrato, sujeto al consentimiento previo y por escrito del Departamento de Educación. Íd., pág. 142. En particular, la cláusula mencionada disponía lo siguiente:

> **TRIGÉSIMA OCTAVA: INDELEGABLIDAD:** Los servicios que prestará la **SEGUNDA PARTE serán INDELEGABLES. LA SEGUNDA PARTE** no podrá subcontratar, tampoco podrá contratar peritos, ceder ni traspasar los servicios objeto de este contrato sin el consentimiento previo y por escrito de la **PRIMERA PARTE**. La delegación de estos será causa suficiente para dar por terminado este contrato. El incumplimiento de esta cláusula hará responsable a la SEGUNDA PARTE por cualesquiera daños y perjuicios que fueran causados a la **PRIMERA PARTE**, ya sean éstos en forma directa o indirecta. Íd. (Énfasis en el original).

asignados por el Departamento de Educación a The Able Child durante el periodo escolar 2022-2023.

El Contrato de Servicios Profesionales entró en vigor el 26 de julio de 2022 y tuvo una duración hasta el 31 de julio de 2023. Además, contenía una cláusula de no competencia que disponía lo siguiente:

> 1. ESPECIALISTA tendrá que esperar un **mínimo de un año**, a partir de la fecha de renuncia oficial a la CORPORACIÓN, o de la notificación de determinación de no renovación, para poder atender, a través de otra corporación, de contrato directo con el Departamento de Educación, Remedio Provisional o de cualquier forma o medio que no sea a través de MCG and The Able Child a los pacientes que atendía a través de la CORPORACIÓN.
>
> 2.                       […]
>
> 3. En los casos en los que ESPECIALISTA incumpla con lo establecido en esta cláusula de *No Competencia* tendrá que pagar una indemnización de incumplimiento, por cada uno de los estudiantes con los que la CORPORACIÓN hubiese facturado al Departamento de Educación por los servicios ofrecidos a cada uno de los estudiantes por el periodo del año escolar completo y tomando en consideración la modalidad, frecuencia y duración establecida en el [Programa Educativo Individualizado] de cada uno.[2] (Énfasis y subrayado en el original).

---

[2] *Contrato de servicios profesionales*, Apéndice del *certiorari*, pág. 118. Es de notar que, en la *Demanda Enmendada*, MCG Therapy Group (MCG o peticionaria) alegó que "[e]l Departamento de Educación está de acuerdo [con la cláusula de no competencia objeto del presente litigio] y confirma este propósito cuando a través de sus contratos con las compañías de servicios, también incluye cláusulas sobre la prohibición de que los especialistas [contratados por The Able Child] ofrezcan sus servicios al Departamento de Educación durante o luego de su renuncia a su respectiva compañía contratante por el periodo de un (1) año". *Demanda Enmendada*, Apéndice del *certiorari*, pág. 202.

En particular, MCG señaló, de forma ilustrativa, la cláusula *Sexta* del Contrato de Servicios Profesionales Núm. 2022-EE0059, entre el Departamento de Educación y The Able Child, la cual establece lo siguiente:

> SEXTA: Los Especialistas de la SEGUNDA PARTE que ofrecen servicios de evaluación e intervención no podrán ofrecer servicios a la Agencia a través de la Unidad Secretarial

Asimismo, dicho contrato contenía un *Addendum* con una cláusula que leía como sigue:

> 31. Este contrato se ha creado basado en el conocimiento de las cláusulas contractuales actuales con el Departamento de Educación. **En caso de que el Departamento de Educación haga algún cambio a su contrato de servicios con MCG and The Able Child,** CORPORACIÓN se verá en la obligación de hacer una enmienda modificando las partes del contrato que sean necesarias para asegurar el cumplimiento con los requisitos del Departamento de Educación. De ser el caso, se estarán enviando las enmiendas a ESPECIALISTA para que éste las firme y dicho documento pasará a ser parte del contrato firmado originalmente. (Énfasis nuestro).[3]

Así las cosas, el 1 de octubre de 2022, se produjo una transición de todo el personal y especialistas de The Able Child a MCG Therapy Group, LLC (MCG o peticionaria), mediante la cual The Able Child cedió todos sus contratos a MCG.[4]       Previo a esta transición,

---

del Procedimiento de Querellas y Remedio Provisional. **Asimismo, si un especialista de la SEGUNDA PARTE renuncia, está impedido de ofrecer servicios a la Agencia a través de la Unidad Secretarial del Procedimiento de Querellas y Remedio Provisional hasta transcurrido un (1) año a partir de la fecha en que presentó su renuncia a la SEGUNDA PARTE. Será responsabilidad de la SEGUNDA PARTE ASEGURARSE DE apercibir a sus especialistas sobre el contenido de esta cláusula.** (Énfasis nuestro). *Contrato de servicios profesionales* 2022-EE0059, Apéndice del *certiorari*, págs. 131-132.

[3] *Contrato de servicios profesionales*, Apéndice del *certiorari*, pág. 126.

[4] Surge del expediente una *Certificación* emitida el 1 de agosto de 2023 por la Oficina del Contralor de Puerto Rico, mediante la cual se acredita que del Registro de Contratos constan inscritos los contratos suscritos entre el Departamento de Educación y MCG, durante el periodo del 1 de enero de 2021 al presente. Véase *Certificación Oficina del Contralor*, Apéndice del *certiorari*, pág. 214. Asimismo, tomamos conocimiento oficial del Registro de Contratos de la Oficina del Contralor de Puerto Rico referente a los *Contrato de Servicios Profesionales* otorgados entre el Departamento de Educación y la peticionaria, así como de las cláusulas contenidas en éstos, a saber:

1. *Contrato de Servicios Profesionales*, Contrato Núm. 2023-EE010, **con vigencia desde el 1 de septiembre de 2022 hasta el 30 de junio de 2023.**

El mencionado contrato contenía una cláusula de *Indelegabilidad* que disponía lo siguiente:

> **TRIGÉSIMA OCTAVA: INDELEGABLIDAD:** Los servicios que prestará la **SEGUNDA PARTE serán INDELEGABLES. LA SEGUNDA PARTE** no podrá subcontratar, tampoco podrá contratar peritos, ceder ni traspasar los servicios objeto de este contrato sin el consentimiento previo y por escrito de la **PRIMERA PARTE.** La delegación de estos será causa suficiente para dar por terminado este contrato. El incumplimiento de esta cláusula hará responsable a la SEGUNDA PARTE por cualesquiera daños y perjuicios que fueran causados a la **PRIMERA PARTE,** ya sean éstos en forma directa o indirecta. *Contrato de servicios profesionales* 2022-EE0059, pág. 13. (Énfasis en el original).

2. *Contrato de servicios profesionales*, Contrato Núm. 2024-EE0036, con vigencia desde el 1 de octubre de 2023 hasta el 30 de junio de 2024. El referido contrato contenía una cláusula de *Indelegabilidad* que disponía lo siguiente:

> **TRIGÉSIMA OCTAVA: INDELEGABLIDAD:** Los servicios que prestará la **SEGUNDA PARTE serán INDELEGABLES. LA SEGUNDA PARTE** no podrá subcontratar, tampoco podrá contratar peritos, ceder ni traspasar los servicios objeto de este contrato sin el consentimiento previo y por escrito de la **PRIMERA PARTE.** La delegación de estos será causa suficiente para dar por terminado este contrato. El incumplimiento de esta cláusula hará responsable a la SEGUNDA PARTE por cualesquiera daños y perjuicios que fueran causados a la **PRIMERA PARTE,** ya sean éstos en forma directa o indirecta. *Contrato de servicios profesionales* 2024-EE0036, pág. 13. (Énfasis en el original).

3. *Contrato de servicios profesionales*, Contrato Núm. 2025-EE0073, con vigencia desde el 24 de septiembre de 2024 hasta el 30 de junio de 2025. Este contrato contenía una cláusula de *Indelegabilidad* que disponía lo siguiente:

> **TRIGÉSIMA OCTAVA: INDELEGABLIDAD:** Los servicios que prestará la **SEGUNDA PARTE serán INDELEGABLES. LA SEGUNDA PARTE** no podrá subcontratar, tampoco podrá contratar peritos, ceder ni traspasar los servicios objeto de este contrato sin el consentimiento previo y por escrito de la **PRIMERA PARTE.** La delegación de estos será causa suficiente para dar por terminado este contrato. El incumplimiento de esta cláusula hará responsable a la SEGUNDA PARTE por cualesquiera daños y perjuicios que fueran causados a la **PRIMERA PARTE,** ya sean éstos en forma directa o indirecta. *Contrato de servicios profesionales* 2025-EE0073, pág. 14. (Énfasis en el original).

4. *Contrato de servicios profesionales*, Contrato Núm. 2026-EE0056, con vigencia desde el 1 de julio de 2025 hasta el 30 de junio de 2026. El aludido contrato contenía una cláusula de *Indelegabilidad* que disponía lo siguiente:

> **TRIGÉSIMA NOVENA: INDELEGABLIDAD:** Los servicios que prestará la **SEGUNDA PARTE serán INDELEGABLES. LA SEGUNDA PARTE** no podrá subcontratar, tampoco podrá contratar peritos, ceder ni traspasar los servicios objeto de este contrato sin el consentimiento previo y por escrito de la **PRIMERA PARTE.** La delegación de estos será causa suficiente para dar por terminado este contrato. El incumplimiento de esta cláusula hará responsable a la SEGUNDA PARTE por cualesquiera daños y perjuicios que fueran causados a la **PRIMERA PARTE,** ya sean éstos en forma directa o indirecta. *Contrato de servicios profesionales* 2026-EE0056, pág. 11. (Énfasis en el original).

el 27 de septiembre de 2022, la peticionaria notificó sobre la cesión a todos los especialistas de servicios profesionales y continuó desempeñando las funciones previamente ejercidas por el proveedor original ante el Departamento de Educación. A su vez, la señora Maestre Rivera continuó ofreciendo sus servicios profesionales de psicología a los estudiantes de educación especial del Departamento de Educación como contratista independiente, pero a través de la peticionaria. Lo anterior ocurrió sin trámite ulterior y sin manifestar oposición o ejercer gestión alguna para desvincularse del nuevo contratante cesionario.

En este contexto, a principios de septiembre de 2022, la señora Maestre Rivera suscribió un contrato directamente con el Departamento de Educación para ofrecer los mismos servicios profesionales que brindaba a través de MCG. Sin embargo, continuó trabajando para la compañía.[5]

Tras un intercambio de comunicaciones y reuniones con la peticionaria, el 3 de marzo de 2023 la señora Maestre Rivera notificó a MCG su decisión de no continuar ofreciendo sus servicios.

Ante lo anterior, el 3 de abril de 2023, MCG presentó una *Demanda* sobre incumplimiento de contrato, daños y perjuicios e interferencia torticera en contra de la señora Maestre Rivera. Posteriormente, el 12 de julio de 2023, la peticionaria presentó una *Demanda Enmendada* en la que

---

[5] *Contrato de servicios profesionales 2023-EE0016*, Apéndice del *certiorari*, págs. 146-160.

incluyó como demandados a la señora Maestre Rivera y a AM Therapeutic Service For Children, Inc. (AM Therapeutic) (en conjunto, recurridos).

En esencia, MCG alegó que adquirió el referido contrato de servicios profesionales mediante cesión por la compañía antecesora, The Able Child, y que en virtud de dicha cesión se mantenían los términos, cláusulas y condiciones originales. Por ello, arguyó que tenía derecho a reclamar judicialmente a la señora Maestre Rivera por incumplir la cláusula de no competencia, ya que ésta comenzó a atender de forma privada e independiente a pacientes previamente asignados a la peticionaria antes de que transcurriera el término de un (1) año, según dispuesto en el contrato.

En particular, MCG sostuvo que, antes de la transición oficial del personal, el 19 de julio de 2022 sus agentes notificaron directamente a la señora Maestre Rivera la cesión a favor de ésta y que, además, discutieron ciertos términos del contrato. Afirmó que se alcanzó un acuerdo verbal mediante el cual se le pagaría a la señora Maestre Rivera una tarifa superior a la de otros psicólogos a cambio de que ella trabajara exclusivamente para la peticionaria y no atendiera de forma privada la matrícula asignada. Según la peticionaria, la señora Maestre Rivera continuó ofreciendo sus servicios según lo acordado y destacó que el contrato en controversia no prohibía la cesión a favor de un tercero.

No obstante, MCG alegó que el 2 de septiembre de 2022, en contravención al Contrato de Servicios Profesionales

cedido y al acuerdo verbal, la señora Maestre Rivera, a través de AM Therapeutic (corporación creada por ella), suscribió un acuerdo con el Departamento de Educación para ofrecer los mismos servicios profesionales que brindaba a través de la peticionaria. Asimismo, sostuvo que la señora Maestre Rivera atendió y solicitó transferir a varios estudiantes previamente atendidos por MCG, lo que consideró una violación a la cláusula de no competencia. MCG añadió que la señora Maestre Rivera continuó trabajando y facturando hasta marzo de 2023, cuando finalmente presentó su carta de renuncia. En consecuencia, la peticionaria reclamó una suma mínima de $800,000 en concepto de penalidades por el incumplimiento de la cláusula de no competencia y otros daños sufridos.

Por su parte, el 16 de mayo de 2023, la señora Maestre Rivera presentó una *Moción en solicitud de desestimación al amparo de la Regla 10.2 de Procedimiento Civil.* En síntesis, adujo que la demanda no contenía hechos que justificaran la concesión de algún remedio ya que alegó que la peticionaria no formó parte del Contrato de Servicios Profesionales originalmente suscrito con The Able Child, así como tampoco ratificó por escrito sus cláusulas y condiciones. Por tanto, resaltó que el contrato no podía ser objeto de cesión. Así, sostuvo que MCG no tenía legitimación activa para reclamar el cumplimiento de la cláusula de no competencia. Asimismo, la señora Maestre Rivera cuestionó la validez de la cláusula de no competencia al alegar que no

existía un acuerdo escrito entre las partes, conforme establecía la jurisprudencia aplicable.

En respuesta, el 5 de junio de 2023 la peticionaria presentó una *Oposición a moción de desestimación*. En relación con la controversia, MCG sostuvo que la demanda contenía argumentos suficientes para justificar la concesión de un remedio. Enfatizó que The Able Child le cedió todos los derechos y obligaciones de los contratos bajo los mismos términos y condiciones, por lo que el Contrato de Servicios Profesionales en controversia permanecía inalterado. Basándose en ello, afirmó que tenía legitimación activa para reclamar los daños alegados por el incumplimiento de la cláusula accesoria de no competencia. Respecto a esto último, la peticionaria señaló que, además del acuerdo verbal, la cláusula de no competencia constaba por escrito en el Contrato de Servicios Profesionales cedido y que cumplía con los requisitos de validez, entre estos el de una contraprestación válida. Finalmente, expresó que, tomando como ciertas las alegaciones de la demanda, se cumplía con el estándar de plausibilidad y suficiencia exigido por nuestro ordenamiento.

Tras varias incidencias procesales,[6] y luego de evaluar ambos escritos, el 10 de agosto de 2023 el

---

[6] El 8 de agosto de 2023, el Tribunal de Primera Instancia celebró una vista argumentativa mediante la cual evaluó los argumentos de las partes en cuanto a la *Moción en solicitud de desestimación al amparo de la Regla 10.2 de Procedimiento Civil* presentada por la Sra. Arlene J. Maestre Rivera (señora Maestre Rivera) y la respectiva *Oposición a moción de desestimación* interpuesta por MCG. Véase *Minuta* del Tribunal de Primera Instancia emitida el 10 de agosto de 2023, Apéndice del *certiorari*, págs. 456-457.

Tribunal de Primera Instancia emitió una *Sentencia Parcial*. En ésta, el foro primario destacó que no había controversia en cuanto a los siguientes hechos:

1. Entre MCG y la [señora Maestre Rivera], nunca hubo un contrato por escrito. La [peticionaria] argumenta que en la medida que The Able Child cedió todos sus contratos a MCG, incluyendo [el] de la [señora Maestre Rivera], las obligaciones contraídas por la demandada con The Able Child son vinculantes hacia MCG también.

2. La relación de la demandada y la demandante fue una de contratista independiente.

3. La demandada prestó servicios profesionales a MCG.[7]

En la *Sentencia Parcial*, el Tribunal de Primera Instancia sostuvo que, independientemente de cómo se efectuó la cesión de los contratos a favor de la peticionaria, el ordenamiento legal requería que entre MCG y la señora Maestre Rivera existiera un acuerdo escrito firmado por ambas partes para que una cláusula de no competencia tuviera vigencia.[8] Consecuentemente, el foro primario concluyó que la cesión no tuvo el efecto de validar dicha cláusula por no haberse suscrito un acuerdo de ratificación por escrito. A tales efectos, el Tribunal de Primera Instancia declaró con lugar la moción de desestimación respecto al presunto incumplimiento con la cláusula restrictiva y, a su vez, ordenó la continuación de los procedimientos en relación con las demás causas de acción.

---

[7]   Véase *Sentencia Parcial* del Tribunal de Primera Instancia emitida el 10 de agosto de 2023, Apéndice del *certiorari*, pág. 26.

[8]   Íd., pág. 28.

Inconforme, MCG presentó una *Solicitud de reconsideración de la sentencia parcial de 10 de agosto de 2023.* Por su parte, los recurridos presentaron su oposición a la misma el 12 de septiembre de 2023. Evaluadas las comparecencias de las partes, el Tribunal de Primera Instancia proveyó no ha lugar a la moción de reconsideración mediante una *Resolución* emitida el 27 de septiembre de 2023.

En desacuerdo con este resultado, el 27 de octubre de 2023 la peticionaria presentó un *Recurso de apelación civil* ante el Tribunal de Apelaciones. En síntesis, sostuvo que el Tribunal de Primera Instancia erró al desestimar la causa de acción sobre incumplimiento de contrato con una cláusula de no competencia y al privarle de su día en corte. Argumentó que el foro primario realizó un análisis de plausibilidad de las alegaciones en la *Demanda Enmendada* de manera arbitraria, rígida y contraria a derecho. Ello, pues, según reiteró MCG, de la demanda surgía con la especificidad requerida que el contrato que le fue cedido constaba por escrito.

Cónsono con lo anterior, la peticionaria planteó que la cesión implicó la transmisión de todos los derechos y obligaciones principales y accesorias del contrato, en su forma material e íntegra, tal como fue redactado en el documento original entre la señora Maestre Rivera y el cedente. Por consiguiente, alegó que la cesión le colocó en la misma posición que ocupaba The Able Child bajo el contrato original cedido como si hubiera estado presente en el momento de su otorgamiento. En virtud de ello, sostuvo que,

como efecto jurídico de la cesión, podía exigir a la señora Maestre Rivera el cumplimiento del acuerdo.

Por su parte, el 27 de noviembre de 2023 los recurridos presentaron un *Alegato en oposición a escrito de apelación y solicitud de desestimación* en el cual reiteraron que las alegaciones en cuestión dejaban de exponer un remedio a tenor de la Regla 10.2(5) de las Reglas Procedimiento Civil de 2009 (Reglas de Procedimiento Civil), *infra*.

Así las cosas, el foro apelativo intermedio emitió una *Sentencia* el 8 de agosto de 2024, en la que confirmó la *Sentencia Parcial* del foro primario. En lo pertinente, una mayoría del Tribunal de Apelaciones determinó que no existía impedimento legal en nuestro ordenamiento jurídico que prohibiera la inclusión de una cláusula de no competencia en un contrato de servicios profesionales suscrito por un contratista independiente. No obstante, resolvió que, debido al efecto restrictivo de este tipo de cláusulas, su transmisión mediante cesión sólo era posible si se incorporaba en un acuerdo escrito entre las partes.

Por consiguiente, en ausencia de dicha formalidad y ante la falta del consentimiento escrito de la señora Rivera Maestre a la cesión, el Tribunal de Apelaciones concluyó que la peticionaria no podía invocar la existencia de la cláusula. Finalmente, el foro apelativo intermedio añadió, sin realizar un análisis completo de la cláusula de no competencia, que la razonabilidad del acuerdo restrictivo resultaba cuestionable por el posible efecto que éste podía tener sobre la población

de estudiantes de educación especial en las escuelas públicas de la isla.

Insatisfecha con el dictamen del foro apelativo intermedio, el 9 de septiembre de 2024, MCG presentó una *Petición de certiorari* ante este Tribunal, en la que expuso los señalamientos de error siguientes:

**Primer error**: Erró el Tribunal de Apelaciones al validar la Sentencia Parcial del [Tribunal de Primera Instancia] que desestimó la causa de acción por el incumplimiento de una cláusula de no competencia suscrita por una contratista independiente tras establecer arbitrariamente por fíat judicial una nueva restricción al derecho a la libertad de contratación, pues decretó que la referida cláusula sólo puede ser cedida por consentimiento escrito; a pesar de que dicho requisito es irrazonable, oneroso, contrario a la norma general de la doctrina de cesión de créditos o derechos y no cualifica como una de sus excepciones.

**Segundo error**: Erró el Honorable Tribunal de Apelaciones al validar la Sentencia Parcial del [Tribunal de Primera Instancia] que desestimó la causa de acción por incumplimiento de una cláusula de no competencia suscrita por una contratista independiente tras establecer que es irrazonable porque "afecta a los estudiantes de educación especial de nuestras escuelas públicas". Ello, a pesar de que los supuestos efectos de la cláusula constituyen determinaciones de hechos conclusorios e hipotéticos añadidos por el foro intermedio en abuso de su poder revisor, son opuestos a las alegaciones fácticas de la demanda enmendada que deben tomarse como ciertas al evaluar la solicitud de desestimación y no tienen base en el expediente o en evidencia alguna.

En reconsideración, expedimos el recurso de *certiorari* solicitado por la peticionaria mediante una *Resolución* emitida el 28 de marzo de 2025. Como parte del trámite procesal de este recurso, el 12 de mayo de 2025, la peticionaria presentó su alegato, en el cual sostuvo que

la cesión de contrato y la cláusula de no competencia eran válidas conforme al derecho vigente en Puerto Rico.

Por su parte, los recurridos presentaron su *Alegato en oposición* el 10 de junio de 2025. En esencia, reiteraron que dicho acuerdo restrictivo no constaba por escrito, no hubo una contraprestación válida y era contrario al interés público.

Así pues, el caso quedó sometido en los méritos el 11 de junio de 2025. Con el beneficio de las comparecencias de las partes, procedemos a exponer el derecho aplicable.

**II**

**A. La moción de desestimación al amparo de la Regla 10.2(5) de Procedimiento Civil**

La Regla 10.2 de las Reglas de Procedimiento Civil de Puerto Rico (Reglas de Procedimiento Civil), 32 LPRA Ap. V, R. 10.2, permite que una parte demandada pueda solicitar la desestimación de la demanda en su contra por los siguientes fundamentos: "(1) 'falta de jurisdicción sobre la materia o persona', (2) 'insuficiencia del emplazamiento o su diligenciamiento', (3) 'dejar de exponer una reclamación que justifique la concesión de un remedio' y (4) 'dejar de acumular una parte indispensable'". Rivera Sanfelizet *et al.* v. Jta. Dir. FirstBank, 193 DPR 38, 49 (2015) (citando a Colón Rivera *et al.* v. ELA, 189 DPR 1033, 1049 (2013); Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 935 (2011)).

En cuanto a una solicitud de desestimación basada en la defensa de que la demanda no expone una reclamación que

justifica la concesión de un remedio, este Tribunal ha resuelto que, "los tribunales están obligados a tomar como ciertos todos los hechos bien alegados en la demanda y que hayan sido aseverados de manera clara y concluyente". Costas Elena y otros v. Magic Sport y otros, 213 DPR 523, 533 (2024) (citando a Eagle Security v. Efrón Dorado *et al.*, 211 DPR 70, 78 (2023); Cobra Acquisitions v. Mun. Yabucoa *et al.*, 210 DPR 384, 396 (2022); González Méndez v. Acción Social *et al.*, 196 DPR 213, 234 (2016)).

La norma exige a los tribunales evaluar las alegaciones conjuntamente para auscultar si, a la luz de la situación más favorable al demandante y resolviendo toda duda a su favor, la demanda establece una reclamación plausible que amerite la concesión de un remedio. Costas Elena y otros v. Magic Sport, *supra*, pág. 534. **Ello obedece a que la privación del "día en corte" de un litigante constituye una medida extraordinaria que solo procede en casos extremos**. Íd. (citando a Rosario v. Nationwide Mutual, 158 DPR 775, 780 (2003)).

**B. La cesión de derechos y obligaciones**

**a. Principios generales**

El Art. 1232 del Código Civil de Puerto Rico de 2020 (Código Civil de Puerto Rico), Ley Núm. 55-2020, según enmendada, 31 LPRA sec. 9753, reconoce el principio de la autonomía contractual. Este principio dispone que las partes contratantes podrán establecer los pactos, cláusulas y condiciones que así entiendan, salvo que sean contrarios a la ley, moral u orden público. Íd.; Carmona, Negrón v. BSN y

otros, 214 DPR 388, 398 (2024); Aponte Valentín *et al.* v. Pfizer Pharm., 208 DPR 263, 286 (2021). Cónsono con lo anterior, el Art. 1233 del Código Civil de Puerto Rico, reconoce que todos los pactos y las obligaciones "t[endrá]n fuerza de ley entre las partes, ante sus sucesores y ante terceros en la forma que dispone la ley". 31 LPRA sec. 9754. **Por tanto, en virtud de ello, los tribunales tendrán el deber de velar por el cumplimiento de las obligaciones contractuales y, cuando éstas sean legales y válidas, no podrán relevar a una parte de su cumplimiento.** Mercado, Quilichini v. U.C.P.R., 143 DPR 610, 627 (1997).

En línea con lo anterior, nuestro ordenamiento jurídico contiene disposiciones específicas que reconocen la transmisión de los derechos y las obligaciones. Como norma general, el Art. 1065 del Código Civil de Puerto Rico reconoce que **"[t]odos los derechos adquiridos en virtud de una obligación son transmisibles con sujeción a las leyes, si no se ha pactado algo distinto".[9]** (Énfasis nuestro). 31 LPRA sec. 8986. Dicha disposición, la cual proviene del Art. 1065 del Código Civil de Puerto Rico, edición 1930 (Código Civil derogado), 32 LPRA ant. sec. 3029, nos brinda

---

**9**    El Art. 1065 del Código Civil de Puerto Rico de 2020 (Código Civil de Puerto Rico), Ley Núm. 55-2020, según enmendada, 31 LPRA sec. 8986, proviene del Art. 1065 del Código Civil de Puerto Rico, edición de 1930 (Código Civil derogado), según enmendado, 32 LPRA ant. sec. 3029. La disposición actual no tuvo cambios sustantivos en su redacción y, al igual que el derogado artículo, establece que la facultad de exigir puede transmitirse a otra persona, siempre que ésta no esté prohibida en la ley o medie un paco en contrario. M. R. Garay Aubán, *Código Civil de 2020 y su historial legislativo*, *Obligaciones y contratos*, 2da ed. rev., San Juan, Ediciones SITUM, 2021, T. 4, pág. 19.

un esquema jurídico sobre la transmisión de las obligaciones, es decir, la cesión de créditos.

La cesión de créditos es un "negocio jurídico celebrado por el acreedor cedente con otra persona, cesionario, por virtud del cual aquél transmite a éste la titularidad del derecho de 'crédito cedido'".[10] Consejo de Titulares v. C.R.U.V., 132 DPR 707, 717 (1993) (citando a L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 789). Mediante este acto jurídico, "[e]l cesionario se instala en la misma posición y relación obligatoria con respecto al deudor a partir de la transmisión del crédito". Consejo de Titulares v. C.R.U.V., *supra*, pág. 717. Ahora bien, como excepción al principio general de la cesibilidad de los derechos adquiridos en virtud de una obligación se encuentran tres (3) categorías, a saber: por razón de la voluntad de las partes al haberse pactado; por prohibición legal, o por la propia naturaleza del crédito, esto es, que se trate de un derecho personalísimo.[11] Art. 1065 del Código Civil de Puerto Rico, *supra*; Art. 359

---

[10] En cuanto a los requisitos para la validez de una cesión de créditos, en IBEC v. Banco Comercial, 117 DPR 371, 377 (1986), tuvimos la oportunidad de examinar dicha figura y señalamos que son los siguientes: (1) que el crédito sea transmisible; (2) que el crédito esté fundado en un título válido y eficaz; (3) que sea un crédito existente, y (4) que éste tenga su origen en una obligación válida y eficaz. Véase, además, Consejo de Titulares v. C.R.U.V., 132 DPR 707, 717 (1993).

[11] Cabe señalar que los derechos personalísimos se caracterizan por ser intransmisibles, pues requieren de la existencia misma de la persona para su ejercicio y se extinguen con la muerte de su titular. Consejo de Titulares v. C.R.U.V., *supra*, pág. 720. A manera de ejemplo, los siguientes derechos son considerados personalísimos: "el usufructo, el uso y la habitación, la renta vitalicia que estuviere disfrutando el finado, la patria potestad, los alimentos, la tutela, las servidumbres personales […]". Íd.

del Código Civil de Puerto Rico, 31 LPRA sec. 6361, Consejo de Titulares v. C.R.U.V., *supra*, págs. 719-720. Véase, además, Carlo v. Vargas, 66 DPR 407, 408-409 (1946).

Así pues, como hemos discutido en el pasado, la cesión de créditos será válida sin el consentimiento del deudor, siempre y cuando no se hubiera pactado algo distinto. Consejo de Titulares v. C.R.U.V., *supra*, pág. 729. Además, para que tenga efectos contra terceros, será necesario que conste la fecha de modo auténtico y que se notifique de la cesión de créditos al deudor. Íd., pág. 718.

Ahora bien, en lo pertinente al caso que nos ocupa, **la cesión de contrato es un negocio jurídico conformado de manera independiente a la transmisión de créditos y deudas particulares que regula el Art. 1065 del Código Civil de Puerto Rico, *supra***. Empero, aun cuando la cesión de créditos mantenga su independencia formal y no se haya establecido como una estructura genérica, "sí [es] lo suficientemente clara para dar pie a las necesidades de la cesión de contratos que nos ocupa". L. Valls Taberner, *La cesión de contratos en el derecho español*, Barcelona, BOSCH, 1955, pág. 80. Así pues, con el fin de precisar la noción antes expuesta sobre la cesión de contrato, prevenir confusiones futuras y delimitar con claridad su alcance, pasaremos a definirla y distinguirla de la cesión de créditos como figura jurídica afín.

b. **Naturaleza de la cesión de contratos y su relación con la cesión de créditos como figura jurídica afín**

La cesión de contratos es una figura jurídica que, a pesar de que el Código Civil de Puerto Rico no la regula expresamente, ha sido reconocida desde hace mucho tiempo en el derecho positivo puertorriqueño y se admite sin reparos en virtud de la **autonomía de la voluntad contractual.**[12] Sucn. Mercado Parra v. Srio. de Hacienda, 92 DPR 710, 715 (1965); Blasini v. Beech-Nut Life Savers, 104 DPR 570, 574-575 (1976). Véase, además, Art. 1232 del Código Civil de Puerto Rico, *supra*.

En nuestro derecho civil, los efectos de la voluntad negocial se traducen en la posibilidad de plasmar libremente todas las pretensiones que los contratantes estimen, incluyendo tanto la forma como el contenido del contrato, siempre y cuando estén dentro de los límites impuestos por el ordenamiento jurídico. Campos del Toro v. Ame. Transit Corp., 113 DPR 337, 345-346 (1982). Siendo esto así, una vez se reúnen los requisitos o presupuestos de validez exigidos por el Art. 1237 del Código Civil de Puerto Rico, 31 LPRA sec. 9771, sobre consentimiento, objeto y causa, será suficiente el principio de la libertad de contratación

---

[12] Valga señalar que esta doctrina también es admitida sin reparos por el derecho positivo español. En lo que concierne a la doctrina civil en España, la cual sirvió de modelo e influencia legislativa a nuestro ordenamiento, ésta no contempla una disposición legal expresa en el Código Civil español que regule la cesión de contratos. L. Díez-Picazo, *Fundamentos del derecho civil patrimonial, Las relaciones obligatorias*, 6ta ed. rev., España, CIVITAS, 2008, T. II, pág. 1044. Sin embargo, la jurisprudencia y la doctrina han reconocido la validez de este negocio jurídico al amparo del principio de la libertad o autonomía de la voluntad. Íd., pág. 1045; L. Valls Taberner, *La cesión de contratos en el Derecho español*, BOSCH, Barcelona, 1955, pág. 82.

para que opere a plenitud la cesión de los contratos por negocio.

Cónsono con lo anterior, la cesión de contratos se define como "un negocio jurídico concluido entre las partes contratantes y un tercero, cuya finalidad es sustituir a una de ellas por dicho tercero en la titularidad de la relación contractual, la cual permanece idéntica en su dimensión objetiva". M. García-Amigo, *La cesión de contratos en el derecho español*, Editorial Revista de Derecho Privado, Madrid, 1964, pág. 80.

Se trata de una figura que se encuentra ampliamente utilizada en la práctica comercial, y su admisión legal se reconoce en determinados supuestos, como, por ejemplo, la cesión de arrendamientos, **la cesión de contratos de trabajo** y la cesión de la relación contractual vinculada a acciones no liberadas de una sociedad anónima. L. Díez-Picazo, *Fundamentos del derecho civil patrimonial, Las relaciones obligatorias*, 6ta ed. rev., España, CIVITAS, 2008, T. II, pág. 1043.

La configuración de la cesión de contratos representa una sustitución modificativa sujeta a las reglas generales de las obligaciones. Blasini v. Beech-Nut Life Savers, *supra*, pág. 575. En consecuencia, las únicas excepciones a la transmisión de un contrato serán aquellas contenidas en el Art. 359 del Código Civil de Puerto Rico, *supra*, a saber, "[l]os derechos y las obligaciones que nacen del negocio jurídico [] sean personalísimos o inherentes a la persona [y]

su transmisión esté prohibida por la ley o por la voluntad de las partes".

A diferencia de otras instituciones en las que interviene un tercero, ésta comprende la cesión del negocio jurídico **"como un todo"** mediante el cual se transmiten de forma íntegra todos los derechos y las obligaciones derivadas del contrato. (Énfasis nuestro). Díez Picazo, *op. cit.*, pág. 1045. Véase, además, Valls Taberner, *op. cit.*, pág. 13. Es decir, el negocio de cesión "coloca al cesionario en lugar del cedente y le integra en el uso y ejercicio de todos los derechos y obligaciones que provienen del [contrato original]", en la medida en que éstos subsistan al momento de la cesión. Blasini v. Beech-Nut Life Savers, *supra*, pág. 574. Véase, además, Otero Rivera v. USAA Fed. Savs. Bank, 214 DPR 473, 486 (2024).**[13]** Lo anterior ocurre sin que ello suponga modificación alguna de las cláusulas y condiciones acordadas en el contrato cedido. N. Marchal Escalona, *Derecho contractual comparado (Una perspectiva europea y transnacional), La Cesión del contrato*, 3 ed. rev., Madrid, CIVITAS, 2016, pág. 501. Se trata, pues, de un **"contrato con vida propia"** mediante el cual el cesionario se coloca en la misma posición jurídica del cedente y,

---

**[13]** Cabe destacar que, aunque Otero Rivera v. USAA Fed. Savs. Bank, 214 DPR 473, 486 (2024), se dio en el contexto de la Ley Núm. 68 de 19 de junio de 1964, conocida como Ley de Ventas a Plazos y Compañías de Financiamiento, según enmendada, 10 LPRA sec. 731 *et seq.*, reconocimos como efecto jurídico de la cesión de contratos en el derecho civil que "[l]a finalidad de la cesión es la transmisión de la titularidad del contrato [] del cedente al cesionario con sus derechos y obligaciones […]". (citando a Berríos v. Tito Zambrana Auto, Inc., 123 DPR 317, 329 (1989)).

en consecuencia, asume todos los derechos y obligaciones derivados del contrato original. (Énfasis nuestro). Blasini v. Beech-Nut Life Savers, *supra*, pág. 574. Véase, además, García-Amigo, *op. cit.*, págs. 35-36.

No obstante, sus efectos no se reducen solo a créditos y deudas, sino que abarcan otras facultades a favor de las partes contratantes.[14] A. Cristóbal-Montes, *Anuario de derecho civil*, *La cesión de contrato*, Instituto Nacional de Estudios Jurídicos, 1968, T. XXI, Núm. 2, pág. 862. Conforme a la doctrina civilista, la cesión del contrato produce un efecto liberatorio a favor del cedente frente a la parte cedida, salvo pacto en contrario. Otero Rivera v. USAA Fed. Savs. Bank, *supra*, pág. 487; Berríos v. Tito Zambrana Auto, Inc., 123 DPR 317, 330 (1989). Ello implica, de una parte, que el cedido deja de ostentar derechos y obligaciones frente al cedente y, de otra parte, **que la relación contractual continúa íntegramente entre el cedido y el cesionario, quienes quedan vinculados por los mismos derechos y deberes que conformaba la relación original**. Otero Rivera v. USAA Fed. Savs. Bank, *supra*; Berríos v. Tito Zambrana Auto, Inc., *supra*. Por lo que, como parte contractual, el cesionario se

---

[14] Cabe destacar que, entre estas facultades se encuentran los conocidos "derechos potestativos", los cuales incluyen, por ejemplo: la acción de anulabilidad, la facultad resolutoria tácita, la rescisión del contrato y el derecho de tanteo o retracto, entre otros. A. Cristóbal-Montes, *Anuario de derecho civil*, *La cesión de contrato*, Instituto Nacional de Estudios Jurídicos, 1968, T. XXI, Núm. 2, págs. 55-57; M. García-Amigo, *La cesión de contratos en el derecho español*, Ed. Rev. Der. Privado, Madrid, 1964, págs. 55-57.

convierte en titular tanto de los créditos como de las obligaciones que emanan del contrato cedido. Íd.

Así pues, se evidencia que la tradicional cesión de créditos, al igual que otras figuras afines, no resulta suficiente cuando lo que se busca es la transmisión íntegra de una relación contractual como unidad. Cristóbal-Montes, *supra*, pág. 862. Por ello, esta institución debe distinguirse de aquellas en las que interviene un tercero, pues no constituye un negocio simple sujeto al régimen de transmisión de créditos. Íd. A manera de ilustración, el tratadista Manuel García-Amigo reseña algunas notas diferenciadoras de la cesión de contrato como figura afín a la cesión de créditos, a saber:

> 1. Por los elementos constitutivos de cada uno de los negocios: así, mientras el consentimiento es bilateral en la cesión de créditos, es trilateral en la de contratos; mientras el objeto de la cesión de créditos es la titularidad activa de la relación obligatoria simple, en la de contratos lo es la titularidad de la relación contractual completa; y, por tanto, la causa [] es también diversa.
>
> 2. También la función económico-social perseguida por ambas instituciones es diferente: la cesión de créditos, generalmente, persigue una realización del activo patrimonial, mientras que la de contratos puede representar enajenación de activo o pasivo.
>
> 3. Finalmente, el ámbito de aplicación es también distinto, puesto que la cesión de créditos puede aplicarse a todo tipo de relación contractual, aunque nazca de un delito o de acciones u omisiones en que intervenga culpa o negligencia; la de contratos, en cambio, sólo tiene sentido al ser referida a las relaciones contractuales. García-Amigo, *op. cit.*, págs. 81-82.

**c. Requisitos esenciales para la validez de la cesión de contratos**

Nuestro ordenamiento civil contiene normas generales para los contratos atípicos como ocurre con el contrato de cesión. Particularmente, para que se perfeccione un contrato partiendo de la autonomía de la voluntad deben concurrir tres (3) elementos indispensables: el consentimiento, el objeto y la causa. Art. 1237 del Código Civil de Puerto Rico, 31 LPRA sec. 9771; Consejo de Titulares v. C.R.U.V., *supra*, pág. 724. Sin embargo, para definir los supuestos necesarios para perfeccionar el contrato de cesión, es preciso identificar aquellas partes que intervienen en este negocio: (1) el cedente; (2) el cesionario, y (3) el cedido.

Según adelantamos, por definición, la cesión de contratos genera una situación triangular en la que intervienen tres (3) partes: el cedente, que abandona la relación contractual; el cesionario, que ocupa su lugar; y el cedido, el cual permanece en el contrato. Berríos v. Tito Zambrana Auto, Inc., *supra*, pág. 330. Por su parte, el cedente busca liberarse de los derechos y obligaciones que le correspondían de acuerdo con su posición jurídica. Cristóbal-Montes, *op. cit.*, pág. 872. El cesionario, por el contrario, pretende ser reconocido como parte en el contrato ya existente y asumir sus efectos obligatorios. Íd. El cedido, por su parte, procura que la alteración subjetiva no le perjudique patrimonialmente, razón por la cual su consentimiento resulta indispensable para la eficacia de la cesión. Íd., pág. 872.

En consecuencia, la cesión de contratos solo se perfecciona mediante el acuerdo unánime de las tres (3) partes: cedente, cesionario y cedido. Díez-Picazo, *op. cit.*, págs. 1046-1047. Ello se debe a que el consentimiento del cedido no constituye un simple requisito de eficacia, sino un elemento esencial del contrato mismo ya que sin éste la cesión es nula. Íd., pág. 1046; Cristóbal-Montes, *op. cit.*, pág. 873. Ahora bien, de acuerdo con Luis Díez-Picazo el orden en que se produzcan dichos consentimientos es indiferente. Díez-Picazo, *op. cit.*, pág. 1047. El consentimiento del contratante cedido puede anticiparse, coincidir con los otros dos o darse con posterioridad, sin que ello altere su contenido ni su función. Íd. Cada modalidad, simplemente, da lugar a distintas formas de celebrar la cesión del contrato. Íd. No obstante, será de rigor que el cedido actúe con prontitud y exponga su posición sobre lo sucedido, pues "[c]allar equivale a consentir cuando el que calla puede y, en el modo corriente de proceder, debe hablar". Blasini v. Beech-Nut Life Savers, *supra*, págs. 579-580, voto concurrente del Juez Presidente Señor Trías Monge.

Cónsono con lo anterior, resulta meritorio señalar que el contratante cedido puede manifestar su consentimiento al negocio jurídico de forma expresa o tácita. Díez-Picazo, *op. cit.*, pág. 1047; García-Amigo, *op. cit.*, págs. 335-340. Véase, además, R. F. Realty Corp. v. J. Gus

Lallande, 87 DPR 351, 359 (1963).[15] En torno al consentimiento tácito, éste ocurre cuando el sujeto no declara directamente su voluntad mediante signos adecuados, sino que realiza una conducta que, al presuponer necesariamente dicha voluntad, es valorada por el ordenamiento jurídico como declaración. P.D.C.M. Assoc. v. Najul Bez, 174 DPR 716, 733 (2008).

**"El consentimiento tácito no es un concepto ajeno a nuestro ordenamiento"**. (Énfasis en el original). 0.Aponte Valentín *et al.* v. Pfizer Pharm., *supra*, pág. 286 (citando a Teachers Annuity v. Soc. de Gananciales, 115 DPR 277, 289 (1984)). A tono con lo anterior, este Tribunal ha reconocido que **"el elemento determinante del consentimiento tácito es la conducta de la persona y no las palabras que utilice para expresarlo"**. (Énfasis en el original). Aponte Valentín *et al.* v. Pfizer Pharm., *supra*, pág. 286 (citando a Teachers Annuity v. Soc. de Gananciales, *supra*, pág. 290). Por tanto, **"[l]os hechos deben revelar inequívocamente la voluntad de consentir"**. (Énfasis en el original). Aponte Valentín *et al.* v. Pfizer Pharm., *supra*, pág. 286.

A modo ilustrativo, en el contexto de la cesión de un contrato, puede entenderse que existe consentimiento tácito

---

**15** En R. F. Realty Corp. v. J. Gus Lallande, 87 DPR 351, 359 (1963), este Tribunal determinó que los actos realizados por una arrendataria equivalían a prestar su consentimiento para la prórroga de un contrato por un nuevo término igual al previamente pactado, rechazando el planteamiento de que, al no notificar su intención de prorrogar según lo exigía el contrato, se había convertido en arrendataria de mes a mes. Particularmente, señalamos que la arrendataria **"no p[odía] aprovecharse de su propio silencio"** y "[…] eludir su responsabilidad cuando la conducta de ést[a] evidencia que la continuación de su permanencia en el objeto arrendado responde al ejercicio de su derecho de opción". (Énfasis nuestro). Íd.

por el mero silencio del contratante cedido al momento de contratar, "si en el [ámbito] de actividad o de negocios en que ambas partes se desenvuelven, los usos generales determinan una sobrevenida autorización para llevar a cabo la cesión de contratos". Díez-Picazo, *op. cit.*, págs. 1047-1048. Pues, en la doctrina civilista puertorriqueña, **"[n]o habiendo demostrado la inexistencia de causa, la mediación de fraude o dolo o razón de orden público alguna para impugnar lo hecho", los actos de una parte equivalen a una renuncia de ese derecho y a un consentimiento de la cesión, pues "nadie puede ir contra sus propios actos".[16]** (Énfasis nuestro). Lausell Marxuach v. Díaz de Yáñez, 103 DPR 533, 537-538 (1975). En consecuencia, **"la conducta contradictoria no tiene lugar en el campo del Derecho, y debe ser impedida"**. (Énfasis nuestro). Aponte Valentín *et al.* v. Pfizer Pharm., *supra*, pág. 287 (citando a Alonso Piñero v. UNDARE, Inc., 199 DPR 32, 55 (2017)).

Por último, en cuanto a las formalidades del contrato de cesión cabe señalar que no existe ningún deber o carga específica en cuanto a la forma que ha de observarse para llevarse a cabo la cesión del contrato. Díez-Picazo, *op. cit.*, pág. 1053. Esto no releva de seguir aquellas formalidades requeridas en nuestro ordenamiento civil

---

**16** Cabe destacar que la doctrina de los actos propios se fundamenta en el principio general de derecho que exige a las partes contratantes obrar de buena fe en la vida jurídica. Aponte Valentín *et al.* v. Pfizer Pharm., 208 DPR 263, 287 (2021) (citando a Alonso Piñero v. UNDARE, Inc., 199 DPR 32, 55 (2017)). Su eficacia y fuerza vinculante descansan en la protección de la confianza legítima generada por la apariencia creada, lo cual, en última instancia, salvaguarda un interés social y promueve un ideal de justicia. Aponte Valentín *et al.* v. Pfizer Pharm., *supra*.

positivo dispuestas en el Art. 1245 del Código Civil de Puerto Rico, 31 LPRA sec. 9792, para la validez de ciertos negocios jurídicos.[17]

## C. El contrato de servicios profesionales

El contrato de servicios, particularmente el de servicios profesionales, está revestido de una importancia social y económica, pues constituye un pilar en el desarrollo productivo de empleo y la gestión de asuntos sociales. V. L. Montes Panadés, *Contratos de gestión*, Cuadernos de Derecho Judicial, 1995, Vol. 9, https://www.poderjudicial.es/search/publicaciones/ponencia/ 14679. Véase, además, L. Díez Picazo, *Fundamentos del derecho civil, Las particulares relaciones obligatorias*, ed. rev., Madrid, CIVITAS, 2010, T. IV, págs. 461-462. Se trata de un contrato común en el tráfico jurídico, a través del cual profesionales y técnicos —como médicos, abogados o arquitectos— pueden prestar sus servicios. J.A. Cuevas Segarra y A. Román García, *Los contratos especiales (Puerto Rico y España)*, San Juan, Publicaciones JTS, 1998, pág. 178.

A tenor con lo anterior, el contrato de servicios profesionales es un contrato oneroso mediante el cual "un

---

[17] De acuerdo con el Art. 1245 del Código Civil de Puerto Rico, 31 LPRA sec. 9792, los siguientes negocios jurídicos van a requerir para su otorgamiento que consten en un instrumento público o privado, para efectos probatorios: "(a) la creación, transmisión, modificación o extinción de derechos reales sobre inmuebles; (b) el arrendamiento de inmuebles por seis (6) años o más; (c) la cesión o renuncia de derechos hereditarios o de los de la sociedad conyugal; (d) el poder que debe presentarse en juicio, el poder para administrar bienes y los poderes que afecten los derechos de un tercero; (e) la cesión de derechos o acciones procedentes de un acto consignado en documento público".

profesional pone a disposición de [una] persona una actividad intelectual o técnica retribuida". Nassar Rizek v. Hernández, 123 DPR 360, 369 (1989). Asimismo, el Art. 1381 del Código Civil de Puerto Rico, 31 LPRA sec. 10291, lo delimita como aquel contrato donde "el prestador se obliga a proveer, **sin estar subordinado al comitente**, un servicio mediante el pago de un precio".[18] (Énfasis nuestro).

La persona que ofrece el servicio estará obligada a: (1) prestar los servicios según las cláusulas y condiciones del contrato conforme al conocimiento que exige la actividad constitutiva de los servicios; (2) notificar al comitente aquella información esencial sobre la ejecución del contrato; (3) aportar los materiales y herramientas necesarios en la prestación de los servicios, y (4) prestar los servicios dentro del tiempo convenido en el contrato o en el que razonablemente corresponda. Art. 1386 del Código Civil de Puerto Rico, 31 LPRA sec. 10312. Por su parte, el comitente deberá "pagar el precio de los servicios" y, a su vez, "proporcionar la colaboración necesaria para que los servicios puedan prestarse". Art. 1385 del Código Civil de Puerto Rico, 31 LPRA sec. 10311.

Como podemos observar, esta figura contractual se caracteriza principalmente **"por la forma autónoma e independiente en que el profesional, poseedor del título**

---

[18] Conviene señalar que, a diferencia del Código Civil derogado, el nuevo Art. 1381 del Código Civil de Puerto Rico, 31 LPRA sec. 10291, reconoce el contrato de servicios profesionales como una figura independiente y regulada separadamente del contrato de arrendamiento de obras.

**habilitante, la ejerce**".  <u>Nassar Rizek v. Hernández</u>, *supra*, pág. 369 (citando a M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Editorial Revista de Derecho Privado, 1986, T. XX, Vol. 2, pág. 27).  En tales casos, esta ausencia de subordinación configura, en principio, una relación propia de un contratista independiente y, en consecuencia, queda excluida toda relación de patrono y empleados.[19]  M. R. Garay Aubán, *Código Civil de 2020 y su historial legislativo, Obligaciones y contratos*, 2da ed. rev., San Juan, Ediciones Situm, 2021, T. 4, pág. 432. Véase, además, Art. 1381 del Código Civil de Puerto Rico, *supra*.

Como regla general, los servicios profesionales constituyen una prestación de hacer.  Art. 1077 del Código Civil de Puerto Rico, 31 LPRA sec. 9012.  No obstante, **no toda prestación de servicio reviste el carácter personalísimo**.  Al respecto, la doctrina civilista aclara que:

> **No es presumible que el contrato de servicios exista como principio un *intuitus personae***, de manera que solo en aquellos casos en que resulte de los pactos de las partes o de otras circunstancias, que la calidad y la preparación del prestador de los servicios se hayan tenido en cuenta, la obligación deberá ser cumplida personalmente por el obligado. En los demás casos, se admite con carácter general que el obligado pueda valerse de

---

[19]  Cabe señalar que, en nuestro ordenamiento laboral, un contratista independiente es quien "dada la naturaleza de su función y la forma en que presta servicios resulta ser su propio patrono". <u>Romero *et als.* v. Cabrer Roig *et als.*</u>, 191 DPR 643, 659 (2014) (citando a <u>Whittenburg v. Col. Ntra. Sra. del Carmen</u>, 182 DPR 937, 952 (2011)).  Por el contrario, un empleado es "aquella 'persona que rinde servicios a un patrono y a cambio recibe de éste un sueldo, salario, jornal, comisión, bono, adehala o cualquier otra forma de compensación'". <u>Íd.</u>, pág. 952.  Tal distinción trasciende el plano conceptual de ambas figuras, toda vez que su determinación conlleva efectos legales, económicos y contributivos. C. Zeno Santiago y V. M. Bermúdez Pérez, *Tratado de derecho del trabajo*, San Juan, Publicaciones JTS, 2003, T. 1, pág. 195.

> otras personas. También con carácter general no cabe la menor duda de que el obligado podrá valerse del auxilio de otros, que son, en rigor, auxiliares del cumplimiento. (Énfasis nuestro). Díez-Picazo, *op. cit.*, pág. 462.

Puede, sin embargo, el contrato de servicios profesionales adquirir dicho carácter cuando, "al constituirse la obligación de hacer se han tenido en cuenta la calidad y las circunstancias de la persona del deudor […]", según discutido previamente en el Art. 1079 del Código Civil de Puerto Rico, 31 LPRA sec. 9014. Ante tal escenario, no procede ordenar el cumplimiento específico en caso de incumplimiento, por tratarse de una obligación personalísima.[20] García v. World Wide Entmt Co., 132 DPR 378, 385 (1992). Véase, además, Cuevas Segarra y Román García, *op. cit.*, pág. 179. No obstante, **sí puede válidamente pactarse una cláusula de exclusividad que impida al profesional prestar servicios a terceros durante la vigencia del contrato profesional.** García v. World Wide Entmt Co., *supra*, págs. 385-386, 389; Cuevas Segarra y Román García, *op. cit.*, pág. 179.

D. **La cláusula de no competencia**

Según hemos resuelto, "[e]n Puerto Rico, como regla general, los acuerdos de no competencia son válidos con base en el principio de libertad de contratación".[21] Martin's BBQ

---

[20]  En García v. World Wide Entmt. Co., 132 DPR 378, 389 (1992), este Tribunal —sin mayor expresión— reconoció la validez de un acuerdo de exclusividad que impedía a un artista trabajar para terceras personas.

[21]  Cabe señalar que, en el 23 de abril de 2024, la Comisión Federal de Comercio (FTC, por sus siglas en inglés) promulgó una norma que prohibía definitivamente los acuerdos de no competencia

v. García De Gracia, 178 DPR 978, 990 (2010). Cónsono con ello, el Art. 1232 del Código Civil de Puerto Rico, *supra*, dispone, en lo pertinente, que "[l]as partes p[odrá]n acordar cualquier cláusula que no sea contraria a la ley, a la moral o al orden público". No obstante, "[l]a libertad de contratación privada no es irrestricta", por lo que los tribunales están facultados para intervenir cuando concurra alguna de las tres (3) salvedades principales reconocidas en dicho Artículo. Hernández v. Méndez & Assoc. Dev. Corp., 105 DPR 149, 153 (1976).

Las cláusulas de no competencia se incorporan en los contratos con el propósito de evitar que una de las partes se involucre en actividades que puedan derivar en una competencia desleal frente a la otra, protegiendo así intereses comerciales legítimos. Martin's BBQ v. García de Gracia, *supra*, pág. 994. En atención a ello, este Tribunal tuvo la oportunidad de pronunciarse sobre la validez de este tipo de cláusulas en nuestro ordenamiento jurídico en los casos normativos Arthur Young & Co. v. Vega III, 136 DPR 157, 175-176 (1994), Martin's BBQ v. García de Gracia, *supra*, pág. 999.[22]

---

entre patronos y trabajadores en todo Estados Unidos. No obstante, esta norma no prosperó y, al presente, las cláusulas de no competencia siguen siendo una forma legítima de proteger los intereses de un empleador contra la competencia desleal, según la ley federal. Véase, *The Non-Compete Agreement Landscape in 2025 | Frost Brown Todd*, https://frostbrowntodd.com/the-non-compete-agreement-landscape-in-2025/.

[22] Cabe señalar que, además, en el contexto de un contrato de compraventa de acciones, en Reyes Ramis v. Serra Torres *et al.*, 195 DPR 828, 829 (2016) (Sentencia), este Tribunal validó una cláusula de no competencia que contrató la CPA Liza Serra Torres donde ésta se obligó a

En <u>Arthur Young & Co. v. Vega III</u>, *supra*, nos expresamos por primera vez en torno a las cláusulas de no competencia en el contexto de una relación patrono-empleado. Allí, adoptamos la regla de razonabilidad, según aplicada por los tribunales estatales en los Estados Unidos, como el criterio rector para evaluar su validez. <u>Íd.</u>, *supra*, pág. 168. En consecuencia, reconocimos la legalidad de estas cláusulas **y resolvimos que una cláusula de no competencia será razonable cuando: (1) proteja un interés legítimo del patrono; (2) no imponga una carga excesiva al empleado, y (3) no perjudique al público en general.** <u>Íd.</u>, pág. 167. Asimismo, determinamos que, en el ámbito laboral, este tipo de restricción no debe exceder un término mayor de doce (12) meses. <u>Íd.</u>, pág. 175.

Particularmente, concluimos que un acuerdo de no competencia será razonable cuando, a la luz de las circunstancias particulares del caso, reúna los requisitos siguientes:

> Primero, **el patrono debe tener un interés legítimo en dicho acuerdo,** esto es, que de no recibir la protección de una cláusula de no competencia, su negocio se vería sustancialmente afectado. La magnitud de este interés se medirá, entre otras cosas, a la luz de la posición del empleado dentro de la empresa. Esto es, que la existencia del interés del patrono estará directamente relacionada y dependerá de que el empleado, por la posición que asume en la empresa, esté facultado para competir de forma efectiva con su patrono en un futuro.
>
> Segundo, **el alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término y lugar de restricción o clientes afectados.** El objeto de la prohibición se debe limitar a actividades similares a las efectuadas

---

no atender por un término de dieciséis (16) meses la clientela que desarrolló la corporación profesional Reyes Ramis CPA Group, PSC.

por el patrono; no es necesario que se limite a las funciones específicas del empleado. **El término de no competencia no debe excederse de doce (12) meses, entendiéndose que cualquier tiempo adicional es excesivo e innecesario para proteger adecuadamente al patrono.** Por último, respecto al alcance de la prohibición, el contrato debe especificar los límites geográficos o los clientes afectados.   En cuanto al área geográfica a la que aplica la restricción, ésta debe limitarse a la estrictamente necesaria para evitar la competencia real entre el patrono y el empleado. **Cuando la prohibición de competencia se refiere a los clientes, debe referirse sólo a aquellos que el empleado atendió personalmente durante un período razonable de tiempo antes de renunciar o en un período inmediatamente anterior a la renuncia, y que al hacerlo todavía eran clientes del patrono.** Estos elementos se evaluarán teniendo en mente la naturaleza de la industria involucrada y el posible interés público relacionado.

Tercero, el patrono debe ofrecer una contraprestación a cambio de la firma del acuerdo de no competir por parte del empleado. Esta contraprestación puede consistir, por ejemplo, en la obtención de un ascenso, de beneficios adicionales en el trabajo o del disfrute de cambios sustanciales de similar naturaleza en las condiciones de empleo. Incluso sería suficiente que un candidato obtenga el empleo deseado en la empresa. Sin embargo, no se admitirá como causa del acuerdo de no competencia la mera permanencia en el empleo.

Cuarto, los pactos de no competencia, como todo contrato, deben contar con los elementos esenciales para su validez: consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 LPRA sec. 3391. Sin embargo, en este tipo de contratos seremos especialmente estrictos al asegurarnos de que el empleado firmó libre y voluntariamente el contrato de no competencia. No permitiremos coacción o presión indebida alguna por parte del patrono. Nada se ha alegado en el caso de marras que nos permita inferir que hubo tal coacción o presión indebida. Esta consideración, sin embargo, es innecesaria a la luz de lo que resolvemos a continuación sobre la validez del contrato.

Finalmente, **es indispensable que los pactos de no competencia consten por escrito.** (Énfasis nuestro). <u>Íd.</u>, págs. 175-176.

Por lo que, cuando dichos acuerdos incumplan los criterios de razonabilidad previamente delineados, se considerarán contrarios a la buena fe contractual y violatorios al orden público, en la medida que restrinjan de forma excesiva e injustificada la libertad de empleo y la libertad de competencia en el mercado en general. Arthur Young & Co. v. Vega III, *supra*, pág. 177.

Posteriormente, en Martin's BBQ v. García de Gracia, *supra*, pág. 994, examinamos la validez de una cláusula de no competencia en el contexto de la venta de negocios mediante un contrato de franquicia. En aquel momento, destacamos que "la relación existente en un [c]ontrato de [f]ranquicia entre el franquiciante y franquiciado no es de patrono-empleado, sino entre empresarios", por lo que los intereses relevantes al evaluar la razonabilidad de la restricción difieren sustancialmente de un contexto laboral. Íd., pág. 996. En consecuencia, señalamos que, a diferencia de una relación patrono-empleado,[23] el examen de razonabilidad en este tipo de relación comercial debe aplicarse con mayor flexibilidad. Íd., págs. 995-996.

Así pues, tras analizar las particularidades de los contratos de franquicia, aceptamos la licitud de las cláusulas de no competencia en dicho contexto y extendimos la aplicación de la regla de razonabilidad, al adoptar el método

---

[23] En Martin's BBQ v. García De Gracia, 178 DPR 978, 995 (2010) señalamos que las cláusulas de no competencia en los contratos de empleo "aplica la regla de razonabilidad de forma más estricta al entender que el patrono tiene un mayor poder de negociación y en protección al derecho a trabajar del individuo".

de análisis de la regla *per se.*[24]    Íd., págs. 993, 997.
Sin embargo, contrario a la norma establecida para las
relaciones patrono-empleado, rehusamos imponer parámetros
rígidos para su validez y, por ejemplo, reconocimos que un
término de dos (2) años de prohibición de no competencia
resultaba razonable conforme a las circunstancias específicas
de ese caso.  Íd., pág. 1001.

De este modo, adoptamos un enfoque de reciprocidad en
cuanto a los límites territoriales y a las actividades
restringidas que colocaran al franquiciante en una desventaja
competitiva.  Íd., pág. 999.  Fuimos enfáticos en advertir
que el incumplimiento de estos criterios conllevaría la
nulidad del contrato y que no procedería la modificación
judicial de la voluntad de las partes para ajustarla a
parámetros razonables.  Íd., pág. 992.

Finalmente, en Martin's BBQ v. García de Gracia, *supra*,
pág. 990, reconocimos que las cláusulas de no competencia
suelen encontrarse comúnmente en los contratos de empleo,
venta de negocios y franquicias, **lo que evidencia que este
tipo de restricción también puede utilizarse en otras
modalidades contractuales**.  Así, la naturaleza del negocio
jurídico que da origen al acuerdo de no competencia constituye
un elemento determinante en el análisis de su validez y exige
que los tribunales evalúen cuidadosamente las circunstancias

---

[24]  La regla *per se* o de reciprocidad se refiere a un estándar de
escrutinio judicial en el derecho comercial que "[…] condena la
restricción comercial impugnada sin examinar su propósito o hacer un
extenso análisis de su efecto en el mercado y el daño a la competencia".
Íd., pág. 993, esc. 12.

fácticas que rodean tanto al contrato como a las partes. Íd., págs. 993-994. **En ese sentido, los criterios de razonabilidad deben atemperarse a las particularidades del negocio y a los intereses legítimos involucrados.** Íd.

Evaluado el alcance de las cláusulas de no competencia en el derecho contractual puertorriqueño, procedemos a examinar este tipo de restricción en el contexto de un contrato de servicios profesionales, particularmente cuando una de las partes actúa en calidad de contratista independiente.

**a. Las cláusulas de no competencia en los contratos de servicios profesionales de la salud**

Habiendo expuesto la doctrina general sobre las cláusulas de no competencia, corresponde ahora examinar su alcance y razonabilidad en un contexto distinto al de la venta de un negocio o al de una relación patrono-empleado tradicional. Así pues, por primera vez, este Tribunal analiza las cláusulas de no competencia en el ámbito de los contratos de servicios profesionales en el sector de la salud cuando una de las partes actúa como un contratista independiente.

Los contratos para la prestación de servicios profesionales incluyen con frecuencia cláusulas de no competencia con el objetivo de limitar o prohibir la competencia, tanto durante la vigencia del contrato como con posterioridad a ésta. García v. World Wide Entmt. Co., *supra*, pág. 389. Véase, además, F. J. Cavico, *Extraordinary or Specialized Training –As a Legitimate Business Interest– In Restrictive Covenant Employment Law: Florida and National Perspectives*, 14 St. Thomas L. REV. 53, 55 (2001).

Estas cláusulas se utilizan como mecanismo para proteger los intereses legítimos, tales como que el profesional no participe en el mismo tipo de negocio o actividad que su empleador durante un periodo determinado o dentro de un área geográfica determinada. Íd. No obstante, el análisis legislativo y jurisprudencial de estas cláusulas en este contexto ha sido limitado.

**En el sector de la salud, la mayoría de los tribunales estatales han sostenido que las cláusulas de no competencia aplicadas a profesionales médicos luego de concluida la relación contractual no son,** *per se*, **inválidas.**[25] Ohio Urology, Inc. v. Poll, 594 N.E.2d 1027, 1033 (Ohio Ct. App. 1991). Aunque algunas jurisdicciones han prohibido este tipo de acuerdos, muchos tribunales reconocen la naturaleza comercial de la práctica médica y consideran legítimo el interés del contratante en proteger su base de pacientes y las relaciones comerciales.[26]

---

[25] Pinnacle Healthcare, LLC v. Sheets, 17 N.E.3d 947, 956 (Ind. Ct. App. 2014); St. Clair Med., P.C. v. Borgiel, 715 N.W.2d 914, 921 (Mich. Ct. App. 2006) (La Corte de Apelaciones de Michigan concluyó que los principios de la Asociación Médica Estadounidense (A.M.A., por sus siglas en inglés) -según los cuales los pactos restrictivos que limitan el ejercicio de la medicina pueden resultar contrarios a la ética profesional— no hacen otra cosa que reflejar el criterio de razonabilidad del derecho consuetudinario. El tribunal aclaró que dichos pactos solo se consideran poco éticos cuando su duración o su alcance geográfico resultan excesivos); The Cmty. Hosp. Grp., Inc. v. More, 869 A.2d 884, 896 (N.J. S. Ct. 2005); Ohio Urology, Inc. v. Poll, 594 N.E.2d 1027, 1033 (Ohio Ct. App. 1991) ("[…] the trial court erred in holding that all noncompetition covenants between physicians are, *per se,* unenforceable on account of medical ethics.") Véase, además, D. W. Loeser, *The Legal, Ethical, and Practical Implications of Noncompetition Clauses: What Physicians Should Know Before They Sign*, 31 J.L. Med. & Ethics 283, 287-288 (2003).

[26] Algunos tribunales han reconocido que **el sector de la salud opera, en múltiples aspectos, dentro de la lógica de la libre empresa, lo que justifica un grado razonable de protección frente a conductas que pueden desviar clientela o afecta la estabilidad económica del servicio prestado.**

Cónsono con lo anterior, los tribunales han reconocido que un empleador en el sector médico posee un interés comercial legítimo que justifica adoptar acuerdos de no competencia **cuando el profesional saliente ha tenido acceso directo a pacientes, ha recibido capacitación especializada o ha manejado información confidencial, incluidas las listas de pacientes**. Idbeis v. Wichita Surgical Specialists, P.A., 112 P.3d 81, 89 (Kan. S. Ct. 2005); Karlin v. Weinberg, 390 A.2d 1161, 1166 (N.J. S. Ct. 1978).

Asimismo, se han reconocido como intereses legítimos: la estabilidad de la clientela institucional; la prevención de la desintermediación,[27] la protección de secretos comerciales; **el fondo de comercio o *goodwill*,**[28] la reputación del negocio;

---

Raymundo v. Hammond Clinic Ass'n, 449 N.E.2d 276, 284 (Ind. S. Ct. 1983) ("Although we like to think of such institutions as altruistic and benevolent health care providers, realistically we must recognize that they are also business ventures operating in the free enterprise system.") Véase, además, Karlin v. Weinberg, 390 A.2d 1161, 1166 (N.J. S. Ct. 1978) (Allí, la Corte Suprema de New Jersey, al evaluar los criterios de razonabilidad, determinó que estos pactos no son intrínsecamente irrazonables y sostuvo que, **al igual que cualquier empresa, el empleador tenía un interés legítimo en impedir que el trabajador saliente captara a sus pacientes y en preservar la relación establecida con ellos**).

[27] Por ejemplo, Columbus Med. Servs., LLC v. Thomas, 308 S.W.3d 368, 390 (Tenn. Ct. App. 2009), el Tribunal de Apelaciones de Tennessee reconoció que, aunque la cláusula de no competencia no era exigible por consideraciones de orden público en sus circunstancias particulares, la empresa sí poseía un interés comercial legítimo digno de protección: la desintermediación. El caso ilustra que, en contextos donde un proveedor de servicios invierte recursos en personal, licitaciones y cumplimiento contractual, existe un interés real en evitar la desintermediación que erosiona el valor de la empresa. Íd.

[28] Cabe destacar que el *goodwill* que las empresas desarrollan frente a su clientela suele originarse en el contexto de diversos acuerdos de no competencia, como ocurre en la venta de un negocio. Martin's BBQ v. García de Gracia, *supra*, pág. 996, esc. 21. Sin embargo, con mayor frecuencia se reconoce como un interés protegible en los pactos de no competencia aplicables a empleados. Un ejemplo ilustrativo es St. Clair Med., P.C. v. Borgiel, *supra*, pág. 920, donde el Tribunal de Apelaciones de Michigan concluyó que una cláusula de no competencia que impedía a un médico ejercer dentro de un radio de siete millas de cualquier consultorio de su antiguo empleador durante un año posterior a la terminación de su relación laboral, no era irrazonable respecto de los intereses comerciales

y la continuidad de los contratos con los clientes y fuentes de referencia. Íd.; St. Clair Med., P.C. v. Borgiel, 715 N.W.2d 914, 919 (Mich. Ct. App. 2006); The Cmty. Hosp. Grp., Inc. v. More, 869 A.2d 884, 897 (N.J. S. Ct. 2005). Véase, además, Karlin v. Weinberg, *supra*, págs. 1165-1166.

Estos intereses empresariales justifican, en principio, la adopción de pactos restrictivos, **particularmente cuando el profesional mantiene contacto directo con los pacientes o accede a información sensible del negocio.** Íd. No obstante, dicho interés debe equilibrarse con el interés público en preservar el acceso a servicios esenciales y proteger la relación de confianza que surge entre el proveedor de la salud y el paciente. Íd.; Barker v. Starkey, 144 N.W.2d 889, 897-898 (Iowa S. Ct. 1966). Ello se debe a que las cláusulas de no competencia en el sector de la salud implican cuestiones de política pública que no suelen presentarse en el contexto comercial ordinario. Intermountain Eye & Laser Centers, P.L.L.C. v. Miller, 127 P.3d 121, 131 (Idaho S. Ct. 2005).

Por tales razones, algunos tribunales se han rehusado a hacer cumplir acuerdos restrictivos cuando su aplicación puede poner en riesgo a una comunidad o a un grupo particular

---

del empleador. El tribunal razonó que la disposición protegía un interés legítimo: preservar el *goodwill* de la empresa frente a sus pacientes. Íd. En particular, señaló que **un médico que establece vínculos con pacientes gracias al prestigio de la práctica de su empleador podría aprovechar indebidamente ese reconocimiento y, al dejar la organización, incurrir en competencia desleal.** Íd.

de ciudadanos.[29] En ese análisis se han considerado factores como la escasez de especialistas en el área restringida, el riesgo de establecer un monopolio, la disponibilidad de un profesional para atender emergencias y el interés público de preservar la libertad de selección del proveedor médico. Aesthetic Facial & Ocular Plastic Surgery Ctr., P.A. v. Zaldivar, 826 S.E.2d 723, 727 (N.C. Ct. App. 2019); Emerick v. Cardiac Study Ctr., Inc., P.S., 286 P.3d 689, 694 (Wash. Ct. App. 2012).

Empero, se ha reconocido que el público no posee un derecho absoluto a recibir servicios de un proveedor de salud específico cuando existen otros disponibles.[30] Por lo que, cada cláusula debe evaluarse caso a caso, y corresponde al

---

[29] Por ejemplo, cuando el pacto de no competencia de captación de clientes impida a un profesional de la salud ejercer una especialidad y ponga en riesgo un grupo de ciudadanos. Aesthetic Facial & Ocular Plastic Surgery Ctr., P.A. v. Zaldivar, 826 S.E.2d 723, 728 (N.C. Ct. App. 2019) (Luego de analizar la razonabilidad del pacto de no competencia en el contexto de una relación laboral, el Tribunal de Apelaciones concluyó que restringir la capacidad del profesional de la salud para ejercer en las zonas más pobladas de Carolina del Norte, cuando hay muy pocos cirujanos oculoplásticos y aún menos que realicen algunos de los procedimientos especializados para los que está capacitado, planteaba una cuestión sustancial de posible daño a la salud pública. Íd., pág. 730. Ahora bien, aclaró que, **en el caso de que los servicios de atención médica estén fácilmente disponibles en el territorio restringido, un pacto que impida a un profesional médico prestar dicha atención podría no infringir el orden público)**. Íd., pág. 728.

[30] A modo de ilustración, en Cogley Clinic v. Martini, 112 N.W.2d 678, 682 (Iowa S. Ct. 1962), al hacer cumplir la cláusula de no competencia contra el médico y exsocio, la Corte Suprema de Iowa señaló que no se había demostrado que los derechos del público estuvieran en peligro, ya que el público no tenía un derecho adquirido a los servicios del profesional, además de que habían más de 60 médicos en el área, incluidos médicos que ejercían la especialidad de éste. Véase, además, Gelder Med. Grp. v. Webber, 363 N.E.2d 573, 577 (N.Y. Ct. App. 1977); Rash v. Toccoa Clinic Med. Assocs., 320 S.E.2d 170, 173-174 (Ga. Ct. App. 1984)(La Corte Suprema de Georgia, razonó que no existían fundamentos para concluir que las necesidades obstétricas y ginecológicas de las personas ubicadas dentro de un radio de 25 millas fueran mayores que las de otras regiones del estado de Georgia u otros estados, ni que la necesidad de recibir los servicios del profesional médico fueran suficientes para no hacer valer la libertad de contratación y hacer cumplir los derechos y obligaciones pactados).

tribunal sopesar estas preocupaciones frente al derecho del empleador a proteger su negocio. <u>Emerick v. Cardiac Study Ctr., Inc., P.S.</u>, *supra*.

**b. Las cláusulas de no competencia cuando una de las partes actúa como contratista independiente**

Ahora bien, cuando la relación jurídica entre las partes no es de naturaleza laboral, sino contractual mediante la cual una de las partes actúa como contratista independiente, el análisis de razonabilidad deberá adaptarse a las circunstancias particulares de la relación. Veamos.

Actualmente, una porción significativa de la fuerza laboral está compuesta por contratistas independientes, muchos de los cuales suscriben cláusulas de no competencia que limitan su participación en determinados mercados. M. J. Sandor, *Independent Contractors & Noncompetition Covenants: A Modified Approach*, 91 Fordham L. Rev. 2029, 2030-2031 (2023). Este tipo de relaciones contractuales no tradicionales se ha extendido a múltiples sectores económicos, particularmente en industrias basadas en la prestación de servicios tales como la educación, **la salud** y las ventas. <u>Íd.</u>, pág. 2036.

En Estados Unidos, la mayoría de las jurisdicciones permite la inclusión de cláusulas de no competencia en contratos con contratistas independientes, sujetos a limitaciones similares -aunque no idénticas- a las que se

aplican a los empleados.**31** <u>Ag Spectrum Co. v. Elder</u>, 865 F.3d 1088, 1093 (8th Cir. 2017). No obstante, algunos tribunales han adoptado un análisis de razonabilidad modificado, al reconocer la mayor autonomía de los contratistas independientes y la naturaleza comercial distinta de este tipo de relación contractual.**32**

Ello corresponde a que, en este contexto, el interés legítimo de la parte contratante de restringir la actividad económica del contratista independiente suele ser más limitado, pues se circunscribe principalmente a actividades que compitan de forma directa con el negocio objeto del contrato. <u>Ag Spectrum Co. v. Elder</u>, 865 F.3d 1088, 1093 (8th Cir. 2017); <u>EDIX Media Grp., Inc. v. Mahani</u>, No. CIV.A. 2186-N, 2006 WL 3742595, Slip op. at 8 (Del. Ch. Dec. 12, 2006).

En línea con lo anterior, este Tribunal ha reconocido que la relación con un contratista independiente es tradicionalmente menos íntima que la que existe en una

---

**31** Véase, además, <u>Bristol Window and Door, Inc. v. Hoogenstyn</u>, 650 N.W.2d 670, 680 (Mich. Ct. App. 2002) (La Corte de Apelaciones de Michigan autorizó la ejecución de un acuerdo de no competencia contra un contratista independiente conforme a la ley de Michigan y ordenó que el tribunal inferior lo evaluara a la luz de la regla de la razón); <u>Quaker City Engine Rebuilders, Inc. v. Toscano</u>, 535 A.2d 1083, 1087 (Pa. Super. 1987) (La Corte Superior de Pensilvania determinó que la norma que autoriza las cláusulas restrictivas, tradicionalmente aplicadas entre patrono y empleado, puede extenderse a un acuerdo suscrito entre un principal y un contratista independiente, según la ley aplicable de Pensilvania, por ser lo suficientemente análogo a un contrato laboral).

**32** Por ejemplo, si bien <u>Ag Spectrum Co. v. Elder</u>, 865 F.3d 1088, 1093 (8th Cir. 2017) apoya la conclusión de que los acuerdos de no competencia que vinculan a contratistas independientes deben considerarse con mayor escepticismo, también respalda la conclusión de que los tribunales deben seguir utilizando la prueba tradicional de razonabilidad para analizar dichos acuerdos. Por tanto, el análisis va a variar según las circunstancias específicas del caso y un análisis exhaustivo de los hechos. <u>Íd.</u>

relación patrono-empleado.  Romero *et als.* v. Cabrer Roig *et als.*, 191 DPR 643, 659 (2014).  Asimismo, a diferencia de un empleado tradicional, el contratista independiente suele ejercer mayor control sobre la forma en que presta sus servicios; se dedica a una profesión especializada y, por lo general, opera con menor supervisión.  Íd., pág. 660; S.L.G. Hernández-Beltrán v. TOLIC, 151 DPR 754, 768 (2000). Véase, además, C. Zeno Santiago y V. M. Bermúdez Pérez, *Tratado de derecho del trabajo*, San Juan, Publicaciones JTS, 2003, T. 1, págs. 200-201; K. H. Decker, *Covenants not to complete*, New Jersey, Wiley Law Publications, 1993, V. 1, págs. 14-15.  Además, los contratistas independientes pueden no obtener los mismos beneficios de las leyes laborales que los empleados.  Romero *et als.* v. Cabrer Roig *et als.*, *supra*, pág. 660; Whittenburg v. Col. Ntra. Sra. del Carmen, 182 DPR 937, 952-953 (2011); S.L.G. Hernández-Beltrán v. TOLIC, *supra*, pág. 768.  Véase, además, Art. 2.3 de la Ley Núm. 4-2017, conocida como Ley de Transformación y Flexibilidad Laboral (Ley Núm. 4), según enmendada, 29 LPRA sec. 122b.

Asimismo, quien contrata a un contratista independiente no responde ordinariamente por los actos u omisiones causados por éste a terceros.  López v. Gobierno Mun. de Cataño, 131 DPR 694, 706 (1992).  A ello se le suma que el contratista independiente suele contar con activos propios, por lo que resulta razonable inferir que tiene mayor poder de negociación, lo cual reduce la necesidad de una protección

jurídica equivalente a la que se brinda al trabajador asalariado. Art. 2.3 de la Ley Núm. 4, *supra*. Véase, además, Sandor, *supra*, págs. 2049-2050.

En este contexto, los tribunales estatales han identificado como factores guía para evaluar la razonabilidad de estas cláusulas: (1) la cercanía del contratista con los clientes; (2) el conocimiento especializado adquirido que facilite la captación o influencia sobre los clientes; (3) la naturaleza y el alcance de la capacitación proporcionada por el contratante; y (4) los principios generales de equidad. Ag Spectrum Co. v. Elder, 865 F.3d 1088, 1091 (8th Cir. 2017). En última instancia, el objetivo será evitar el enriquecimiento injusto a expensas del antiguo comitente. Íd.

### III

MCG sostiene que la cesión del contrato —y, por ende, la cláusula de no competencia— es válida conforme a los principios de buena fe y libertad de contratación en Puerto Rico. Alega que, contrario a lo resuelto por el foro apelativo intermedio, dicha cláusula constaba por escrito y, en ausencia de alguna de las excepciones establecidas en la ley, como norma general, todo derecho y obligación es susceptible de cesión.

Asimismo, enfatizó que la relación entre las partes era una de contratista independiente, y que la cláusula de no competencia resultaba razonable y necesaria para proteger el interés legítimo del contratante de evitar que la profesional se aprovechara de información confidencial, destrezas

adquiridas y relaciones con clientes existentes para desviar a los mismos estudiantes a una entidad distinta, luego de haberlos atendido bajo la estructura contractual de la peticionaria.[33]

Finalmente, argumenta que el Tribunal de Apelaciones erró al no realizar el análisis de razonabilidad exigido por la jurisprudencia, toda vez que, conforme al expediente, la restricción de un (1) año no afectaba adversamente la continuidad de los servicios psicológicos, debido a que la empresa contaba con capacidad operativa y económica suficiente para contratar nuevos especialistas. Por ello, sostiene que los foros recurridos debieron aceptar como ciertas las alegaciones de la demanda y evaluar la validez de la cláusula conforme a los criterios establecidos por nuestro ordenamiento jurídico.

En oposición a la solicitud presentada por la peticionaria, los recurridos plantearon diversos argumentos impugnando la validez de la cesión de contrato y la exigibilidad de la cláusula restrictiva en el Contrato de Servicios Profesionales. En su escrito, señalan que no se perfeccionó una cesión de contrato ya que la peticionaria no formó parte del acuerdo original con The Able Child. Asimismo, exponen que MCG incumplió con las formalidades requeridas para las cláusulas de no competencia. Además, plantean que la cesión no era válida debido a que The Able Child no podía ceder el contrato de servicios

---

[33] Véase *Alegato de la peticionaria*, pág. 20.

otorgado con el Departamento de Educación, sin su consentimiento previo.

Las reclamaciones de MCG parten, como cuestión de umbral, de la existencia de un contrato válido y vinculante entre ésta y la señora Maestre Rivera. Por ello, resulta imprescindible examinar, en primer término, la validez y eficacia de la alegada cesión del contrato, pues solo al confirmarse la existencia de una relación contractual entre las partes procede evaluar la exigibilidad de la cláusula restrictiva. **Adelantamos que, luego de examinar los planteamientos de las partes y el expediente ante nuestra consideración, a la peticionaria le asiste la razón.** Pasemos, pues a resolver la controversia ante nuestra consideración.

Según expuesto en la discusión del derecho aplicable, aunque el Código Civil de Puerto Rico no regula expresamente la cesión de contrato, esta figura forma parte del derecho positivo puertorriqueño y ha sido aceptada en virtud del principio de libertad de contratación. Como norma general, la cesión de contratos en Puerto Rico requiere: la existencia de un contrato válido transmisible; que los derechos y obligaciones no sean personalísimos; la inexistencia de una prohibición legal o contractual que impida la cesión, y el consentimiento expreso o tácito de la parte cedida.

Así pues, una vez perfeccionada la cesión, y salvo pacto en contrario, el cedente queda liberado frente a la parte cedida y el cesionario se subroga plenamente en la posición

contractual de aquel, asumiendo los derechos y las obligaciones derivadas del contrato. **Ello implica que el cesionario adquiere la condición de parte contratante, convirtiéndose en titular tanto de los créditos como de las obligaciones que emanan del contrato cedido y que se encuentran pendientes de cumplimiento al momento de la cesión.** En consecuencia, la parte cedida queda vinculada frente al cesionario en los mismos términos originalmente pactados.

Tras un examen de las alegaciones de la *Demanda Enmendada*, resolvemos que en el presente caso **concurren todos los elementos necesarios para determinar que la cesión de contrato fue válida, eficaz y vinculante para la señora Maestre Rivera.**

Corresponde ahora evaluar si el contrato en controversia contenía alguna disposición que, por voluntad de las partes o mandato legal, restringiera o prohibiera la cesión de los servicios profesionales objeto del acuerdo. Luego de un análisis exhaustivo del Contrato de Servicios Profesionales, no surge del mismo la existencia de alguna excepción legal ni contractual que limite la transmisibilidad de los derechos y obligaciones contractuales. En particular, el contrato no contenía disposición alguna que prohibiera la cesión, ni consta que las partes hubieran pactado una obligación de carácter personalísimo, cuya ejecución dependiera exclusivamente de las cualidades únicas y personales de la señora Maestre Rivera. Por el contrario, el objeto del

contrato (la prestación de servicios profesionales a través de una entidad intermediaria) era plenamente transmisible. Así, en ausencia de una prohibición expresa y tratándose de obligaciones contractuales transferibles, nada impedía que dichos servicios fueran válidamente continuados por una entidad cesionaria.

Corresponde también evaluar si los actos de la señora Maestre Rivera equivalen a consentir a la cesión y continuación del contrato original, conforme a sus términos y condiciones.

Según hemos expuesto, conforme a los principios generales de la teoría contractual en Puerto Rico, la transmisión de los derechos y las obligaciones puede perfeccionarse de forma tácita. En el presente caso, no está en controversia que la señora Maestre Rivera fue notificada de la cesión en septiembre de 2022, esto es, antes de que la misma comenzara a producir efectos operativos.[34] No obstante, pese a dicha notificación, la señora Maestre Rivera no manifestó objeción alguna, no reclamó derecho a rescindir el contrato, ni advirtió al nuevo cesionario que entendía que el antiguo contrato se había extinguido. En cambio, **guardó silencio y continuó prestando sus servicios conforme a los términos en el contrato, facturando y recibiendo pagos por parte de la cesionaria por un periodo superior a seis (6) meses.**

No fue sino hasta transcurrido dicho término que la señora Maestre Rivera impugnó, **por primera vez**, la validez del

---

[34] *Declaración Jurada*, Apéndice del *certiorari*, pág. 114.

Contrato de Servicios Profesionales y, en su consecuencia, la cláusula accesoria de no competencia. Ciertamente, la señora Maestre Rivera fue debidamente informada y su conducta posterior equivale jurídicamente a un consentimiento tácito, tanto a la cesión del contrato como a la continuidad de la relación con la nueva entidad contratante. De hecho, su actuación constituyó una declaración implícita de voluntad, con el efecto de perfeccionar la cesión contractual.

Si bien se alega la existencia de ciertos acuerdos verbales posteriores, el fundamento jurídico que sostiene la validez de la cesión impugnada descansa en el contrato original suscrito entre The Able Child y la señora Maestre Rivera. La cláusula de no competencia constituye una disposición integral e inseparable de dicho Contrato de Servicios Profesionales. Por consiguiente, al efectuarse la cesión del contrato, también se transmitieron las obligaciones accesorias y restrictivas allí contenidas, incluyendo la cláusula de no competencia con toda su fuerza, alcance y eficacia jurídica.

Finalmente, la señora Maestre Rivera plantea –**por primera vez en esta etapa procesal**– que el consentimiento previo del Departamento de Educación era un requisito indispensable para la cesión del *Contrato de Servicios Profesionales*, Contrato Núm. 2022-EE0059 (Contrato de Servicios Profesionales Núm. EE0059), suscrito por The Able Child para ofrecer servicios de evaluación e intervención a la población

atendida por dicha agencia. Sostiene, además, que dicho contrato contenía una cláusula de *Indelegabilidad* mediante la cual se disponía que The Able Child no podía ceder el Contrato de Servicios Profesionales Núm. EE-2022-0059 a MCG sin el consentimiento previo y por escrito de la agencia. A base de ello, argumenta que, ante la ausencia de evidencia que demuestre el consentimiento previo y expreso del Departamento de Educación para efectuar cesión alguna, resulta forzoso concluir que la cesión aquí controvertida es ilícita. No le asiste la razón.

De entrada y en cuanto a este último planteamiento, es preciso señalar que del expediente ante nos no surge que dicho asunto haya sido objeto de controversia ante el foro primario ni que fuera planteado por los recurridos en su escrito en oposición ante el Tribunal de Apelaciones. Consecuentemente, "es norma reiterada que nos encontramos impedidos de evaluar los méritos de tal asunto, ya que no fue planteado por la parte, ni considerado anteriormente por un tribunal inferior". Consejo de Titulares v. Triple-S, 2025 TSPR 82, 216 DPR ___, (2025) (citando a Sánchez Ruíz v. Higueras Pérez *et al.*, 203 DPR 982, 993 (2020)). **Además, cabe señalar que el Contrato de Servicios Profesionales Núm. 2022-EE0059 suscrito entre el Departamento de Educación y The Able Child no fue objeto de cesión alguna**, sino que culminó conforme a su término natural en junio de 2022,

de acuerdo con sus propias disposiciones contractuales.**35**
Asimismo, dicha cláusula de *Indelegabilidad* no vincula a la
contratista independiente, así como tampoco restringe la
cesión del contrato de servicios de intermediación de
The Able Child a favor de MCG.**36**

De este modo, resolvemos que la cesión quedó válidamente
perfeccionada mediante el consentimiento tácito de la señora

---

**35** *Contrato de Servicios Profesionales* 2023-EE0059, Apéndice del
*certiorari*, pág. 137.

Conviene destacar la siguiente secuencia cronológica para aclarar lo
anterior. Conforme surge en el expediente, el 14 de diciembre de 2021 el
**Departamento de Educación y The Able Child suscribieron el Contrato de
Servicios Profesionales Núm. 2022-EE0059,** el cual entró en vigor el 3 de
enero de 2022 y **tenía vigencia hasta el 30 de junio de 2022.** Íd.

**Previo a la culminación de dicha obligación contractual, el
26 de julio de 2022,** The Able Child y la señora Maestre Rivera **suscribieron
el Contrato de Servicios Profesionales aquí en controversia.** *Contrato de
servicios profesionales*, Apéndice del *certiorari*, pág. 120.
Posteriormente, **una vez vencida la obligación contractual entre The Able
Child y el Departamento de Educación,** conforme a las cláusulas contenidas
en el Contrato de Servicios Profesionales Núm. 2022-EE0059, MCG suscribió
con el Departamento de Educación un contrato distinto  con vida jurídica
propia, intitulado *Contrato de servicios profesionales*, Contrato
Núm. 2023-EE0010 (Contrato de Servicios Profesionales Núm. 2023-EE0010),
**con vigencia desde el 1 de septiembre de 2022 hasta el 30 de junio
de 2023.** *Contrato de servicios profesionales* 2023-EE0010, pág. 8.
Así pues, conforme surge de las alegaciones en la *Demanda Enmendada*,
la transición del personal y especialistas de The Able Child a favor de
MCG ocurrió **el 1 de octubre de 2022.** *Demanda enmendada,* Apéndice del
*certiorari*, pág. 200.

Como puede observarse, en este caso el Contrato de Servicios
Núm. 2022-EE0059 entre el Departamento de Educación y The Able Child no
fue transferido, enmendado ni novado a favor de MCG, simplemente **alcanzó
el término de su vigencia.** Posteriormente, y como entidad jurídica
distinta en el ejercicio de su autonomía contractual, MCG suscribió un
nuevo Contrato de Servicios Profesionales Núm. 2023-EE0010 con el
Departamento de Educación, distinto del previamente otorgado entre dicha
agencia y The Able Child.  Es decir, se trata de un contrato nuevo y
autónomo que no responde a enmienda, cesión o novación alguna.  Por ende,
no procede sostener que era necesario notificar o requerir autorización
de la agencia respecto a la cesión del contrato de servicio en
controversia, pues, además de que el contrato original ya había expirado,
sus disposiciones no restringían la cesión del Contrato de Servicios
Profesionales aquí impugnado.

**36** Cabe señalar que el contrato de Servicios Profesionales
Núm. 2022-EE0059, suscrito entre el Departamento de Educación y
The Able Child, y el Contrato de Servicios Profesionales aquí en
controversia **constituyen dos (2) negocios jurídicos distintos,
independientes entre sí y con cláusulas y condiciones propias, cada uno
vinculante únicamente a las partes que lo suscribieron.**

Maestre Rivera, quedando ésta vinculada al contrato cedido **en los mismos términos y condiciones originalmente pactados, incluyendo las cláusulas accesorias y restrictivas que formaban parte del acuerdo original**. Como hemos resuelto, la cesión válida de un contrato transmite al cesionario **<u>la totalidad</u> de los derechos y obligaciones que emanan del acuerdo original, incluyendo las cláusulas accesorias restrictivas que forman parte integral del negocio jurídico**.

En virtud de lo anterior, el foro apelativo intermedio erró al concluir que, como requisito adicional a la cesión, era necesaria una ratificación expresa de la cláusula de no competencia como condición para su exigibilidad. Tal conclusión no encuentra apoyo en nuestro ordenamiento jurídico y resulta incompatible con los principios que rigen la cesión de contratos y el consentimiento tácito en Puerto Rico.

Ahora, corresponde determinar en qué medida y de qué manera es exigible el pacto de no competencia en controversia. Solo entonces el tribunal recurrido estará en mejor posición de evaluar la procedencia de la *Moción de Desestimación* interpuesta por los recurridos.

Según expuesto, la ejecución de los contratos con cláusulas de no competencia requiere un análisis cuidadoso y no meramente mecánico. Al considerar dichos acuerdos, los tribunales deberán sopesar cuidadosamente todos los hechos y resolver cada caso según sus circunstancias particulares, considerando la naturaleza de la industria y el

posible interés público.  Arthur Young & Co. v. Vega III, *supra*, pág. 176.

En el ámbito de los contratos de servicios profesionales, cuando una de las partes actúa como contratista independiente, la aplicación del estándar de razonabilidad conserva su vigencia.  Sin embargo, la validez de la cláusula debe analizarse conforme a la relación jurídica particular, distinta del contexto patrono-empleado, ajustado a los hechos particulares de la relación contractual.  A diferencia de una relación laboral tradicional -donde la ley procura evitar la desigualdad de poder- el contratista independiente suele contar con mayor autonomía y capacidad de negociación.  Por ello, el orden público involucrado en ambos escenarios es distinto.

Para ello, **los tribunales deben determinar <u>primero</u> si el interés del contratante es legítimo, para luego evaluar si las prohibiciones impuestas se limitan a proteger tal interés**, o si, por el contrario, exceden la necesidad de protección del patrono y afectan el interés público y el derecho de trabajo de la parte contratante.  Tal determinación de legitimidad es imprescindible, pues constituye el punto de partida para el análisis de razonabilidad de este tipo de acuerdo.  En otras palabras, sólo si el interés es legítimo y dirigido a evitar un perjuicio sustancial, **procede entonces evaluar si las limitaciones -como el alcance geográfico,**

**la clientela restringida o la duración- son proporcionales a dicho interés perseguido.[37]**

Aclarado lo anterior, corresponde analizar si la cláusula de no competencia suscrita en el Contrato de Servicios Profesionales en controversia es razonable a la luz de los criterios expuestos.

Como cuestión de umbral, debemos determinar si MCG ostenta un interés comercial legítimo susceptible de protección mediante el pacto de no competencia en cuestión.

De acuerdo con el derecho mencionado, para que proceda la protección mediante un pacto de no competencia, deben concurrir circunstancias especiales que excedan la competencia legítima y que, de no mediar la restricción pactada, colocaría a la parte contratante en una posición injusta frente al que presta los servicios. En consecuencia, la peticionaria debe demostrar la existencia de tales circunstancias especiales, más allá de evitar la competencia ordinaria, las cuales justifiquen la imposición de la cláusula de no competencia.

En el caso de autos, corresponde examinar la cláusula de no competencia objeto de controversia dentro del contexto particular en el que surge: un contrato de servicios profesionales prestado por un contratista independiente mediante un modelo de intermediación, en el cual el proveedor

---

**37** Cabe destacar que el Tribunal de Apelaciones pretirió el análisis de razonabilidad, particularmente, el interés legítimo del patrono en el acuerdo restrictivo con la señora Maestre Rivera, según lo exige nuestra jurisprudencia. Resulta imposible **analizar si las restricciones impuestas exceden la necesidad del contratante y contravienen el interés público si no se lleva a cabo dicho examen de razonabilidad.**

de servicios de salud no contrata directamente con la población servida, sino a través de una entidad que organiza, administra y canaliza la prestación de dichos servicios.

En este tipo de esquema contractual, la peticionaria, como entidad intermediaria, no solo se limita a fungir como un mero agente administrativo, sino que, además, asume responsabilidades significativas relacionadas con la captación de la población atendida, la estructuración del servicio especializado ofrecido, el cumplimiento con requisitos gubernamentales, la continuidad operacional del programa y la coordinación del personal especializado necesario para su ejecución. [38]

En este contexto, el contacto de la especialista con los beneficiarios del servicio ocurre como consecuencia directa de la relación contractual con MCG y no como resultado de una clientela propia o gestiones independientes de la señora Maestre Rivera. Además, dado a la naturaleza de los servicios psicológicos, dicha relación profesional genera una relación

---

[38] De forma ilustrativa, cabe señalar que, en el Contrato de Servicios Profesionales Núm. 2023-EE0010, suscrito entre el Departamento de Educación y MCG, la peticionaria asumió, entre otras, las siguientes obligaciones: administrar instrumentos de evaluación y revaluación requeridos para determinar la elegibilidad de la población servida; entregar informes conforme a la *Guía para la provisión de servicios relacionados*; prestar servicios de acuerdo con la política pública, normas y procedimientos del Departamento de Educación; cumplir con las normas y procedimientos aplicables al Programa de Educación Especial y las visitas de supervisión de la agencia; estar disponible para procesos de investigación y monitoreo federal y estatal realizados por el Departamento de Educación; mantener un proceso interno de monitoreo y auditoría para garantizar la calidad de los servicios ofrecidos; responsabilizarse de toda la matrícula activa correspondiente a los servicios relacionados provistos por la entidad, y preparar aquellos estudios, informes y documentos que sean necesarios y pertinentes para el adecuado desempeño de las funciones encomendadas bajo el contrato. *Contrato de servicios profesionales 2023-EE0010*, págs. 1-9.

continua, íntima y de confianza,[39] la cual coloca a la especialista en una posición privilegiada sobre la población servida, lo que puede traducirse en una ventaja injusta frente a la entidad que diseñó y estructuró el programa de servicios y, en consecuencia, fomentar una competencia desleal.[40]

Asimismo, el contrato con una agencia pública constituye un activo de alto valor comercial, fruto de una inversión significativa de tiempo, esfuerzo y del cumplimiento con numerosos requisitos reglamentarios y estándares de calidad, orientados a garantizar la continuidad de los servicios y la observancia de las normas gubernamentales. Alco Corp. v. Mun. de Toa Alta, 183 DPR 530, 537 (2011). La ejecución de

---

[39]  Derek W. Loeser, *The Legal, Ethical, and Practical Implications of Noncompetition Clauses: What Physicians Should Know Before They Sign*, 31 J.L. Med. & Ethics 283, 286 (2003).

[40]  Debemos señalar que la Sra. Gretchen Gotay (señora Gotay), Presidenta de MCG, declaró bajo juramento lo siguiente en relación con el Contrato de Servicios Profesionales y el propósito de su cláusula restrictiva:

> 5. Este contrato posee cláusulas sobre no competencia que son meritorias incluirlas en los contratos de servicios de [los] especialistas del Departamento de Educación por la naturaleza del servicio, la relación cercana que desarrollan los profesionales con los estudiantes que sirven y el interés legítimo de proteger el esfuerzo y negocio de las compañías que los contratan.

> 6. Por eso, el propósito básico de pactar este tipo de cláusulas como mecanismo de protección fue evitar que quienes estuvieran contratados para servir la matrícula de estudiantes de la Compañía, se aprovecharan de la información confidencial, destrezas aprendidas y los contactos o clientes existentes y adquiridos para despojar al contratante de su matrícula y servir a los mismos estudiantes que servían mientras estaban contratados con la Compañía.

> 7. Con la anterior intención, la [señora Maestre] estaba obligada a esperar un mínimo de un año a partir de la fecha de renuncia oficial a la Corporación, o de la notificación de determinación de no renovación, para poder atender a través de otra Corporación, de contrato directo con el Departamento de Educación, Remedio Provisional o de cualquier otra forma o medio que no sea a través de [] The Able Child, a los pacientes que atendía a través de la Corporación. […]. *Declaración Jurada*, Apéndice del *certiorari*, págs. 113-114.

este tipo de contratos depende en gran medida de contar con un equipo profesional que garantice la continuidad del servicio. A tales efectos, la peticionaria tiene un interés comercial legítimo de proteger la integridad de las relaciones desarrolladas bajo su estructura contractual y evitar la desviación de la matrícula atendida como resultado de la desintermediación.[41]

La cláusula de no competencia aquí impugnada no impide a la señora Maestre Rivera ejercer su profesión, ni le excluye del mercado de servicios profesionales psicológicos. Esto es así pues su alcance se limita a restringir, **por un periodo de tiempo definido**, la prestación de los servicios únicamente a la población que ella atendió a través de la peticionaria. No se le priva de atender a otras personas. Se protegen de ese modo los intereses comerciales legítimos de MCG y la práctica profesional de la señora Maestre Rivera.

Así pues, reconocido el interés de la peticionaria en la industria, procede analizar si MCG puede proteger tal interés comercial o si, en cambio, resulta ser excesivo de forma que afecta el interés público.

Al evaluar el interés público en este ámbito, es necesario señalar que, por la particularidad de la relación entre un psicólogo y su paciente —comparable a la que surge entre un

---

[41] No cabe duda de que la señora Maestre Rivera, como psicóloga en la compañía, gozaba de las ventajas anteriormente mencionadas. Tal como se resolvió en <u>Arthur Young & Co. v. Vega III</u>, *supra*, pág. 179, "[e]s razonable pensar que un cliente que ha confiado sus secretos a un profesional prefiera seguirlo cuando éste abandone a su patrono".

abogado y su cliente—,**42** el examen de razonabilidad en el sector de la salud exigirá considerar el interés público al acceso a los servicios esenciales. Esto implica que los tribunales deberán hacer un balance entre el interés comercial legítimo del contratante en proteger su inversión, su clientela y la estabilidad del servicio, y el interés público en garantizar el acceso a servicios esenciales sin restricciones arbitrarias.

Los profesionales de la salud en el área de la psicología, al igual que los contadores públicos y los abogados, ejercen una profesión que necesariamente exige que sus pacientes revelen información personal y confidencial en el transcurso de la relación profesional. Arthur Young & Co. v. Vega III, *supra*, pág. 180. Véase, además, Ortiz v. Meléndez, 164 DPR 16, 32-33 (2005). En consideración a esto, nuestro ordenamiento ha reconocido la importancia de fomentar esta relación íntima que se desarrolla al reconocer un privilegio en las Reglas de Evidencia de Puerto Rico (Reglas de Evidencia de 2009), por el cual "el o la paciente tendrá el privilegio de rehusar revelar, y de impedir que otra persona revele, una comunicación confidencial hecha para propósitos de diagnóstico o tratamiento de su condición mental o emocional […]". Regla 508 de las Reglas de Evidencia de 2009,

---

**42** Por ejemplo, algunas jurisdicciones y comentaristas argumentan el paralelismo entre la práctica de la medicina y la del derecho, señalando que en las relaciones abogado-cliente y médico-paciente cada una es consensual, altamente fiduciaria y peculiarmente dependiente de la confianza del paciente o cliente en el médico consultado o el abogado contratado. Intermountain Eye & Laser Centers, P.L.L.C. v. Miller, 127 P.3d 121, 131 (Idaho S. Ct. 2005).

32 LPRA Ap. VI, R.508. Asimismo, en cuanto a la profesión, hemos reconocido que el Estado tiene un interés legítimo en garantizar la presentación de servicios psicológicos adecuados a favor de la población estudiantil de Educación Especial. Art. 1.02 de la de la Ley Núm. 85-2018, conocida como Ley de reforma educativa de Puerto Rico, según enmendada, 3 LPRA sec. 9801a. Véase, además, Art. 9 de la Ley Núm. 163-2024, conocida como Ley para la protección, seguridad, integración, bienestar y desarrollo integral de las personas con los trastornos del espectro autista.

Con estos intereses en mente, pasemos a evaluar el alcance de la restricción impuesta en el contrato cedido a favor de MCG.

Si bien reconocemos la importancia del interés público en garantizar la libertad de selección del profesional médico y la relevancia del vínculo terapéutico que se desarrolla entre éste y la población servida, la cláusula restrictiva aquí impugnada no contraviene el interés público. Del expediente no se desprende que su aplicación haya limitado el acceso de la población de estudiantes a servicios esenciales ni que haya provocado escasez de profesionales en el área pertinente. Por el contrario, la continuidad del modelo contractual de la peticionaria como entidad intermediaria favorecía la prestación estable de los servicios terapéuticos, en beneficio tanto del interés público como de la entidad institucional que los recibe.

Asimismo, en el caso de autos, aunque la restricción impuesta no especificó una restricción geográfica, limita claramente el alcance de la actividad prohibida. Particularmente, la cláusula de no competencia restringe atender a los clientes servidos por la señora Maestre Rivera a través de MCG por el periodo de doce (12) meses. En cuanto a estos clientes, la señora Maestre Rivera se comprometió a no brindarles servicios similares a los prestados por la peticionaria, ya fuese por sí o a través de cualquier tipo de entidad. En caso de incumplimiento con esta obligación, la contratista acordó pagarle a MCG una indemnización por cada uno de los estudiantes con los que haya incumplido, equivalente al total de lo que la entidad hubiera facturado al Departamento de Educación, tomando en cuenta la modalidad, frecuencia y duración de cada uno.[43]

La limitación acordada por la señora Maestre Rivera en el Contrato de Servicios Profesionales no resulta excesiva frente al interés que se busca proteger. En efecto, el acuerdo de no competencia delimita con precisión la lista de clientes que la profesional no puede atender y se dirige exclusivamente a impedir que ésta preste servicios a la matrícula servida a través de la entidad, permitiéndole, no obstante, **continuar ejerciendo su profesión dentro del Departamento de Educación y atender otros clientes.**

---

[43] *Contrato de Servicios Profesionales*, Apéndice del *certiorari*, pág. 73.

Asimismo, surge del expediente que la señora Maestre Rivera, a cambio de esta restricción, negoció una contraprestación económica mayor, obteniendo una tarifa superior a la del resto de los psicólogos en la compañía.[44] En este contexto, la cláusula de no competencia respondió a un proceso de negociación entre partes en circunstancias equiparables. Por ello, y contrario a lo resuelto por el foro apelativo intermedio, la restricción es razonable y debe ser respetada según fue pactada.

A tales efectos, concluimos que, conforme al principio de libertad de contratación, la cláusula de no competencia impugnada es válida y satisface los criterios de razonabilidad establecidos por nuestra jurisprudencia. Ello es así porque protege intereses comerciales legítimos, no impone una carga desproporcionada a la contratista independiente y no contraviene el orden público. Por ende, nada impide que la cláusula sea plenamente exigible conforme a derecho. En consecuencia, la peticionaria cuenta con una causa de acción válida por incumplimiento de contrato con una cláusula de no competencia, por lo que la desestimación de su reclamación no procedía.

**IV.**

Finalmente, ante las expresiones contenidas en las opiniones disidentes de algunos miembros de este Tribunal, entendemos necesario destacar y enfatizar ciertos señalamientos adicionales.

---

[44] *Declaración Jurada*, Apéndice del *certiorari*, pág. 114.

En esencia, **la controversia planteada ante nos, según hemos indicado previamente, gira en torno a la validez de la cesión de un contrato <u>entre dos (2) partes privadas</u>, a saber: The Able Child y MCG, así como la exigibilidad de una cláusula de no competencia contenida en dicho acuerdo, la cual fue pactada libre y voluntariamente por una contratista independiente.** Nada más y nada menos. Ante ello, luego de un análisis ponderado de la norma y la jurisprudencia aplicable, una mayoría de este Tribunal resuelve en la afirmativa y precisa los fundamentos jurídicos necesarios para disponer del caso conforme a derecho, tal cual estamos llamados a hacer.

Empero, las opiniones disidentes formulan una serie de supuestos e interrogantes cuya exposición parece sugerir que el resto de los integrantes de este Tribunal pretenden obstaculizar el interés público en el ejercicio libre de una profesión y afectar el acceso a servicios esenciales de salud para los estudiantes de nuestras escuelas públicas. **Sin embargo, tal conclusión se aparta sustancialmente de la verdad.**

Ante la importancia que revisten los servicios educativos para la población estudiantil en Puerto Rico, nuestro ordenamiento jurídico ha reconocido el derecho a la educación con rango constitucional. Art. II, Sec. 5, Const. PR, LPRA Tomo 1; <u>Declet Ríos v. Dpto. de educación</u>, 177 DPR 765, 773 (2009). Asimismo, en lo que respecta a las personas con necesidades especiales, se trata de un interés de alto orden

público ampliamente respaldado tanto en la jurisprudencia como en diversas disposiciones legislativas. Íd. A su vez, hemos reconocido que el Gobierno tiene un interés legítimo en garantizar la prestación de servicios psicológicos a favor de la población estudiantil de Educación Especial. Art. 1.02 de la de la Ley Núm. 85-2018, *supra*.

Así pues, aunque sostenemos que los niños del Programa de Educación Especial del Departamento de Educación, como población servida en este caso, constituyen un sector de alto interés público, la controversia ante nos es de naturaleza esencialmente contractual entre **dos (2) partes privadas**. Por lo que, al evaluar el interés público involucrado, corresponde determinar si la cláusula de no competencia entre MCG y la contratista independiente resulta razonable a la luz del interés de la profesión y si, a su vez, no menoscaba el acceso del público general a dichos servicios profesionales. Arthur Young & Co. v. Vega III, *supra*, pág. 167.

En línea con lo anterior, y a diferencia de los casos que sugieren en su análisis las expresiones disidentes, los hechos del presente caso no involucran una restricción amplia que impida a la señora Maestre Rivera ejercer su ocupación dentro de una región geográfica determinada ni una prohibición absoluta del ejercicio de la profesión. Por ejemplo, en Aesthetic Facial & Ocular Plastic Surgery Ctr., P.A. v. Zaldivar, *supra*, págs. 725-726; Valley Med. Specialists v. Farber, 982 P.2d 1277, 1278-1280 (Ariz. S. Ct. 1999); Intermountain Eye & Laser Centers,

P.L.L.C. v. Miller, *supra*, págs. 123-214; y, The Cmty. Hosp. Grp., Inc. v. More, *supra*, págs. 887-890, los tribunales evaluaron cláusulas de no competencia aplicables a profesionales de la salud en el contexto de relaciones tradicionalmente laborales, las cuales limitaban significativamente los lugares donde podían ejercer la medicina y planteaban preocupaciones sustanciales relacionadas con el acceso público a servicios especializados, así como a la continuidad del tratamiento médico.

Aquí, por el contrario, la señora Maestre Rivera actuaba como contratista independiente dentro de un esquema institucional intermediario, y la restricción en controversia no le impide continuar ejerciendo la psicología ni prestar servicios dentro del propio Departamento de Educación a otros menores o jóvenes que no recibían el servicio que ella proveía a través de MCG.[45] **Su alcance se limita exclusivamente a la**

---

[45] Resulta pertinente destacar que obra en el expediente que la señora Rivera Maestre suscribió con el Departamento de Educación un *Contrato de Servicios Profesionales*, Contrato Núm. 2023-EE0016, con vigencia desde el 1 de septiembre de 2022 hasta el 30 de junio de 2023, para ofrecer a estudiantes del Programa de Educación Especial los mismos servicios psicológicos que brindaba a través de la MCG. *Contrato de servicios profesionales 2023-EE0016*, Apéndice del *certiorari*, págs. 146-160.

Por otro lado, en cuanto al *Contrato de servicios profesionales*, Contrato Núm. 2024-EE0045, con vigencia desde el 1 de octubre de 2023 al 30 de junio de 2024; y el *Contrato de servicios profesionales*, Contrato Núm. 2025-EE0014, con vigencia desde el 30 de septiembre de 2024 al 30 de junio de 2025, otorgados entre el Departamento de Educación y la señora Maestre Rivera para proporcionar a estudiantes del Programa de Educación Especial los mismos servicios psicológicos que prestaba por conducto de la peticionaria, tomamos conocimiento oficial del Registro de Contratos de la Oficia del Contralor de Puerto Rico.

Asimismo, tomamos conocimiento oficial del Registro de Contratos de la Oficia del Contralor de Puerto Rico referente a los *Contratos de Servicios Profesionales* otorgados entre el Departamento de Educación y la señora Maestre Rivera, a través de AM Therapeutic Services for Children, Inc., con el propósito de ofrecer a estudiantes del Programa de Educación

**población del Programa de Educación Especial que atendió mediante la estructura contractual de MCG y procura proteger la estabilidad del programa, la continuidad operacional de los servicios y las relaciones desarrolladas por la entidad mediante su inversión.** Por ello, las preocupaciones de política pública planteadas en las opiniones disidentes no se ajustan a la realidad fáctica del caso ante nuestra consideración.

Según expuesto, **la cláusula de no competencia únicamente restringe una relación comercial específica por un periodo determinado de <u>un (1) año</u>.** La población servida continuará recibiendo los servicios de terapia del habla y lenguaje, terapia ocupacional, terapia física y psicológica, ya sea a través de MCG o no, mediante la contratación de otro profesional, **como ocurrió en este caso.[46]   Por tanto, la cláusula de no competencia no priva a los estudiantes del**

---

Especial los servicios psicológicos que antes prestaba a través de la MCG, a saber: *Contratos de servicios profesionales*, Contrato Núm. 2025-EE0154, con vigencia desde el 9 de mayo de 2024 al 30 de junio de 2025, y *Contrato de servicios profesionales*, Contrato Núm. EE-2026-0033, con vigencia desde el 11 de julio de 2025 al 30 de junio de 2026.

[46] En lo pertinente, cabe señalar que surge de la *Declaración Jurada* de la señora Gotay lo siguiente:

Finalmente, es importante señalar que la imagen y reputación de la Compañía está siendo afectada también a causa de las actuaciones de la demandada. Por ejemplo, el miércoles, 24 de mayo de 2023, recibimos un correo electrónico directamente del Departamento de Educación con el asunto de Cambio de Proveedor donde en el cuerpo del mensaje indicaron que hay estudiantes afectados, sin servicios de terapia de psicología, **lo cual es falso** y demuestra que [la señora Maestre Rivera] está logrando su objetivo de afectar los negocios y contratos de MCG. *Declaración Jurada*, Apéndice del *certiorari*, pág. 115. (Énfasis nuestro).

**Departamento de Educación del acceso a dichos servicios.**[47]
Por el contrario, la estabilidad y continuidad del programa
también forma parte del interés público, en la medida en que
éste comprende la existencia de entidades intermediarias
estables y funcionales que organicen y canalicen
adecuadamente la prestación de dichos servicios hacia el
Departamento de Educación. En consecuencia, la restricción
en controversia no excluye a la señora Maestre Rivera del
ejercicio de su profesión, no le impide prestar servicios al
Departamento de Educación ni priva a la población servida del
acceso a los servicios.

Por otra parte, la disidencia construye su argumento sobre
una premisa incorrecta al asumir que la cesión del contrato
de servicios de la contratista independiente equivale,
a su vez, a una cesión o modificación del contrato suscrito
entre el Departamento y The Able Child. **No obstante,
dicha premisa carece de fundamento jurídico, pues, según
hemos señalado, <u>se trata de dos (2) relaciones contractuales
distintas y plenamente autónomas</u>,** que regulan relaciones
contractuales separadas y obligan a partes diferentes.[48]
Por un lado, el Contrato de Servicios Profesionales
Núm. 2022-EE0059, suscrito por el Departamento de Educación

---

[47] *Declaración Jurada*, Apéndice del *certiorari*, pág. 115. Conviene
destacar que, contrario a los argumentos planteados por algunos miembros
del Tribunal, invocar el interés de los menores en este contexto
implicaría trasladar al análisis contractual privado un criterio de
política pública cuya configuración corresponde al legislador.

[48] Cabe resaltar que la señora Maestre Rivera y MCG son dos (2) partes
privadas; su relación es estrictamente contractual, y el Departamento de
Educación no fue parte de dicho acuerdo de servicios ni tampoco intervino
en el pleito de autos.

y The Able Child reguló, por un término determinado, las obligaciones asumidas por dicha entidad como proveedor intermediario de servicios ante la agencia. Mientras que, por otro lado, el Contrato de Servicios Profesionales aquí en controversia regula exclusivamente la relación contractual entre la señora Maestre Rivera y la entidad intermediaria, incluyendo las condiciones bajo las cuales ésta prestaría servicios profesionales a la población atendida a través de la corporación, así como las cláusulas restrictivas y obligaciones accesorias pactadas entre las partes. En otras palabras, se trata de obligaciones distintas, cada una exigible conforme a sus propios términos y condiciones.

De modo que **no procede sostener que el consentimiento del Departamento de Educación fuese necesario para la cesión del Contrato de Servicios Profesionales suscrito por la contratista independiente a favor de MCG. Ello, ya que la cláusula de *Indelegabilidad* contenida en el contrato entre el Departamento de Educación y The Able Child no regulaba la trasmisibilidad del contrato suscrito por la señora Maestre Rivera con la entidad.** En cualquier escenario, dicha cláusula de *Indelegabilidad* no constituía un obstáculo a la cesión del Contrato de Servicios Profesionales de la contratista independiente.

Asimismo, tampoco cabe hablar de notificar a la señora Maestre Rivera sobre alguna presunta enmienda al contrato entre el Departamento de Educación y The Able Child, conforme a la *Cláusula 31* del Contrato de Servicios

Profesionales suscrito por ésta, a los fines de que ratificara por escrito su consentimiento. En específico, el contrato en controversia contenía en su *Addendum* una cláusula en la que se disponía lo siguiente:

> **31. Este contrato se ha creado basado en el conocimiento de las cláusulas contractuales actuales con el Departamento de Educación. En caso de que el Departamento de Educación haga algún cambio a su contrato de servicios con MCG and The Able Child,** CORPORACIÓN se verá en la obligación de hacer una enmienda modificando las partes del contrato que sean necesarias para asegurar el cumplimiento con los requisitos del Departamento de Educación. **De ser el caso, se estarán enviando las enmiendas a ESPECIALISTA para que éste las firme y dicho documento pasará a ser parte del contrato firmado originalmente.** (Énfasis nuestro).[49]

Como hemos señalado, **dicha cláusula no resulta aplicable, pues en este caso no se produjo modificación alguna en las disposiciones contractuales con el Departamento de Educación.** En el presente caso, y como entidad jurídica en el ejercicio de su autonomía contractual, MCG suscribió con la agencia el Contrato de Servicios Profesionales Núm. 2023-EE0010, distinto e independiente del otorgado entre el Departamento de educación y The Able Child. Es decir, se trata de un contrato nuevo y autónomo que no responde a enmienda o cesión alguna. Por ende, aunque la posición contractual fue asumida por una nueva entidad, **las obligaciones y condiciones pactadas con la agencia permanecieron inalteradas.**[50]

---

[49] Véase *Contrato de servicios profesionales*, Apéndice del *certiorari*, pág. 126.

[50] *Contrato de Servicios Profesionales 2022-EE0059,* Apéndice del *certiorari,* págs. 130-144 y *Contrato de Servicios Profesionales 2023-EE0010*, págs. 1-15.

En consideración a ello, hoy puntualizamos que el resultado alcanzado por este Tribunal, lejos de afectar el interés público, responde a los principios de buena fe que rigen la libertad de contratación, la prohibición de la competencia desleal y la estabilidad de los servicios institucionales en el ámbito de la salud, todo ello dentro del marco de razonabilidad exigido por nuestro ordenamiento jurídico. Sostener una conclusión distinta implicaría, en efecto, sentar un precedente en virtud del cual las partes en un contrato podrían disfrutar de los beneficios de una relación contractual privada durante meses y, posteriormente, pretender desconocer selectivamente aquellas obligaciones que no les resulten convenientes, burlando los compromisos y obligaciones asumidos libremente; resultado que nuestro ordenamiento jurídico no contempla ni promueve.

**V**

Por los fundamentos antes expuestos, se revoca la *Sentencia* emitida por el Tribunal de Apelaciones el 8 de agosto de 2024, la cual confirmó la *Sentencia Parcial* dictada por el Tribunal de Primera Instancia el 10 de agosto de 2023. En consecuencia, se devuelve el caso al foro primario para la continuación de los procedimientos en conformidad con lo aquí resuelto.

Se dictará *Sentencia* en conformidad.

ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| MCG Therapy Group, LLC<br><br>Peticionario<br><br>v.<br><br>Arlene J. Maestre Rivera;<br>AM Therapeutic Service for<br>Children, Inc.<br><br>Recurridos | CC-2024-553 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico, a 28 de mayo de 2026.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se revoca la *Sentencia* emitida por el Tribunal de Apelaciones el 8 de agosto de 2024, la cual confirmó la *Sentencia Parcial* dictada por el Tribunal de Primera Instancia el 10 de agosto de 2023. En consecuencia, se devuelve el caso al foro primario para la continuación de los procedimientos en conformidad con lo resuelto en la *Opinión*.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez emitió una Opinión Disidente a la cual se une la Jueza Presidenta Oronoz Rodríguez. El Juez Asociado señor Colón Pérez emitió una Opinión Disidente. La Jueza Asociada Rivera Pérez disiente y emite la expresión siguiente:

Los hechos del caso se remontan al 14 de diciembre de 2021, cuando el Departamento de Educación de Puerto Rico le otorgó un contrato con número 2022-E0059 a MCG & The Able Child at Centro Multidisciplinario del Caribe, Inc., (MCG & The Able Child), una corporación con fines de lucro, para que le proveyera servicios de salud a los niños de educación especial. Dicho contrato 2022-E0059 (en adelante, el Contrato Original), obligó a MCG & The Able Child, entre otras cosas, a brindarle servicios de evaluación y tratamiento psicológico a pacientes de educación especial asignados por el Departamento de Educación. Este contrato disponía en su Trigésima Octava cláusula, lo siguiente:

TRIGÉSIMA OCTAVA: INDELEGABLIDAD: **Los servicios que prestará la SEGUNDA PARTE** serán INDELEGABLES. LA SEGUNDA PARTE no podrá subcontratar, tampoco podrá contratar peritos, **ceder ni traspasar los servicios objeto de este contrato sin el consentimiento previo y por escrito de la PRIMERA PARTE.** La delegación de estos será causa suficiente para dar por terminado este contrato. El incumplimiento de esta cláusula hará responsable a la SEGUNDA PARTE por cualesquiera daños y perjuicios que fueran causados a la PRIMERA PARTE, ya sean estos en forma directa o indirecta. (Negrillas suplidas). Véase Apéndice del recurso, págs. 130-145.

Así las cosas, el 26 de julio de 2022, MCG & The Able Child suscribió un Contrato de Servicios Profesionales con la Sra. Arlene J. Maestre Rivera (recurrida). En dicho contrato, esta pactó en proveerles **servicios de evaluación y tratamiento psicológico a pacientes de educación especial** asignados por el Departamento de Educación a MCG & The Able Child durante el período escolar 2022-2023. Además, el Contrato de Servicios Profesionales contenía una cláusula de no competencia por el término de un año.

Posteriormente se alegó que MCG & The Able Child otorgó un contrato de cesión con MCG Therapy Group, LLC (peticionario). En la presente Opinión, la mayoría concluye que el contrato de cesión entre MCG & The Able Child y el peticionario fue válido. En consecuencia, se determina que el acuerdo de no competencia también es válido y puede ser invocado a su favor por MCG Therapy Group, LLC. Además, la mayoría establece que esta cláusula supera el *test* de razonabilidad utilizando el análisis dispuesto en nuestro ordenamiento. Por los fundamentos que expongo a continuación, disiento muy respetuosamente de la interpretación que adopta una mayoría de este Tribunal.

De un análisis minucioso del expediente, no surge evidencia alguna que acredite que el Departamento de Educación, en efecto, **consintió por escrito** la cesión aquí en controversia. Sin embargo, la Opinión mayoritaria sustenta su validez en una alegación de la demanda enmendada, en la cual MCG Therapy Group, LLC solo señaló que el Departamento de Educación **estuvo de acuerdo con la cesión** objeto del presente litigio. En cuanto a este hecho considero que una mera alegación no es suficiente para probar un hecho en controversia, a saber, si el Departamento de Educación prestó su consentimiento previo por escrito para que así la cesión fuese válida. El contrato entre

MCG & The Able Child y el Departamento de Educación expresamente contiene una cláusula de indelegabilidad, según antes citada.

Por otro lado, la mayoría también consideró que la cesión era válida partiendo de una certificación emitida por el Contralor de Puerto Rico, la cual obra en el expediente. Este documento, por sí solo, no demuestra la validez del contrato, pues del mismo no surge el contenido de lo pactado entre MCG Therapy Group, LLC con el Departamento de Educación, ni acredita, en forma alguna, que dicha agencia haya cedido por escrito el Contrato Original (2022-EE0059) a favor de MCG Therapy Group, LLC. Si algo se desprende de la referida certificación es que el Contrato Original (2022-EE0059), suscrito por MCG & The Able Child, es **distinto** al contrato otorgado a MCG Therapy Group, LLC. Véase Apéndice del recurso, pág. 214. Por lo tanto, de un examen de la *Moción en solicitud de desestimación al amparo de la Regla 10.2 de Procedimiento Civil*, instada por la señora Maestre Rivera y la oposición presentada por MCG Therapy Group, LLC, **no era posible concluir que en el presente caso ocurrió una cesión válida**. A su vez, tampoco existe un acuerdo por escrito entre la señora Maestre Rivera y MCG Therapy Group, LLC, esto entonces impide, a su vez, poder determinar la validez de la cláusula de no competencia. Véase Entrada Núm. 30 en SUMAC, pág. 3. Toda vez que para validar dichas cláusulas es un requisito **indispensable** que conste por escrito. *Martin's BBQ v. García de Gracia*, *supra*, pág. 992, citando a *Arthur Young & Co. v. Vega III*, 136 DPR 157, 175-176 (1994).

De otra parte, la Opinión también concluye que la cláusula de no competencia de servicios profesionales de salud fue cedida y es válida, aplicando inadecuadamente el *test* de razonabilidad que hemos utilizado para validar cláusulas de no competencia en el contexto de un contrato de franquicias. Véase *Martin's BBQ v. García de Gracia*, 178 DPR 978 (2010). Allí disponemos que "*[l]as restricciones en cuanto al tiempo, área geográfica y actividades deben ser razonables en lo necesario para proteger los intereses legítimos del franquiciante. De igual forma, no deben provocar dificultades irrazonables al franquiciado, ni pueden atentar contra el interés público*. De lo contrario, éstas se considerarán contrarias a la buena fe contractual y al orden público". (Bastardillas en el original). Íd., pág. 997. Incluso el análisis realizado por la mayoría está falto de un estudio de los elementos más importantes del *test*, esto es, el interés

público y la acreditación del interés legítimo del peticionario.

En cuanto a las cláusulas de no competencia, en contratos de servicios profesionales de salud, ni este Tribunal ni el Tribunal Supremo de los Estados Unidos se han pronunciado. En Puerto Rico, los servicios profesionales de salud y su disponibilidad constituyen un interés público de la más alta jerarquía, ampliamente reconocido y documentado por nuestra Asamblea Legislativa. Desde la Ley Núm. 14-2017, *Ley de Incentivos Para La Retención y Retorno de Profesionales Médicos*, según enmendada, 13 LPRA sec. 10871 et seq., la Asamblea Legislativa reconoció que nuestra jurisdicción sufre de un éxodo masivo de médicos y profesionales de salud especializados, que ha resultado en una crisis de salud pública sin precedentes en la historia de Puerto Rico. Véase Exposición de Motivos, pág. 2. La Asamblea Legislativa reiteró este problema de salud pública al aprobar la Ley Núm. 106-2023, que establece el "Procedimiento Expedito para Médicos Jóvenes Empresarios" y, a su vez, enmendó la Ley Núm. 60-2019, *Código de Incentivos de Puerto Rico*, 13 LPRA sec. 45001 et seq. De esta manera, puede concluirse que el interés público de Puerto Rico en salvaguardar sus profesionales de la salud constituye una prioridad, así como lo evidencian las diversas leyes promulgadas y estudios disponibles.

Por lo anterior, para evaluar la razonabilidad de una cláusula de no competencia, en el contexto de servicios profesionales de la salud en Puerto Rico, era indispensable considerar la jurisdicción en cuestión, la disponibilidad real de dichos servicios y el efecto en la población afectada.[51] Así lo han decidido algunas cortes inferiores como la corte de apelaciones de North Carolina en *Aesthetic Facial & Ocular Plastic Surgery Ctr., P.A. v. Zaldivar*, 264 N.C.App. 260, 826 S.E.2d 723 (2019), la cual invalidó una cláusula escrita de no competencia de servicios profesionales de salud, a pesar de que se trataba de un Estado sin un problema estructural marcado por el

---

[51] **Despite the freedom to contract, the law does not favor restrictive covenants.** (Cita omitida). **This disfavor is particularly strong concerning such covenants among physicians because the practice of medicine affects the public to a much greater extent.** Id. **In fact, "[f]or the past 60 years, the American Medical Association (AMA) has consistently taken the position that noncompetition agreements between physicians impact negatively on patient care."** Paula Berg, Judicial Enforcement of Covenants not to Compete Between Physicians: Protecting Doctors' Interests at Patients' Expense, 45 rutgers L. Rev. 1, 6 (1992). (Negrillas suplidas) *Valley Med. Specialists v. Farber*, supra, 1281.

éxodo sostenido de profesionales de salud y especialistas.

Del mismo modo, la Corte Suprema de Arizona en *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 982 P.2d 1277 (1999), declaró nula una cláusula de no competencia escrita de servicios profesionales de salud aplicando el *test* de razonabilidad. En su análisis, resolvió que, para que una restricción de esta naturaleza sea válida, el interés del patrono tiene que **trascender** el mero deseo de evitar la competencia y responder a una necesidad legítima que no afecte adversamente el interés público, particularmente el acceso de los pacientes a servicios médicos. La importancia de atender el impacto en los pacientes, actuales y potenciales, es que las cláusulas de no competencia en los servicios de salud implican consideraciones de política pública que no están presentes en el contexto comercial ordinario. *Intermountain Eye & Laser Centers, P.L.L.C. v. Miller*, 142 Idaho 218, 127 P.3d 121, 131 (2005).

No obstante, la Opinión mayoritaria no hace un análisis de razonabilidad del interés público, del interés legítimo del peticionario y de las realidades geográficas, económicas y sociales de Puerto Rico. Esto a pesar de que las cortes estatales de los Estados Unidos han adoptado el criterio de razonabilidad para evaluar las cláusulas de no competencia y han sido enfáticas en subrayar que su aplicación requiere un énfasis particular en el interés público y en las implicaciones de dichas restricciones. Véase *The Cmty. Hosp. Grp., Inc. v. More*, 183 N.J. 36, 869 A.2d 884 (2005).

Los hechos del presente caso son aún más específicos que "servicios profesionales de salud", ya que se trata de servicios psicológicos especializados para estudiantes de educación especial. Una población aún más reducida y vulnerable que la población general. La vulnerabilidad de los estudiantes de educación especial ha sido reconocida y atendida por el Estado mediante la implementación de una compilación amplia de leyes estatales y federales que buscan la protección, la integración y el desarrollo integral de las personas que pertenecen a dicha población. Véase, a manera ilustrativa, la Ley Núm. 163-2024, *Ley para la Protección, Seguridad, Integración, Bienestar y Desarrollo Integral de las Personas con los Trastornos del Espectro Autista* y la Ley Núm. 85-2018, *Ley de Reforma Educativa de Puerto Rico*. Véase, además, *Every Student Succeeds Act* (ESSA), Pub. L.

Num. 114-95 (2015); *Americans with Disabilities Act* (ADA), Pub. L. Num. 101-336 (1990).

Además, el servicio de salud profesional en cuestión es considerado uno esencial para el desarrollo de los estudiantes de educación especial. Véase Art. 22 de la Ley Núm. 163-2024. Por ende, la evaluación de la razonabilidad de una cláusula de no competencia de servicios profesionales de salud tiene que incluir la realidad de la población afectada, así como el interés público ratificado por el Gobierno de Puerto Rico. Incluso, varios estados en los Estados Unidos han aprobado varias piezas legislativas que **prohíben las cláusulas de no competencia de servicios profesionales de salud**. Véase, a modo de ejemplo, *Illinois Freedom to Work Act*, 820 Ill. Comp. Stat. 90 (2025); South Dakota HB 1154 (2021) y *Act 232*, Indiana SB 139 (2025). Esta legislación evidencia un consenso emergente en cuanto a que tales restricciones afectan adversamente el acceso a los servicios médicos. Este desarrollo normativo resultaba indispensable para ponderar la razonabilidad de dichas cláusulas frente al interés público comprometido.

En suma, en el presente caso era forzoso concluir, conforme al análisis antes invocado, que la cláusula de no competencia para brindar los servicios profesionales de salud a estudiantes de educación especial es irrazonable, toda vez que contraviene directamente el interés público. Es decir, restringir el acceso a servicios especializados y esenciales de salud a una población vulnerable, en una jurisdicción en la que se ha reconocido una escasez de profesionales de la salud, bajo la única alegación de que el peticionario no desea perder ningún paciente, resulta completamente irrazonable. Como ha establecido la jurisprudencia en torno a la razonabilidad de este tipo de cláusulas, el patrono debe acreditar un interés legítimo que justifique la restricción, el cual no puede reducirse a su mero interés de evitar la competencia. En consecuencia, respetuosamente disiento del análisis mayoritario que válida una cesión inexistente y que legitima la razonabilidad de una cláusula de no competencia en servicios profesionales de salud sin su debido análisis. En consideración a lo antes expuesto, confirmaría el dictamen recurrido.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| MCG Therapy Group, LLC<br><br>Peticionario<br><br>v.<br><br>Arlene J. Maestre Rivera;<br>AM Therapeutic Service for<br>Children, Inc.<br><br>Recurridos | CC-2024-0553 | *Certiorari* |

Opinión disidente emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ, a la cual se une la Jueza Presidenta ORONOZ RODRÍGUEZ.

En San Juan, Puerto Rico, a 28 de mayo de 2026.

La educación especial es un derecho que equipara diferencias para promover una igualdad real. Para lograr esa aspiración, en la balanza de la justicia deben pesar más las consideraciones del interés público en el contexto del calvario que sufren los padres, madres y estudiantes de educación especial y la falta de profesionales que instrumenten ese esencial derecho. En consecuencia, el ánimo de lucro y visualizar la educación especial como un mero negocio, nunca debió pesar más que el derecho a la educación especial. Por tanto, respetuosamente disiento. Me explico.

En *Arthur Young & Co. v. Vega III*, *infra*, este Tribunal abordó la integración de una cláusula de no

competencia en un contrato de empleo entre un patrono y su empleado. Posteriormente, en *Martín's BBQ v. García de Gracia*, *infra*, evaluamos la utilización de este tipo de cláusulas en los contratos de franquicias. En esta ocasión, nos correspondía evaluar la validez de una cláusula de no competencia en el contexto de la cesión de un contrato de servicios profesionales.

Contrario al proceder mayoritario, considero que las cláusulas de no competencia en los contratos de proveedores de la salud, particularmente en el ámbito de servicios psicológicos a niños, niñas y jóvenes del Programa de Educación Especial, deben verse con extrema desconfianza, recelo, y considerarse como pactos ineficaces por quebrantar el orden público. A mi juicio, este era el único camino posible: al aplicar la regla de razonabilidad que gobierna el análisis de este tipo de cláusulas de no competencia, procedía realizar un estudio ponderado de todas las circunstancias presentes y de los hechos particulares del servicio al que se le aplica la restricción, a saber, un servicio educativo protegido y garantizado constitucional y estatutariamente.

Aun si alguien pretendiera ignorar esa realidad, tampoco podemos obviar que de las propias alegaciones de la demanda enmendada la parte demandante reconoce que solamente hubo múltiples conversaciones y acuerdos verbales con miras a la renegociación de los términos con

el llamado cesionario del contrato, MCG Therapy Group, LLC, y no que se materializó algún acuerdo formal escrito, del resultado de estas negociaciones respecto a los términos de empleo y, en consecuencia, de la cláusula de no competencia que hoy se valida. Por el contrario, sostengo que en este caso medió un fraccionamiento que quebrantó cualquier posible consentimiento y, con ello, impidió el perfeccionamiento de la cesión unitaria del contrato. Es evidente que, en este caso, no se firmó ni se pactó ningún acuerdo de no competencia por escrito, según reiteradamente ha requerido nuestra jurisprudencia.

Por lo tanto, **respetuosamente disiento.**

Con este breve contexto, procedo entonces a consignar los fundamentos jurídicos que enmarcan mi disenso, no sin antes examinar las circunstancias procesales más relevantes del caso.

**I**

El 3 de abril de 2023, MCG Therapy Group, LLC (MCG o peticionaria), presentó una *Demanda* y, posteriormente, una *Demanda enmendada* por incumplimiento de contrato, interferencia torticera y daños y perjuicios en contra de la psicóloga Arlene J. Maestre Rivera (señora Maestre Rivera o recurrida) y la entidad AM Therapeutic Service for Children, Inc., (AM Therapeutic). En su demanda, sostuvo que adquirió los términos y las condiciones de un *Contrato de Servicios Profesionales* en virtud de una

*cesión* con MCG & The Able Child at Centro Multidisciplinario del Caribe, Inc. (The Able Child) y que, por ello, ostentaba la facultad para demandar a la recurrida.

Específicamente, alegó que la señora Maestre Rivera incumplió la cláusula de no competencia del contrato, debido a que, presuntamente, comenzó a atender a los pacientes previamente asignados a MCG antes de que transcurriera el plazo de un año desde su renuncia. En cuanto a eso, señaló que la señora Maestre Rivera solicitó al Departamento de Educación que se le transfirieran los estudiantes para ofrecerles sus servicios, lo que le ha ocasionado daños mínimos de $800,000.00.

En su demanda enmendada, MCG realizó las alegaciones que se resumen a continuación.

El 26 de julio de 2022, The Able Child, corporación que brindaba servicios de terapia del habla y lenguaje, terapia ocupacional, física y psicológica a estudiantes de educación especial del Departamento de Educación (DE), suscribió un *Contrato de Servicios Profesionales* (Contrato) con la señora Maestre Rivera. En virtud de este, la recurrida brindaría, en calidad de contratista independiente, servicios de evaluación y tratamiento psicológico a **los estudiantes de educación especial asignados por el DE a The Able Child**. El referido Contrato estaría en vigor desde el 26 de julio de 2022 hasta el 31

de julio de 2023. Este, además, contenía la siguiente cláusula de no competencia:

> 1.      ESPECIALISTA tendrá que esperar un **mínimo de un año, a partir de la fecha de renuncia oficial a la CORPORACIÓN,** o de la notificación de determinación de no renovación, para poder atender, a través de otra corporación, de contrato directo con el Departamento de Educación, Remedio Provisional o de cualquier forma o **medio que no sea a través de MCG and The Able Child a los pacientes** que atendía a través de la CORPORACIÓN.
> 2.      La fecha de la renuncia oficial será la certificada por la CORPORACIÓN al aceptar su carta de renuncia. Esto quiere decir, que no se considerará como fecha de renuncia oficial desde el día en que abandonó sus funciones o entregó la carta de renuncia, sino la fecha de 30 días a partir del recibo de dicha carta.
> 3.      En los casos en los que ESPECIALISTA incumpla con lo establecido en esta cláusula de No Competencia tendrá que pagar una indemnización de incumplimiento, por cada uno de los estudiantes con los que la CORPORACIÓN hubiese facturado al Departamento de Educación por los servicios ofrecidos a cada uno de los estudiantes por el periodo del año escolar completo y tomando en consideración la modalidad, frecuencia y duración establecida en el PEI [Programa Educativo Individualizado] de cada uno. […]. (Negrillas suplidas y énfasis del original suprimido).[1]

El 1 de octubre de 2022, se produjo una *transición* de todo el personal de The Able Child a MCG, mediante la cual, se alegó que, "The Able Child **cedió** todos sus contratos a MCG", incluyendo los contratos de servicios profesionales con sus especialistas.[2]

---

[1] *Apéndice* de la *Petición de certiorari*, pág. 73.

[2] *Demanda enmendada*, *Apéndice* de la *Petición de Certiorari*, pág. 200.

MCG adujo en su demanda que, previo a la transición de personal, el 19 de julio de 2022 sus representantes le notificaron a la señora Maestre Rivera la cesión de The Able Child a MCG, que discutieron ciertos términos del contrato y que alcanzaron un **acuerdo verbal**, mediante el cual se le pagaría a la señora Maestre Rivera una tarifa superior a la de otros psicólogos a cambio de que trabajara exclusivamente para la peticionaria y no atendiera de manera privada la matrícula asignada. Agregó MCG que la señora Maestre Rivera continuó ofreciendo el servicio según lo acordado y que el Contrato cedido no prohibía la cesión a favor de un tercero.

La peticionaria sostuvo que, previo a la transición, el 27 de septiembre de 2022, les notificó la referida cesión a todos los especialistas de servicios profesionales y, como corporación, continuó brindando los mismos servicios al DE. Añadió que la señora Maestre Rivera continuó ofreciendo los servicios de psicología como contratista independiente, pero a través de MCG, sin que manifestara oposición o ejerciera alguna gestión para desvincularse del nuevo contratante cesionario.

Posteriormente, en septiembre de 2022, MCG alegó que la señora Maestre Rivera suscribió un contrato directamente con el DE, por medio de la corporación creada por ella, AM Therapeutic, para ofrecer los mismos servicios profesionales que brindaba a través de MCG y,

simultáneamente, continuó trabajando para esta última.[3] Tras varias comunicaciones y reuniones con personal de MCG, la señora Maestre Rivera notificó por correo electrónico, el 3 de marzo de 2023, su intención de no continuar ofreciendo sus servicios profesionales con MCG. Ante este cuadro, MCG presentó la acción judicial de autos.

En respuesta a la demanda en su contra, la señora Maestre Rivera presentó una solicitud de desestimación en virtud de la Regla 10.2 de Procedimiento Civil, *infra*, fundamentada en que la demanda no contenía hechos que justificaran la concesión de un remedio en su contra.[4] En esencia, manifestó que MCG no formó parte del Contrato original que suscribió con The Able Child y que tampoco ratificó por escrito sus cláusulas y condiciones. A su entender, el contrato no pudo haberse cedido y, por ello, la peticionaria carecía de legitimación para incoar la acción de incumplimiento contractual, daños e

---

[3] En el expediente se encuentra una *Certificación* de la Oficina del Contralor del **1 de agosto de 2023** en la que se indica que en el Registro de Contratos no aparecen registrados contratos otorgados entre el DE y AM Therapeutic durante el periodo del 1 de enero de 2021 a la fecha de la certificación. *Apéndice de la Petición de Certiorari*, pág. 237.

[4] El 14 de septiembre de 2023, la señora Maestre Rivera presentó su contestación a la demanda enmendada y reconvención por cobro de dinero por trabajos realizados, difamación, libelo, calumnia, interferencia torticera y daños y perjuicios. *Apéndice* de la *Petición de Certiorari*, pág. 516.

interferencia contractual en su contra. En consecuencia, expuso que la cláusula de no competencia no era válida porque no existió un acuerdo por escrito entre ella y MCG conforme requiere la jurisprudencia.

En su respectiva moción en oposición a desestimación, MCG reiteró que adquirió todos los derechos y obligaciones por medio de la cesión y que la cláusula de no competencia consta por escrito en el Contrato cedido. Arguyó, de igual manera, que cumplió con todos los requisitos jurisprudenciales para la validez de una cláusula de este tipo, y que la demanda enmendada contiene alegaciones suficientes para cumplir con el estándar de plausibilidad al adjudicarse una solicitud de desestimación.

Tras la celebración de una **vista argumentativa** para discutir la moción dispositiva, el foro de primera instancia dictó una *Sentencia Parcial* en la que determinó que, en la referida vista, las partes estuvieron de acuerdo en lo siguiente:

> 1.    Entre MCG y la demandada [señora Maestre Rivera], nunca hubo un contrato por escrito. La [peticionaria] argumenta que en la medida [en] que The Able Child cedió todos sus contratos a MCG, incluyendo [el] de la [señora Maestre], las obligaciones contraídas por la demandada con The Able Child son vinculantes hacia MCG también.
> 2.    La relación de la demandada y la demandante fue una de contratista independiente.
> 3.    La demandada prestó servicios profesionales a MCG.

En su *Sentencia*, el foro primario concluyó que, de conformidad con *Arthur Young & Co. v. Vega III*, 136 DPR

157 (1994), se requiere que existiera un acuerdo por escrito firmado entre MCG y la señora Maestre Rivera para que la cláusula de no competencia fuese válida. Por ello, determinó que la cesión no tuvo el efecto de validar la referida cláusula por no haberse ratificado por escrito. En particular, el Tribunal de Primera Instancia resolvió que:

> Independientemente la manera en que se cedieron los contratos de The Able Child a MCG, el ordenamiento legal discutido requiere que entre MCG y la demandada hubiese un acuerdo escrito y firmado por ambas partes para [que] tuviera vigencia una cláusula de no competencia. Validar la postura de [MCG] que mediante la cesión subsiste la cláusula de no competencia entre dos partes que no poseen un contrato escrito es contrario al ordenamiento legal previamente discutido.[5]

En consecuencia, el foro primario declaró ha lugar la desestimación con perjuicio en cuanto al alegado incumplimiento de la cláusula de no competencia y ordenó continuar los procedimientos respecto a las demás causas de acción pendientes.

Inconforme, MCG acudió en un recurso de apelación al Tribunal de Apelaciones. En este señaló que el Tribunal de Primera Instancia erró, puesto que, por medio de la cesión, se colocó en la misma posición contractual que The Able Child, como si hubiese estado presente al momento del otorgamiento del Contrato. Al respecto, indicó que la

---

[5] *Sentencia* del Tribunal de Primera Instancia, *Apéndice* de la *Petición de Certiorari,* pág. 5.

cesión implicó la transmisión integral del Contrato tal y como fue redactado originalmente.

El 8 de agosto de 2024, el Tribunal de Apelaciones dictó una *Sentencia* en la que confirmó al foro primario.[6] En síntesis, resolvió que nada en nuestro ordenamiento prohíbe las cláusulas de no competencia en contratos de servicios profesionales, pero que, debido a lo restrictivo de este tipo de disposición, su transmisión mediante cesión solo es posible si se incorpora mediante un acuerdo por escrito entre las partes contratantes. Por ello, determinó que, en ausencia de esta formalidad y ante la falta de consentimiento por escrito de la señora Maestre Rivera, MCG no podía invocar el incumplimiento de la referida cláusula.[7] El foro intermedio añadió que la razonabilidad de la cláusula era cuestionable porque podía afectar los servicios a los estudiantes de educación especial.

Insatisfecha, en su recurso de *certiorari* ante nos, MCG plantea la comisión de dos errores por parte del Tribunal de Apelaciones. En primer lugar, que el requisito

---

[6] En particular, el Juez José Ignacio Campos Pérez emitió un voto disidente.

[7] *Sentencia* del Tribunal de Apelaciones, *Apéndice* de la *Petición de Certiorari*, pág. 611. ("La ausencia de un contrato escrito entre las partes impide a [MCG] invocar la existencia de un acuerdo de no competencia basado en conversaciones telefónicas con la [señora Maestre Rivera]. La formalidad de ser por escrito es un requisito esencial de los acuerdos de no competencia").

de que la referida cláusula sea cedida solamente mediante consentimiento escrito es un requisito establecido por *fiat* judicial que resulta irrazonable, oneroso, contrario a la norma general de la cesión de créditos o derechos y que no cualifica como una excepción. En segundo lugar, que los efectos de la cláusula sobre la prestación de los servicios a los estudiantes de educación especial son determinaciones de hechos conclusorias e hipotéticas, sin sustento en el expediente ni en evidencia alguna, y que, en esta etapa procesal, solo procedía atender las alegaciones de la demanda tomándolas como ciertas para propósitos de resolver la moción de desestimación.

Establecido lo anterior, procedo a esbozar la normativa que sustenta mi divergencia con el dictamen asumido por una mayoría de este Tribunal.

**II**

**A.**

Nuestro ordenamiento procesal civil permite que una parte solicite la desestimación de una reclamación judicial presentada en su contra cuando de las alegaciones de la demanda surja que alguna defensa afirmativa derrotará la pretensión del demandante. *Díaz Vázquez et al. v. Colón Peña et al.*, 214 DPR 1135, 1149 (2024); *Eagle Security v. Efrón Dorado et al.*, 211 DPR 70, 83 (2023). Específicamente, la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2, permite que una parte contra quien

se presentó una reclamación judicial solicite la desestimación bajo el fundamento de que la demanda deja de exponer una reclamación que justifique la concesión de un remedio. *Saint Mary Investment, LLC v. Denton Morales y otros*, 218 DPR ___ (2026), 2026 TSPR 35.

Al adjudicar una moción de desestimación al amparo de esta regla, los tribunales están obligados a considerar los hechos bien alegados en la demanda de la forma más favorable a la parte demandante e interpretar las alegaciones de forma conjunta y liberal. Íd.; *Cobra Acquisitions v. Mun. Yabucoa et al.*, 210 DPR 384, 396 (2022); *González Méndez v. Acción Social et al.*, 196 DPR 213, 234 (2016); *Torres, Torres v. Torres et al.*, 179 DPR 481, 502 (2010); *Pressure Vessels P.R. v. Empire Gas P.R.*, 137 DPR 497, 505 (1994). Esto se hace con la finalidad de evaluar si, "a la luz de la situación más favorable al demandante, y resolviendo las dudas a favor de este, la demanda es suficiente para constituir una reclamación válida". *González Méndez v. Acción Social et al.*, *supra*, pág. 235; *Aut. Tierras v. Moreno & Ruiz Dev. Corp.*, 174 DPR 409, 429 (2008); *Colón v. Lotería*, 167 DPR 625, 649 (2006).

En este contexto, al adjudicarse una moción dispositiva de este tipo, los tribunales deben tomar como ciertos todos los hechos bien alegados en la demanda y que hayan sido aseverados de manera clara y concluyente. *Eagle*

*Security v. Efrón Dorado et al.*, *supra*, pág. 84. De esta manera, deben determinar si, a base de esos hechos aceptados como ciertos, la demanda establece una reclamación que justifique la concesión de un remedio. *Saint Mary Investment, LLC v. Denton Morales y otros, supra.* En otras palabras, una reclamación válida. *Costas Elena y otros v. Magic Sport y otros*, 213 DPR 523, 534 (2024) (citando a R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6ta ed., San Juan, Ed. Lexis Nexis, 2017, pág. 307).

Para que una parte demandada prevalezca en su solicitud de desestimación debe establecer, de forma certera, que el demandante no tiene derecho a remedio alguno bajo cualquier estado de derecho que pueda probarse en apoyo a su reclamación, aun interpretando la demanda lo más liberalmente a su favor. *BPPR v. Cable Media of Puerto Rico, Inc.*, 215 DPR ____, 2025 TSPR 1*; Rivera Sanfeliz et al. v. Jta. Dir. FirstBank*, 193 DPR 38, 49 (2015); *Ortiz Matías et al. v. Mora Development*, 187 DPR 649, 654 (2013). Como resultado, corresponde conceder la desestimación cuando las alegaciones permiten concluir claramente que la demanda carece de todo mérito o que la parte demandante no tiene derecho a obtener algún remedio. *González Méndez v. Acción Social*, *supra*, pág. 235.

**B.**

En materia contractual, es norma ampliamente conocida que, en virtud del principio de la autonomía contractual, los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a la ley, la moral o al **orden público**. Art. 1232 del Código Civil de 2020, 31 LPRA sec. 9753; *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 995 (2024).

De conformidad con esto, en nuestra jurisdicción, como regla general, los acuerdos de no competencia son válidos en virtud del principio de libertad de contratación. *Martín's BBQ v. García de Gracia*, 178 DPR 978, 990 (2010); *Arthur Young & Co. v. Vega III, supra,* pág. 175. Estas cláusulas de no competencia son aquellas que se incorporan en un contrato con el propósito de restringir que una de las partes se involucre en un negocio, o una actividad, que pueda competir con la otra. *Martín's BBQ v. García de Gracia*, *supra,* pág. 990. (Cita omitida). Así, este tipo de cláusulas se encuentra particularmente en tres clases de contratos: empleo, venta de negocios y franquicias. Íd.

En el caso normativo *Arthur Young & Co. v. Vega III, supra,* evaluamos la validez de una cláusula de no competencia en un contrato de empleo. En esa encomienda, adoptamos la norma de razonabilidad que establece los parámetros necesarios a utilizarse para analizar la validez de una cláusula de no competencia en una relación

laboral; en aquel caso, entre un patrono y su empleado. De esta forma, reconocimos que "[p]ara ser razonable, un acuerdo de no competir debe reunir los requisitos siguientes: (1) debe ser necesario para proteger un interés legítimo del patrono; (2) no debe imponer al empleado una carga demasiado onerosa, y (3) no debe afectar demasiado al público". *Arthur Young & Co. v. Vega III, supra,* pág. 167.

Además, precisamos que el análisis de validez debe considerar el área en que se le prohíbe competir al empleado, la duración de esa restricción, el tipo de clientes que le está prohibido atender, así como el tipo de servicios que se le prohíbe rendir. *Arthur Young & Co. v. Vega III, supra,* pág. 167. Se debe presuponer, además, que el acuerdo de no competir es incidental a un contrato de trabajo y que ha mediado causa adecuada. Íd. (citas omitidas).

Igualmente, respecto a los criterios de razonabilidad a emplearse en el análisis de este tipo de cláusulas, hemos reconocido reiteradamente que:

> Primero, el patrono debe tener un **interés legítimo en dicho acuerdo**, esto es, que, de no recibir la protección de una cláusula de no competencia, **su negocio se vería sustancialmente afectado**. La magnitud de este interés se medirá, entre otras cosas, a la luz de la posición del empleado dentro de la empresa. Esto es, que la existencia del interés del patrono estará directamente relacionada y dependerá de que el empleado, por la posición que asume en la empresa, esté facultado para competir de forma efectiva con su patrono en un futuro.

Segundo, el alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término y lugar de restricción o clientes afectados. El objeto de la prohibición se debe limitar a actividades similares a las efectuadas por el patrono; no es necesario que se limite a las funciones específicas del empleado. El término de no competencia no debe excederse de doce (12) meses, entendiéndose que cualquier tiempo adicional es excesivo e innecesario para proteger adecuadamente al patrono. Por último, respecto al alcance de la prohibición, el contrato debe especificar los límites geográficos o los clientes afectados. En cuanto al área geográfica a la que aplica la restricción, ésta debe limitarse a la estrictamente necesaria para evitar la competencia real entre el patrono y el empleado. Cuando la prohibición de competencia se refiere a los clientes, debe referirse sólo a aquellos que el empleado atendió personalmente durante un período razonable de tiempo antes de renunciar o en un período inmediatamente anterior a la renuncia, y que al hacerlo todavía eran clientes del patrono. **Estos elementos se evaluarán teniendo en mente la naturaleza de la industria involucrada y el posible interés público relacionado.**

Tercero, el patrono debe ofrecer una contraprestación a cambio de la firma del acuerdo de no competir por parte del empleado. Esta contraprestación puede consistir, por ejemplo, en la obtención de un ascenso, de beneficios adicionales en el trabajo o del disfrute de cambios sustanciales de similar naturaleza en las condiciones de empleo. Incluso sería suficiente que un candidato obtenga el empleo deseado en la empresa. Sin embargo, no se admitirá como causa del acuerdo de no competencia la mera permanencia en el empleo.

Cuarto, los pactos de no competencia, como todo contrato, deben contar con los elementos esenciales para su validez: **consentimiento,** objeto y causa. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. **Sin embargo, en este tipo de contratos seremos especialmente estrictos al asegurarnos de que el empleado firmó libre y voluntariamente el contrato de no competencia.** […].

Finalmente, **<u>es indispensable que los pactos de no competencia consten por escrito</u>**. (Negrillas y subrayado suplidos). *Arthur Young & Co. v. Vega III, supra,* págs. 175-177.

Por consiguiente, una cláusula de no competencia que no cumpla con estas condiciones para su validez se considerará contraria a la buena fe contractual, **quebrantadora del orden público** por restringir de forma excesiva e injustificada la libertad de trabajo del empleado y **la libertad de selección del público en general**. *Arthur Young & Co. v. Vega III, supra,* pág. 177.[8] Es decir, en lugar de modificar la voluntad de las partes contratantes para ajustarla a las normas de razonabilidad, se deberá declarar nulo el pacto de no competencia por incumplir con los criterios jurisprudenciales para su validez. Íd.

Posteriormente, en el caso normativo *Martín's BBQ v. García de Gracia, supra,* dirimimos la validez de una cláusula de no competencia en un contrato de franquicias, no en una relación de patrono-empleado, sino entre

---

[8] En *Arthur Young & Co. v. Vega III, supra,* resolvimos que la cláusula de no competencia que allí se impugnó era excesiva en cuanto al término de dos años de prohibición. Íd., pág. 182. Véase, además, *G.G. Supp. Corp. v. S.F. Systs., Inc.,* 153 DPR 861, 874 (2001), donde delineamos los contornos para analizar los pactos de no competencia en las relaciones comerciales, al amparo del Art. 2 de la Ley Núm. 77 de 25 de junio de 1964, según enmendada, conocida como la Ley Antimonopolística de Puerto Rico, 10 LPRA sec. 258.

empresarios.[9] En resumen, resolvimos que estos pactos de no competir serán válidos en los contratos de franquicia, siempre y cuando las restricciones en cuanto al tiempo, área geográfica y actividades sean razonables para proteger los intereses legítimos del franquiciante y no provoquen dificultades irrazonables al franquiciado **ni atenten contra el interés público**. *Martín's BBQ v. García de Gracia, supra,* págs. 981 y 997. De esto último ocurrir, se considerará contrario a la buena fe contractual y al orden público. Íd., pág. 997. Es importante destacar que, en la tarea de evaluar la validez de este tipo de cláusulas, los tribunales debemos estar atentos al interés expresado, puesto que será a partir del interés legítimo que se medirá la razonabilidad de los límites impuestos.[10]

Finalmente, hemos expresado que, aunque la cláusula de no competencia sea válida, la persona trabajadora pudiera quedar liberada de su obligación negativa (de no

---

[9] Las cláusulas de no competencia en los contratos de franquicia se utilizan con el objetivo de evitar que, quienes fueron franquiciados, desarrollen negocios similares en la misma área geográfica y utilizando las mismas destrezas, la información confidencial y los contactos que adquirieron por medio del franquiciante, convirtiéndose así posteriormente en la competencia del sistema de franquicias. *Martín's BBQ v. García de Gracia, supra,* pág. 994.

[10] En *Martín's BBQ v. García de Gracia, supra,* determinamos que era irrazonable y excesiva la prohibición de no competir con cualquier restaurante de la franquicia ubicado en una extensión geográfica de 10 millas lineales. En efecto, tomamos en consideración el interés público y las restricciones geográficas de Puerto Rico. Íd., pág. 1002.

hacer): (1) por autorización; (2) cuando la otra parte obligada incumple ciertas condiciones; o (3) **si no se demuestra la realidad del perjuicio sufrido por la empresa.** (Negrillas suplidas). *Arthur Young & Co. v. Vega III, supra,* pág. 173.

En resumen, la regla de razonabilidad que gobierna el análisis de las cláusulas de no competencia requiere un estudio extenso y ponderado de todas las circunstancias presentes y los hechos particulares del negocio al que se le aplica la restricción.

## III

### A.

En nuestro ordenamiento jurídico el derecho a la educación es de rango constitucional. *Orraca López v. ELA*, 192 DPR 31, 40 (2014); *AMPR v. Srio. Educación*, *E.L.A*, 178 DPR 253, 270 (2010); *Declet Ríos v. Dpto. de Educación*, 177 DPR 765, 773 (2009). La Constitución de Puerto Rico dispone expresamente que:

> [t]oda persona tiene derecho a recibir una **educación que propenda al pleno desarrollo de su personalidad** y al fortalecimiento del respeto de los derechos de los seres humanos y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. […]. **Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por la ley para protección o bienestar de la niñez.** (Negrillas suplidas) Art. II, Sec. 5, Const. PR, LPRA Tomo 1.

Así como está consagrado textualmente en nuestra Carta Magna, este derecho es *en toda su esencia* un derecho de acceso a la educación, garantizado todavía más en cuanto a grupos vulnerables al constituirse un sistema educativo público. Similarmente, hemos reconocido que la educación de la niñez y juventud puertorriqueña es de vital importancia para el Estado. *Asoc. Maestros P.R. v. Srio. Educación*, 137 DPR 528, 568 (1994).

La Ley de la Reforma Educativa de Puerto Rico define la "educación especial" como la enseñanza gratuita especialmente diseñada para responder a las necesidades particulares de la persona con discapacidad en el ambiente menos restrictivo. Art. 1.03 de la Ley Núm. 85-2018, 3 LPRA sec. 9801b.[11] Por lo anterior, es la política pública del Departamento de Educación que los estudiantes con discapacidad reciban una educación pública, gratuita y apropiada, fundamentada en una evaluación estructurada de forma especial para atender sus necesidades particulares. Art. 10.01 de la Ley Núm. 85-2018, 3 LPRA sec. 9810.

---

[11] Véanse, también, el *Individuals with Disabilities Education Act* (Ley IDEA), 20 USCA sec. 1400 et seq., y el *Americans with Disabilities Act* (Ley ADA), 42 USCA sec. 12101. Los estados que reciban fondos bajo el estatuto precitado tienen que establecer programas de educación especial públicos, gratuitos y apropiados que atiendan las necesidades particulares de cada estudiante. 20 USCA sec. 1415(a); *Declet Ríos v. Dpto. de Educación*, 177 DPR 765, 776 (2009). En consecuencia, Puerto Rico, al recibir fondos federales para educación especial, tiene que regirse por el mandato y las regulaciones establecidas al amparo de la Ley IDEA. Íd.

En esta encomienda, todo estudiante perteneciente al sistema público de enseñanza que tenga alguna condición o discapacidad física, mental o sensorial **tendrá derecho a recibir los servicios necesarios de acuerdo con su condición**.[12] Íd. Valga destacar que los "servicios relacionados con la educación", como los servicios psicológicos, son definidos como aquellos "servicios de salud y apoyo indispensables, que se requieren para que la persona con impedimentos se beneficie de la educación especial para desarrollar al máximo sus potencialidades". Art. 2 (22) de la Ley Núm. 51-1996, 18 LPRA sec. 3151.[13] De esta forma, los servicios relacionados son clave para apoyar, desarrollar y corregir aquellas habilidades que interfieren en el aspecto educativo del estudiante.[14]

_____

[12] Para cumplir con ello, se creó la Secretaría Auxiliar de Servicios Educativos Integrales para Personas con Impedimentos como un componente operacional del Departamento de Educación. Art. 5 de la Ley Núm. 51-1996, Ley de Servicios Educativos Integrales para Personas con Impedimentos, 18 LPRA sec. 1354.

[13] Véase, además, el *Manual de Procedimientos de Educación Especial,* Departamento de Educación, julio de 2020, pág. 116. Véase, también, L.M. Parodi, *Educación especial y sus servicios: principios, métodos, aplicaciones*, 5ta ed. Rev., San Juan, Publicaciones Puertorriqueñas, 2009, págs. 69-72.

[14] Para un recuento de los estatutos aplicables a la población de niños y niñas de educación especial, véanse A. Rivera Sotomayor, *Caso Rosa Lydia Vélez: Derechos De Los Estudiantes Con Discapacidades Ante La Secretaría Asociada De Educación Especial,* 55 Rev. Der. Pur. 81, 89 (2015) y L.F. Estrella Martínez, *El Legado De La Constitución Federal A La Educación Especial*, 46 Rev. Jur. UIPR 471 (2012).

*Vélez y otros v. DE y otros*, 209 DPR 79, 106 (2022) (Resolución) (Voto particular disidente del Juez Asociado señor Estrella Martínez).

Es evidente que nuestro ordenamiento le impone al Estado una responsabilidad extraordinaria de proteger el bienestar de los niños y las niñas estudiantes de educación especial.[15] Si bien el reconocimiento de los derechos de la niñez y juventud con diversidad funcional es importante, mayor transcendencia reviste poder vindicarlos. Véase, L. F. Estrella Martínez, *Acceso a la Justicia: Derecho Humano Fundamental*, San Juan, Ed. SITUM, 2017, pág. 409. Por ello, sostengo que una forma de reivindicar esos derechos hoy era determinar que la cláusula de no competencia que, en efecto, restringe la facultad de un profesional de prestar y continuar brindado los servicios relacionados a esta población, es contraria al orden público y al bienestar común. Esto cobra mayor relevancia si tenemos presente que la población servida de niños, niñas y jóvenes de educación especial para el año académico 2024-2025 fue de 99,964 estudiantes de entre 3 a 21 años.[16]

---

[15] Véase, L.F. Estrella Martínez, *Acceso a la Justicia: Derecho Humano Fundamental*, San Juan, Ed. SITUM, 2017, pág. 405.

[16] Véase, Mi Portal Especial, https://mipe.dde.pr/data. Véase, también, P.N. Sierra Gelpí, *Puerto Rico con la mayor cantidad de estudiantes de educación especial a nivel federal*, en Locales, Metro, 11 de diciembre de 2024.

En ese extremo, es de conocimiento judicial que, en el 1980, un grupo de padres, madres, encargados de estudiantes y el Comité Timón Pro Niños Impedidos de Puerto Rico, Inc., representados en ese momento por Servicios Legales de Puerto Rico, Inc., demandaron al estado por incumplir con los estatutos federales y estatales que le obligan a proveer los servicios educativos y relacionados de educación especial a los estudiantes con diversidad funcional y necesidades educativas. Véase, *Rosa Lydia Vélez y otros v. María Socorro Lacot y otros*, Civil Núm. KPE80-1738 (907).

Algunos de los servicios que alegaron que no se estaban proveyendo incluían: la inscripción de estudiantes en el Registro de Educación Especial, "las evaluaciones requeridas para determinar si el estudiante necesitaba servicios de educación especial, la determinación de elegibilidad, la ubicación apropiada para proveer los servicios de educación especial de acuerdo a las necesidades educativas del estudiante y los servicios relacionados a la educación especial incluyendo transportación, terapias del habla, sicológicas, físicas y otras". Véase, M. González Báez & A.O. Jiménez Santiago, *Apuntes sobre el desarrollo histórico del caso de Rosa Lydia Vélez y otros v. María Socorro Lacot y otros*, 37 Rev. Jur. UIPR 281 (2003).

Luego de certificarse como un pleito de clase, y tras más de 20 años de litigio, en el 2002 se dictó una *Sentencia* que contiene 87 estipulaciones.[17] Es importante tener presente que, desde el 2005, el Departamento de Educación ha pagado sumas millonarias en sanciones diarias por el incumplimiento con múltiples estipulaciones de la *Sentencia*. Véase, L. F. Estrella Martínez, *Acceso a la Justicia: Derecho Humano Fundamental*, San Juan, Ed. SITUM, 2017, pág. 406.[18] Por consiguiente, el proceso de ejecución de las determinaciones del tribunal ha sido tortuoso y no del todo exitoso. Íd.[19]

---

[17] Algunos de los logros obtenidos en el pleito son: la revisión de los criterios de la determinación de elegibilidad para recibir los servicios de educación especial, la creación del *Manual de Procedimientos de Educación Especial*, el establecimiento del mecanismo de Remedio Provisional para ofrecer los servicios relacionados de evaluaciones y terapias, la creación de un *Reglamento de Procedimiento para la Resolución de Querellas*, entre otros. Véase, S. E. Rivera Lebrón, *El derecho a la educación de los niños y las niñas con impedimentos*, 37 Rev. Jur. UIPR 293, 303-305 (2003). Véase, *Rosa Lydia Vélez Y Otros Demandantes v. Awilda Aponte Roque Y Otros Demandados*, 37 Rev. Jur. UIPR 324, 345 (2003).

[18] Véase, K. López Alicea, *Histórico pleito cumple 45 años: los logros y lo que falta por hacer en el caso Rosa Lydia Vélez*, en Análisis, El Nuevo Día, 15 de noviembre de 2025.

[19] Véanse, F. Rosario, *Siguen los retos de servicio a estudiantes de Educación Especial,* en *Gobierno y política*, *Primera Hora*, 17 de febrero de 2026. En este, se indica:

"Al igual que en los últimos años, el reto mayor que confronta Educación es la del **ofrecimiento de los servicios relacionados** a los que tienen derecho estos estudiantes, particularmente en las

De hecho, el Tribunal de Primera Instancia de San Juan aún conserva jurisdicción para supervisar el cumplimiento de las 67 estipulaciones al momento pendientes.[20] En fin, este largo peregrinaje por más de 45 años reclamando derechos ampliamente reconocidos constituye una muestra del problema social que representa

---

**terapias**, servicios compensatorios, **evaluaciones** y **reevaluaciones. <u>Esta es el área de mayor incumplimiento, tanto del ofrecimiento del Departamento a través de las corporaciones que contrata</u>**, como mediante el mecanismo de remedio provisional. Destacamos que el cumplimiento bajo de las estipulaciones de remedio provisional es evidencia de que, a pesar de tener disponible este mecanismo, el Departamento no lo utiliza con la frecuencia que se requiere. **Recordamos que los servicios relacionados son esenciales para lograr que los estudiantes puedan alcanzar su potencial"**, subrayó la monitora [Pilar Beléndez Soltero en su Informe al Tribunal de Primera Instancia de San Juan en el pleito de clase de *Rosa Lydia Vélez*]. […] Esta situación se ha repetido en los últimos años y todas están estrechamente relacionadas con el ofrecimiento de los servicios a los estudiantes de Educación Especial. (Negrillas y subrayado suplidos).

Véanse, también: K. López Alicea, *Escuela en Arecibo que atiende niños de educación especial denuncia falta de pagos de Educación*, El Nuevo Día, 19 de febrero de 2026; N. Núñez Lamboy, *Madres abogan por mejoras en la administración de servicios educativos del programa de educación especial*, en *Locales*, *Metro*, 9 de octubre de 2024; F. Rosario, *Educación sigue fallando en servicios directos a estudiantes de educación especial*, en Gobierno y política, Primera Hora, 6 de agosto de 2024; W. Agosto, *Exigen servicios para estudiantes de educación especial*, El Vocero, 15 de febrero de 2024; *Persisten problemas con servicios de estudiantes de educación especial*, en *Locales*, *Metro*, 15 de febrero de 2023.

[20] Véase, K. López Alicea, *¿Qué debe mejorar en educación especial? Informe detalla áreas de necesidad*, El Nuevo Día, 23 de febrero de 2026.

el acceso a servicios adecuados, completos y oportunos de educación especial en Puerto Rico.[21]

En lo que atañe a la controversia ante nos, el orden público lo hemos definido como el medio para lograr un balance entre la autonomía de la voluntad y la **protección del bienestar común**. *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 728 (2018), citando a *De Jesús González v. A.C.*, 148 DPR 255, 266 (1999). Es, a su vez,

> el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad. **El concepto orden público recoge <u>y ampara un interés social dominante por su trascendencia</u>, <u>por el número de personas que afecta y por la valía de los derechos que tiende a proteger</u>**. En gran medida el orden público es acopio de normas de moral y de ética pública **que en ocasiones alcanzan su exposición en ley**, pero que aun sin esa expresa declaración legislativa, constituyen principios rectores de sabio gobierno nacidos de la civilización y fortalecidos por la cultura, la costumbre, por la manera de ser, en fin por el estilo de una sociedad. Castán ve tanto en la costumbre como en la ley el modo de manifestación de la voluntad social predominante. (Negrillas y subrayado suplidos). *Arthur Young & Co. v. Vega III, supra,* nota 20; *Hernández v. Méndez & Assoc. Dev.Corp.,* 105 DPR 149, 153 (1976); Véase *Camacho Arroyo v. E.L.A.,* 131 DPR 718 (1992).

El trabajo, indistintamente de que su forma jurídica sea por medio de un contrato de empleo que establezca una relación formal patrono-empleado o sea mediante un contrato de servicios profesionales, es la forma en que los profesionales capacitados pueden brindar a la niñez y

---

[21] Véase, L.F. Estrella Martínez, *El legado de la constitución federal a la educación especial, op. cit.,* pág. 483.

juventud participante de educación especial los servicios relacionados que garanticen una educación apropiada.[22] El pacto de no competir, que se impone como requisito para obtener o preservar un empleo, en circunstancias como las del asunto ante nos, representa no solo una carga onerosa para la libertad laboral del proveedor de la salud —en este caso, una psicóloga pediátrica— a escoger su trabajo, sino, además, una restricción de los recursos especializados que brindan servicios directos a los estudiantes-pacientes del Programa de Educación Especial del Departamento de Educación de Puerto Rico.[23]

Además, soy del criterio de que constituye una limitación a la autonomía de los padres, madres y encargados a permanecer con el proveedor de salud que desarrolló una relación profesional (también llamada alianza terapéutica) y estableció un plan de intervención

---

[22] Discrepo de la conclusión que realiza la mayoría respecto a que en la Ley Núm. 4-2017, Ley de Transformación y flexibilidad laboral, existe una presunción en su Art. 2.3 de que los contratistas independientes tienden a tener mayores activos propios y, por ello, se presume que tienen mayor poder de negociación, lo cual reduce la necesidad de brindarles protección jurídica equivalente a la que se le da a los trabajadores asalariados. Véase el Art. 2.3, Ley Núm. 4-2017, 29 LPRA sec. 122b. **Esta alegada presunción no surge del estatuto mencionado.**

[23] Véase, K. López Alicea, *¿Qué debe mejorar en educación especial? Informe detalla áreas de necesidad*, El Nuevo Día, 23 de febrero de 2026. ("[E]l mayor incumplimiento se dio en estipulaciones relacionadas con los servicios mediante remedio provisional, **las evaluaciones de estudiantes…, los servicios de terapias,** …entre otras").

con el estudiante servido.[24] De esta forma, la cláusula que aquí se impugna infringe los intereses que se procuraron proteger desde *Arthur Young & Co. v. Vega III* y su progenie: la libertad de las personas empleadas a escoger su trabajo y la libertad de selección del público

---

[24] Véase, B. Vargas Gallegos y otros, *Efectividad en intervenciones terapéuticas con niños y adolescentes: Factores asociados a la persona del terapeuta y la alianza terapéutica*, Vol. 26 (Núm. 2) Rev. Chil. Psiquiatr. Neurol. Infanc. Adolesc. 10, 12 (2015). ("La alianza terapéutica "[s]e ha definido como la calidad y la fuerza de la relación colaborativa entre el consultante y el terapeuta en el proceso terapéutico. Involucraría el vínculo afectivo positivo entre ambos, la confianza mutua, el agrado por el otro, el respeto y la preocupación o cuidado").

Nótese, también, que en el expediente obra la *Declaración Jurada* de la Sra. Madeline Allende Delgado, terapista del habla de la Escuela Manuel Ruiz Gandía de Arecibo, en la que declaró:
[…]
6. Que para principios del [sic] primer semestre escolar del presente año tengo conocimiento de que la Sra. Arlene Maestre cesó de dar servicios a MCG Therapy Group como terapista psicológica.
7. Que los padres de los estudiantes de la Esc. Manuel Ruiz Gandía comenzaron a acercarse a donde la aquí declarante a preguntar las razones del porque los niños de educación especial estaban desprovistos de servicio.
8. Que la aquí declarante les explicaba que la Sra. Arlene Maestre ya no estaba brindado servicios a MCG y que la especialista que dicha compañía había contratado para dar los servicios tampoco los estaba ofreciendo…
9. Que a los padres de los estudiantes se les orientaba en cuanto al procedimiento para volver a obtener los servicios, y es ahí que estos me indicaban que querían que fuera la Sra. Arlene Maestre quien atendiera a sus hijos.
10. Una vez los padres de un estudiante son orientados en cuanto al procedimiento para recibir los servicios en el área escolar, son estos quienes optan por el cambio al proveedor que quieren que le brinde el servicio. *Declaración Jurada*, *Apéndice*, pág. 256.

en general. *Arthur Young & Co. v. Vega III, supra,* pág. 177.

Por lo antes expuesto, son múltiples y fundamentales las razones de orden público que nos debieron llevar hoy a un resultado distinto, considerando que, si bien este es un caso entre partes contratantes privadas, nuestro dictamen impacta indirectamente a los niños y las niñas del país registrados en el Programa de Educación Especial, y por ello nuestra responsabilidad era inmensa. [25] Recordemos que no nos encontramos ante la venta de un negocio o de acciones de una corporación de servicios profesionales, ni ante la posibilidad de que un secreto o una receta de negocio sea descubierto, ni ante el esfuerzo o dinero invertido en capacitar a la señora Maestre Rivera como terapeuta en psicología licenciada.

Por el contrario, el interés social que debe prevalecer es el de la población aquí impactada de recibir los servicios relacionados-educativos por encima del lucro económico o la llamada garantía de la plusvalía de la peticionaria o de consideraciones sobre la libre empresa. Indistintamente de si este servicio es brindado directamente por el DE o por uno de sus subcontratistas. Pues al final, todos los estudiantes son asignados a MCG

---

[25] En el pasado, enfaticé el alto interés público que reviste el acceso a los servicios de educación especial. Véase, *Vélez et al. v. Depto. Educación et al.,* 194 DPR 477 (2016) (Sentencia) (Opinión particular del Juez Asociado señor Estrella Martínez).

por medio de referidos del propio DE y la peticionaria no podría alegar que invirtió recursos económicos en captación de sus estudiantes-pacientes. En todo caso, la asignación de los estudiantes a otros proveedores o especialistas igualmente situados responde a la necesidad del servicio relacionado de educación especial y, en última instancia, su pérdida de estudiantes-pacientes, si alguna, es el resultado de la competencia ordinaria de oferta y demanda y no una competencia desleal. **No está presente ningún interés legítimo que amerite la imposición de la cláusula de no competencia cuya protección hoy la mayoría de este Tribunal valida.**[26]

En ocasiones anteriores, este Tribunal ha expresado que las cláusulas de no competencia, de exclusividad, entre otras similares, están diseñadas para proteger y adelantar los intereses comerciales. *Oriental Financial v. Nieves*, 172 DPR 462, 470 (2007). Sostengo que, de existir en este caso algún tipo de interés comercial, este obligatoriamente debe ceder ante situaciones como la de autos, donde el profesional cuya movilidad laboral le es

---

[26] Considero, además, que la *Opinión* mayoritaria adjudicó presuntas *responsabilidades significativas* que asumió que realizó la peticionaria como hechos materiales sobre los que nunca se ha pasado prueba, por la etapa procesal en que se encuentra este caso y, que a su vez, parecieran corresponder más a las responsabilidades y funciones de la *Secretaría Asociada de Educación Especial* en Puerto Rico del DE y sus oficinas regionales, que a las de un proveedor privado de servicios como otros contratistas gubernamentales (corporaciones).

restringida brinda un servicio garantizado constitucional y estatuariamente a una población vulnerable. La educación especial no es un negocio, es un derecho protegido. El interés público de preservar y garantizar este servicio es, indiscutiblemente, de mayor valor.[27] Existe un derecho absoluto a que los estudiantes de educación especial reciban el servicio relacionado que aquí se restringe.

Así, sostengo que esta cláusula de no competencia resulta irrazonable porque sus limitaciones se extienden más allá de lo necesario para proteger los intereses económicos de MCG y contravienen el bienestar común.[28] En otras palabras, MGC no posee un interés legítimo que merezca la protección que este Tribunal le brinda. A causa de ello, considerando los intereses particulares y de mayor jerarquía implicados en este caso, y a la luz del

---

[27] De las alegaciones de la demanda surge que la señora Maestre Rivera brindaba servicios de terapia psicológica a estudiantes de la Escuela Luis Meléndez Rodríguez en Hatillo, la Escuela Manuel Ruiz Gandía, al Centro de Servicios de Educación Especial, en los Centros de MCG en Hatillo y Arecibo, entre otros. Para un total de al menos 429 estudiantes. Véase, *Demanda enmendada*, *Apéndice* de la *Petición de certiorari*, págs. 25-26.

[28] En la actualidad, múltiples estados cuentan con prohibiciones estatutarias sobre las cláusulas de no competencia en escenarios médicos u otros ámbitos de la salud. Si bien es una actuación legislativa que aquí no ha ocurrido, nada impedía que en este caso se hubiese evaluado la validez de la referida cláusula con mayor recelo al considerar las circunstancias fácticas que rodean tanto al contrato como a las partes. Véase, *The Current State of the Enforceability of Restrictive Covenants in the Medical Profession.pdf*, American Bar Association, 28 de diciembre de 2022.

principio de razonabilidad, la referida cláusula debía declararse ineficaz y nula por contravenir el orden público y la buena fe contractual. Lo que, dadas las circunstancias fácticas de un caso, puede considerarse como razonable puede que no lo sea en otro caso al ponderarse los valores sociales e intereses económicos en conflicto.[29]

Ahora bien, aunque para fines adjudicativos la *Opinión* mayoritaria erróneamente rechazó que la cláusula que aquí se impugna debía declararse nula, por quebrantar el orden público, también existían otros fundamentos adicionales que nos debieron dirigir a confirmar el dictamen de los foros recurridos. Veamos.

**B.**

Como mencioné, cuando se considera una moción de desestimación al amparo de la Regla 10.2 de Procedimiento Civil, *supra*, los tribunales tenemos que tomar como ciertos todos los hechos bien alegados en la demanda y considerarlos de la forma más favorable para la parte demandante. Según este criterio, la demanda se desestimará **solo si surge que carece de todo mérito o que la parte demandante no tiene derecho a remedio alguno bajo**

---

[29] Si bien tengo presente que, en este caso, ya transcurrió en exceso el término de un año que dispone la cláusula de no competencia para intervenir con los estudiantes-pacientes, la declaración de validez de la referida cláusula y el restablecimiento de la causa de acción pudiesen implicar el pago de altas cuantías monetarias, si alguna.

**cualesquiera de los hechos que se puedan probar.** *Cruz Pérez v. Roldán Rodríguez et al.*, 206 DPR 261, 267 (2021). Es decir, procede la desestimación si aun interpretando la reclamación de manera liberal no hay remedio alguno disponible conforme a derecho.

En este caso, al analizar las alegaciones de la peticionaria de la forma más favorable y dándolas por ciertas conforme al estándar de adjudicación aplicable, correspondía concluir que los foros recurridos actuaron correctamente al desestimar la causa de acción por el incumplimiento de la cláusula de no competencia. Me explico.

De las alegaciones de la demanda y demanda enmendada surge que en el llamado proceso de transición entre las corporaciones existían dos contratos con los empleados y especialistas, bajo las mismas cláusulas, términos y condiciones. Al mismo tiempo, surge la existencia de acuerdos verbales que evidencian el incumplimiento del requisito de que el pacto de no competencia conste por escrito y esté debidamente firmado. Esto para mí es un asunto medular que impedía acoger la teoría de la cesión unitaria del Contrato, como sostiene y avala el curso mayoritario. Así, por ejemplo, se consignó en la *Demanda*:

> 17. Durante este tiempo, el acuerdo verbal entre la Sra. Maestre y MCG continuó vigente ya que la transición de personal de The Able Child a MCG ocurriría formalmente el 1 de octubre de 2022. Por lo tanto, la Sra. Maestre conocía, según acordó, que trabajaría exclusivamente para MCG

una vez ocurriera la transición. Además, también había dialogado y acordado con la directriz de MCG todas las cláusulas contenidas en el contrato de servicios profesionales de MCG. Este contrato contenía las mismas cláusulas, términos y condiciones que el contrato de servicios profesionales de The Able Child. En otras palabras, solo ocurrió una sustitución de partes. (Subrayado suplido).[30]

Similarmente, en la *Demanda enmendada* se consignó:

16. Los contratos de servicios profesionales de ambas compañías tienen los mismos términos, cláusulas y condiciones, por lo cual, todas las personas que transicionaron a MCG Therapy Group, estuvieron sujetos a los mismos términos, cláusulas y condiciones del contrato existente con The Able Child. Incluso la presidenta de MCG, Sra. Gretchen D. Gotay, **firmó ambos contratos** tanto en MCG como presidenta, como en The Able Child bajo el rol de Directora Ejecutiva Auxiliar.

[…]

24. Mediante dicha carta, la Sra. Maestre intentó alegar que no tenía conocimiento sobre la existencia de MCG con la intención de evitar cumplir con sus cláusulas y condiciones y honrar el acuerdo verbal que había aceptado con MCG.

[…]

26. Posteriormente, el 6 de febrero de 2023, la presidenta de MCG sostuvo una **reunión telefónica** con la Sra. Maestre, mediante la cual **concretaron unos acuerdos adicionales para modificar el contrato de servicios profesionales entre las partes**; a saber, los siguientes: (i) la Sra. Maestre terminaría el semestre escolar con MCG, comprendiendo desde enero de 2023 hasta junio de 2023 y (ii) la Sra. Maestre acordó y reafirmó que no llevaría a cabo ninguna gestión para trasladar los casos de MCG a otra corporación, ni para atenderlos de forma privada, ya sea en contrato directo con el Departamento de Educación o

---

[30] *Demanda*, *Apéndice*, pág. 35.

cualquier otro remedio provisional. (Negrillas y subrayado suplidos).[31]

Como mencioné, considero que, si hubo negociación, e incluso renegociación de los términos y las cláusulas por parte de MCG con la señora Maestre Rivera, y si en efecto existen dos contratos de servicios –uno con The Able Child y otro con MCG– ello pone en duda la premisa de que ocurrió una cesión íntegra del Contrato. En otras palabras, con estas alegaciones de la propia MCG se impugna y controvierte tanto la validez de la llamada cesión íntegra de los derechos y las obligaciones derivadas del Contrato, contrario a lo que erróneamente concluye la mayoría, así como el presunto silencio de la señora Maestre Rivera para consentir tácitamente a la cesión.[32]

De las propias alegaciones de la demanda enmendada se desprende que hubo múltiples conversaciones con miras a la renegociación de los términos con el llamado cesionario, MCG, las cuales permiten concluir que no se materializó ningún acuerdo, al menos por escrito, del resultado de estas negociaciones respecto a los términos de empleo y, en consecuencia, de la cláusula de no

---

[31] *Demanda enmendada* de la *Petición de certiorari, Apéndice*, págs. 202 y 204.

[32] Anteriormente he precisado sobre el peligro de acoger forzadamente la teoría del consentimiento tácito en perjuicio de un empleado. Véase, *Aponte Valentín v. Pfizer Pharmaceuticals, LLC.*, 208 DPR 263, 293 (2021) (Opinión disidente del Juez Asociado señor Estrella Martínez).

competencia que hoy se valida. Por el contrario, en este caso hubo un fraccionamiento que quebrantó cualquier posible cesión unitaria del Contrato y es evidente que entre MCG y la señora Maestre Rivera no se formalizó ningún acuerdo documentado.

Al respecto, se ha expresado que la cesión del contrato permite la transmisión íntegra de la relación contractual, ya que se transfieren tanto los derechos como las obligaciones, "sin que ello suponga modificación alguna de los pactos y de las condiciones acordadas en el contrato cedido, que, en todo caso, mantiene su validez y vigencia". N. Marchal Escalona, *La cesión del contrato*; Derecho contractual comparado: una perspectiva europea transnacional, 3era ed., España, CIVITAS, 2016, T. II, págs. 501-502.

Contrario al proceder mayoritario, concluyo que MCG no ocupó los mismos derechos y las obligaciones que correspondían a la relación contractual entre The Able Child y la recurrida. Recordemos que se debe presuponer, además, que el acuerdo de no competir es incidental a un contrato de trabajo. *Arthur Young & Co. v. Vega III, supra,* pág. 167.

Es necesario enfatizar que las cláusulas de no competencia constituyen una restricción severa al derecho de la persona trabajadora a elegir y a renunciar a su empleo. Es un requisito indispensable el que este tipo de

cláusulas estén consignadas por escrito por las partes contratantes, como repetidamente hemos requerido desde el caso normativo *Arthur Young & Co. v. Vega III, supra,* pág. 176. Esto es necesario porque la obligación de no hacer se activa al culminar la relación laboral y su formalización por escrito permite conocer si esta se pactó de manera libre y voluntaria. Al mismo tiempo, facilita la evaluación de los distintos criterios para su validez, tales como el alcance, la duración, la limitación geográfica, entre otros.

De esto realizarse, se elimina la incertidumbre contractual e inseguridad jurídica que precisamente están presentes en este caso: conversaciones, llamadas telefónicas, cartas, modificaciones, renegociaciones y acuerdos verbales entre las partes en cuanto a la contratación con la señora Maestre Rivera, particularmente con relación a la cláusula accesoria e incidental de no competir. Todo esto convierte, desde mi criterio, en incierto, impreciso y erróneo el asegurar que la señora Maestre Rivera consintió tácita y libremente a la cesión de la cláusula de no competencia con MCG como parte contratante, en lugar de con The Able Child, como fue la cláusula originalmente suscrita. ¿Cómo puede entenderse, y, por ende, concluirse que existió un consentimiento tácito a la cesión del Contrato como un negocio jurídico

unitario, si aún se estaban negociando los términos y las obligaciones entre las partes?[33]

Abona a mi disenso el que, si en efecto hubo una cesión del Contrato, incluso de los contratos de todos los especialistas e íntegramente como se alega y se concluye, debería existir al menos una resolución corporativa de The Able Child o de MCG para acreditarlo. Esto, indistintamente de su naturaleza jurídica, a saber, si la cesión del Contrato entre el cedente y el cesionario fue un negocio puramente gratuito o a título oneroso. Nada de ello se presentó ni surge de la revisión del expediente.[34]

---

[33] Al respecto, la doctrina civilista reconoce que el cedido, como parte del proceso para brindar su consentimiento a la cesión, puede "perfectamente insinuar modificaciones de las cláusulas que aquellos [cedente y cesionario] hayan estipulado. Es decir, tiene no solamente libertad de contratar -adherirse o no a las estipulaciones pactadas por las otras partes-, sino, además, libertad de contratación- tomar parte activa en la formulación del contenido de las estipulaciones". M. García-Amigo, *La cesión de contratos en el derecho español,* Editorial Revista de Derecho Privado, Madrid, 1964, pág. 340.

[34] En cuanto a eso, la señora Maestre Rivera y AM Therapeutic expresaron en su *Alegato* que, a pesar de que el descubrimiento de prueba está adelantado entre las partes "no surge documento alguno que acredite lo expresado en la demanda sobre la transacción o acuerdo de cesión entre ambos entes jurídicos, entiéndase MCG & The Able Child". *Alegato*, pág. 12.

Por otra parte, para los requisitos de un acuerdo de fusión o consolidación entre compañías de responsabilidad limitada, véase, el Art. 10.04 de la Ley Núm. 164-2009, conocida como Ley General de Corporaciones, 14 LPRA sec. 3734. Para la cesión de un interés en este tipo de entidades, véase el Art. 19.43 de la Ley Núm. 164-2009, 14 LPRA sec. 3993.

Paralelamente, el Contrato, en su *Addendum*, contiene una cláusula en la que dispone que, de haber algún cambio en el contrato entre el DE y The Able Child, esta última tendría que enviar a la especialista, entiéndase a la señora Maestre Rivera, las enmiendas para su firma y ese documento pasaría a ser parte del Contrato. En específico dispone:

> 31. Este contrato se ha creado basado en el conocimiento de las cláusulas contractuales actuales con el Departamento de Educación. **En caso de que el Departamento de Educación haga algún cambio a su contrato de servicios con MCG AND The Able Child,** CORPORACIÓN se verá en la obligación de hacer una enmienda modificando las partes del contrato que sean necesarias para asegurar el cumplimiento con los requisitos del Departamento de Educación. **De ser el caso, se estarán enviando las enmiendas a ESPECIALISTA para que este las firme y dicho documento pasará a ser parte del contrato firmado originalmente.** (Negrillas suplidas). [35]

Aun bajo la lógica de la *Opinión* mayoritaria, que excluye las importantes consideraciones de orden público, si The Able Child y MCG tenían la expectativa de que el Contrato de servicios profesionales de la señora Maestre Rivera continuara en toda su extensión con MCG, y tras el evidente cambio de The Able Child a MCG en la contratación con el DE, era necesario notificarle a la recurrida la enmienda contractual. Entiéndase, el cambio de las partes

---

[35] *Apéndice* de la *Petición de certiorari*, pág. 81.

contratantes con el DE, para que ratificara por escrito su consentimiento en virtud de la Cláusula #31.[36]

Por todos estos fundamentos, resulta errado concluir que la señora Maestre Rivera consintió tácitamente a la cesión del Contrato. Esto es importante, pues, como reseña la *Opinión* mayoritaria en su parte normativa, la declaración de voluntad del cedido es parte constitutiva de la cesión. M. García-Amigo*, La cesión de contratos en el derecho español,* Editorial Revista de Derecho Privado, Madrid, 1964, pág. 314. Por este motivo, al tratarse de un negocio trilateral es necesario la concurrencia de las tres declaraciones de voluntad, la del cedente, la del cedido y la del cesionario, y "[si] cualquiera de las tres faltare, sea cual sea, la cesión es inválida, o mejor, inexistente". Íd., págs. 315 y 330. **Más importante aún, cuando se habla del consentimiento del cedido, el simple conocimiento de la cesión es un asunto distinto al consentimiento contractual**. Íd., pág. 336.

En lo relativo a esto último, a mi juicio, tampoco tiene méritos la conclusión fáctica de que la señora Maestre Rivera fue notificada de la alegada cesión del

---

[36] La prestación del consentimiento, sea tácito o explícito, debe surgir de manera libre, espontánea y con completo conocimiento sobre lo que se está haciendo. J.R. Vélez Torres, *Curso de derecho civil: derecho de contratos*, San Juan, Facultad de Derecho de la Universidad Interamericana, 1990, T. V, Vol. II, pág. 45. Véase, *Aponte Valentín et al. v. Pfizer Pharm*, *supra*, pág. 306 (Opinión disidente del Juez Asociado señor Estrella Martínez).

Contrato y que ello constituyó una declaración tácita de su consentimiento por presuntamente no haberse opuesto. En cuanto a la presunta notificación, MCG adujo que:

> 17. Tanto fue así, que en un comunicado de transición de operaciones por parte de MCG a todos sus especialistas y personal administrativo, enviado el 27 de septiembre de 2022, se le informó a todo el personal que el cambio de corporación no requeriría ninguna gestión por parte de ellos debido a que los traslados se harían de forma interna entre el Departamento de Educación y MCG. Generalmente, los traslados de estudiantes se llevan a cabo a través de una solicitud en el DE para que el estudiante sea reubicado a otro proveedor el cual puede ser una corporación o un individuo. No obstante, en este caso y de forma excepcional, el DE por su parte informó a MCG de que gestionaría todos los traslados de estudiantes de The Able Child a MCG, y así hizo.[37]

Aun tomando esta aseveración como cierta, conforme el estándar de adjudicación previamente discutido, lo único que se puede desprender es que en el referido comunicado se les informó a los especialistas que el cambio de corporación no requería ninguna gestión por parte de ellos para vincular a los estudiantes a sus servicios. Ello, debido a que los traslados de los estudiantes se harían de forma interna entre el DE y MCG, pues generalmente los traslados se tramitan mediante solicitud. Por eso, estimo que no tiene el alcance de demostrar que la señora Maestre Rivera fue notificada de

---

[37] *Demanda enmendada*, *Apéndice* de la *Petición de certiorari*, pág. 202-203.

la cesión y que, en consecuencia, consintió tácitamente a la cláusula de no competencia.

Finalmente, este caso no se trata de un intento de burlar las obligaciones contractuales. Por el contrario, según expliqué, aun si para propósitos argumentativos consideramos que la referida cláusula no violenta el orden público, reitero que la alegada cesión del contrato nunca se perfeccionó válidamente entre MGC y la recurrida. Tampoco el dictamen de los foros recurridos trató de introducir un nuevo requisito para que la cesión de un contrato con una cláusula de no competencia fuese válida. El exigir que los acuerdos de no competencia, incluso de ocurrir una cesión del referido contrato, consten por escrito entre las partes contratantes, tal cual se requirió desde *Arthur Young & Co. v. Vega III, supra,* no implicaba una carga muy onerosa, sino el requerimiento de un elemento esencial para su validez.[38] Particularmente, cuando el servicio pactado al que se le aplica la restricción es de tan alto valor social.

---

[38] En nuestro ordenamiento jurídico se reconoce la la necesidad que la notificación de la cesión conste por escrito en el caso del contrato de arrendamiento de bienes muebles. Véase el Art. 17 de la Ley Núm. 76-1994, Ley para regular los contratos de arrendamiento de bienes muebles, 10 LPRA sec. 2415.

Por otra parte, el Código Civil Italiano regula la figura de la cesión de contratos como un negocio trilateral, que tendrá lugar siempre y cuando las contraprestaciones pactadas no se hayan cumplido y siempre que la parte cedida brinde su consentimiento. Véase, Art. 1406 del Código Civil Italiano.

**IV**

Así las cosas, y contrario al curso mayoritario, estimo que en este caso no nos encontramos ante un contrato de cesión cuyas cláusulas sean exigibles contra la recurrida. Como resultado, correspondía conceder la desestimación de la acción de incumplimiento contractual debido a que las alegaciones permiten concluir claramente que la demanda carece de todo mérito y que la peticionaria no tiene derecho a obtener algún remedio. Como ello no fue el proceder mayoritario, **disiento**.


Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

MCG Therapy Group, LLC

    Peticionario

      v.                           CC-2024-553

Arlene J. Maestre Rivera;
AM Therapeutic Service for
Children, Inc.

    Recurridos

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 28 de mayo de 2026.

Una vez más, una mayoría de mis compañeros y compañera de estrado, se aparta de principios que nuestro ordenamiento jurídico reiteradamente ha reconocido como esenciales para la protección efectiva de la clase trabajadora. En esta ocasión, al validar una cláusula de no competencia sin exigir el cumplimiento estricto de los requisitos que previamente habíamos elaborado en *Arthur Young & Co. v. Vega*, *infra*, erosionando así garantías fundamentales dirigidas a asegurar que toda restricción al derecho a escoger libremente y renunciar a una ocupación responda al consentimiento libre, expreso e informado del obrero o de la obrera.

Con ello, una mayoría de este Tribunal no sólo abandona la interpretación restrictiva que se exige al acercarse a una cláusula de no competencia, sino que debilita protecciones de evidente primacía constitucional. De ese lamentable proceder, disentimos.

I.

Los hechos medulares que dan margen al presente litigio no están en controversia. En síntesis, el 26 de julio de 2022 MCG & The Able Child at Centro Multidisciplinario del Caribe, Inc. (en adelante, "The Able Child"), -- compañía que ofrece servicios psicológicos a estudiantes de educación especial del Departamento de Educación de Puerto Rico (en adelante, "Departamento de Educación") --, suscribió un contrato de servicios profesionales con la Sra. Arlene J. Maestre Rivera (en adelante, "señora Maestre Rivera"). Mediante dicho acuerdo, la señora Maestre Rivera se comprometió a ofrecer, durante el periodo escolar 2022-2023,[1] servicios de evaluación y tratamiento psicológico a pacientes asignados por el Departamento de Educación a The Able Child.

**En lo pertinente a la controversia que hoy nos ocupa, el contrato de servicios profesionales en cuestión contenía una cláusula de no competencia que disponía, en esencia, que la señora Maestre Rivera debía esperar un mínimo de un (1) año, a partir de la fecha de su renuncia oficial a la compañía o de la notificación de determinación de no renovación, para**

---

[1] En particular, el referido contrato estaría vigente hasta el 31 de julio de 2023.

**atender, a través de otro medio que no fuese The Able Child, los pacientes que atendía a través de tal entidad. En caso de incumplir con ello, el acuerdo disponía que ésta vendría obligada a pagar una indemnización.**

**Ahora bien, el 1 de octubre de 2022 The Able Child cedió todos sus contratos a MCG Therapy Group, LLC (en adelante, "MCG"). A raíz de ello, la señora Maestre Rivera continuó ofreciendo sus servicios profesionales de psicología a los estudiantes de educación especial del Departamento de Educación como contratista independiente de MCG.**

No obstante, el 2 de septiembre de 2022, -- es decir, antes de que hubiese ocurrido la referida cesión --, la señora Maestre Rivera suscribió un contrato directamente con el Departamento de Educación para brindar los mismos servicios que ofrecía a través de MCG. A su vez, el 14 de diciembre de 2022 la señora Maestre Rivera formó la compañía AM Therapeutic Service (en adelante, "AM Therapeutic"). Finalmente, el 3 de marzo de 2023 la señora Maestre Rivera renunció a MCG.

El 6 de marzo de 2023, MCG advino en conocimiento del proceder de la señora Maestre Rivera, luego de que el Departamento de Educación le ordenase desvincular a unos estudiantes suyos para trasladarlos a la señora Maestre Rivera. Así las cosas, el 3 de abril de 2023 la referida compañía presentó, ante el Tribunal de Primera Instancia, una *Demanda* sobre incumplimiento de contrato, daños y perjuicios

e interferencia torticera en contra de la señora Maestre Rivera.[2]

En esencia, MCG alegó que había adquirido el referido contrato de servicios profesionales mediante cesión por la compañía antecesora, The Able Child, y que, en virtud de dicha transacción, se mantenían los términos, cláusulas y condiciones originales. Ante ello, argumentó que tenía derecho a reclamar a la señora Maestre Rivera por su incumplimiento con la cláusula de no competencia.

Al respecto, MCG sostuvo que, el 19 de julio de 2022, sus agentes notificaron directamente a la señora Maestre Rivera sobre la cesión y discutieron ciertos términos del contrato. Adujo que dichas partes alcanzaron un acuerdo verbal mediante el cual se le pagaría a la señora Maestre Rivera una tarifa superior a la de otros psicólogos, a cambio de que esta última trabajara exclusivamente para la peticionaria y no atendiera de forma privada la matrícula asignada.

En respuesta, el 16 de mayo de 2023 la señora Maestre Rivera presentó, ante el foro primario, una *Moción en solicitud de desestimación al amparo de la Regla 10.2 de Procedimiento Civil*. En su escrito, dicha parte sostuvo que las alegaciones de la *Demanda* no justificaban la concesión de un remedio.

A juicio de la señora Maestre Rivera, MCG no tenía legitimación activa para invocar la protección de una

---

[2] Eventualmente, MCG enmendó la *Demanda* para incluir a AM Therapeutic.

cláusula de no competencia suscrita en un contrato pactado con otra compañía, -- a saber, The Able Child --, y en el que no fue parte. A su vez, alegó que esta última empresa era parte indispensable en el pleito.

**En específico, la señora Maestre Rivera argumentó que nunca ratificó por escrito con MCG el acuerdo de no competencia originalmente pactado con The Able Child. En ese sentido, adujo que la validez de la cláusula de no competencia no podía refrendarse verbalmente. Por último, la señora Maestre Rivera alegó que la cláusula en cuestión era nula, por el patrono no haberle ofrecido una contraprestación a cambio de la firma del acuerdo.**

Enterada de lo anterior, el 5 de junio de 2023 MCG presentó, ante el Tribunal de Primera Instancia, una *Oposición a moción de desestimación*. En su escrito, la referida compañía señaló que la *Demanda* contenía argumentos suficientes para justificar la concesión de un remedio. Enfatizó que The Able Child le cedió todos los derechos y obligaciones de los contratos bajo los mismos términos y condiciones, por lo que el contrato en cuestión permanecía inalterado. A base de ello, MCG sostuvo que tenía legitimación activa para instar el presente litigio, toda vez la señora Maestre Rivera le había ocasionado daños específicos.

**Evaluados los argumentos de ambas partes, el 10 de agosto de 2023 el foro primario emitió una *Sentencia parcial* mediante la cual desestimó, con perjuicio, la causa de acción**

**presentada ante sí por MCG. En específico, el Tribunal de Primera Instancia destacó que no había controversia en cuanto a que: (1) entre las partes nunca hubo un contrato por escrito; (2) la señora Maestre Rivera era una contratista independiente; y (3) esta última prestó servicios profesionales a MCG.**

**Asimismo, el foro primario concluyó que el ordenamiento legal requería que, entre MCG y la señora Maestre Rivera, existiera un acuerdo escrito firmado por ambas partes para que la cláusula de no competencia tuviera vigencia. Así pues, el Tribunal de Primera Instancia determinó que la cesión no tuvo el efecto de validar dicha cláusula, por no haberse suscrito un acuerdo de ratificación por escrito.**

En desacuerdo, y luego de denegada la correspondiente solicitud de reconsideración, el 27 de octubre de 2023 MCG presentó, ante el Tribunal de Apelaciones, un *Recurso de apelación civil*. En éste, la referida compañía argumentó que el foro primario había errado al desestimar la causa de acción sobre incumplimiento de contrato con una cláusula de no competencia y al privarle de su día en corte. Sostuvo, además, que de la *Demanda* surgía, con la especificidad requerida, que el contrato que le fue cedido constaba por escrito. En ese sentido, MCG planteó que la cesión implicó la transmisión de todos los derechos y obligaciones principales y accesorias del contrato.

Por su parte, el 27 de noviembre de 2023 la señora Maestre Rivera presentó, ante el foro apelativo intermedio,

un *Alegato en oposición a escrito de apelación y solicitud de desestimación*. En el mismo, dicha parte reiteró que las alegaciones en cuestión dejaban de exponer un remedio bajo la Regla 10.2(5) de Procedimiento Civil, 32 LPRA Ap. V.

**Examinados los alegatos presentados por ambas partes, el 8 de agosto de 2024 el Tribunal de Apelaciones emitió la correspondiente *Sentencia*.**[3] **En virtud de la misma, el foro apelativo intermedio confirmó la *Sentencia parcial* emitida por el Tribunal de Primera Instancia.**

**En particular, el Tribunal de Apelaciones fundamentó su determinación en que, debido al efecto restrictivo de las cláusulas de no competencia, su transmisión mediante cesión sólo podía ocurrir si se incorporaba un acuerdo escrito entre las partes. Ante la ausencia de dicho acuerdo, el foro apelativo intermedio entendió que MCG no podía invocar los efectos de la referida cláusula.**[4]

Insatisfecha todavía, el 9 de septiembre de 2024 MCG acudió ante nos mediante una *Petición de certiorari*.[5] En su escrito, la compañía expuso que el Tribunal de Apelaciones había errado al imponer una nueva restricción al derecho de

---

[3] Panel compuesto por la Jueza Grana Martínez, el Juez Pérez Ocasio y el Juez Campos Pérez. El Juez Campos Pérez disintió con *Opinión* escrita.

[4] **El foro apelativo intermedio también encontró que la razonabilidad de la cláusula objeto de controversia era cuestionable, pues la misma tenía un efecto real o probable sobre el interés público. En particular, el Tribunal de Apelaciones enfatizó que la restricción repercutía directamente sobre el derecho de los estudiantes de educación especial de escuelas públicas a recibir un tratamiento psicológico efectivo y en la libertad de los padres de escoger al profesional que atenderá a sus hijos.**

[5] Inicialmente, la referida *Petición de certiorari* fue denegada por este Foro. No obstante, el 28 de marzo de 2025 se expidió el recurso en reconsideración y el mismo quedó perfeccionado el 11 de junio de 2025.

libertad contractual y al determinar que la cláusula en cuestión afectaba a los estudiantes de educación especial de las escuelas públicas.

Por su parte, el 10 de junio de 2025 la señora Maestre Rivera presentó ante este Tribunal el correspondiente *Alegato en oposición*. En el mismo, dicha parte sostuvo que el acuerdo no constaba por escrito, que no hubo una contraprestación válida y que el mismo era contrario al interés público.

**Como adelantamos, hoy, una mayoría de este Tribunal erróneamente concluye que una cláusula de no competencia puede ser cedida a otro patrono sin ratificación expresa y por escrito por parte del trabajador o trabajadora. Con dicho proceder, una mayoría de mis compañeros y compañera de estrado vuelve a debilitar las garantías que nuestro ordenamiento, en algún momento, le otorgó a nuestra clase trabajadora. Asimismo, evade el principio de que toda duda o ambigüedad, en el contexto laboral, debe resolverse a favor del obrero o de la obrera.**

Con tal decisión, obviamente, no podemos estar de acuerdo. Procedamos, pues, a esbozar nuestros fundamentos para disentir de dicho proceder.

## II.

### A.

Como se sabe, la protección a los derechos de la clase trabajadora es uno de los asuntos a los que la Constitución del Estado Libre Asociado de Puerto Rico le presta particular atención. Lo anterior se evidencia con una simple lectura de

su Carta de Derechos, pues "[d]e las veinte secciones que componen el Artículo II […], cinco de ellas se refieren directamente a derechos relacionados al trabajo". *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 901-902 (2011). Ello responde, claro está, al valor que el trabajo reviste en nuestra sociedad y a la desigualdad inherente que caracteriza la relación obrero-patronal. *Íd.* Véase, también, *Kendall Hope Tucker v. Money Group, LLC y otros*, 217 DPR ___, 2026 TSPR 9, 3 (Colón Pérez, opinión disidente).

**Así pues, y en lo pertinente a la controversia que hoy nos ocupa, la Constitución del Estado Libre Asociado de Puerto Rico, en su Art. II, Sec. 16, reconoce, entre otros, el derecho de todo trabajador y de toda trabajadora a escoger libremente su ocupación y a renunciar a ella.** Art II, Sec. 16, Const. PR, LPRA, Tomo 1. **Tal disposición, "si bien aplica a los empleados públicos, tiene como principal objetivo proteger [también] a los trabajadores de la empresa privada".** (Énfasis suplido). J. M. Farinacci Fernós, *Igual Trato por Igual Trabajo: Las Clasificaciones Laborales Irracionales y el Trato Desigual en el Empleo Privado*, 50 Rev. Jur. U.I.P.R. 311, 318 (2016).

Dicha garantía, nos explica el Prof. Farinacci Fernós, abarca dos acciones: (1) escoger libremente una ocupación; y (2) renunciar voluntariamente a ella. J. Farinacci Fernós, *La carta de derechos*, San Juan, Editorial InterJuris, 2021, pág. 307. El propósito de la primera acción, -- a saber, la de escoger libremente una ocupación --, fue subrayar el

carácter libre y voluntario de todo trabajo. *Íd*. A su vez, la intención fue que toda relación de trabajo estuviese basada en el consentimiento libre del trabajador o de la trabajadora; es decir, que no se impusiese una tarea en contra de su voluntad. *Íd.* pág. 308.

En cuanto a la acción de renunciar, -- la segunda de las acciones --, el Prof. Farinacci Fernós señala que, igual que con la selección libre de un trabajo, su propósito fue enfatizar el carácter voluntario de toda ocupación. *Íd.* pág. 309. La intención, por otra parte, fue que el obrero o la obrera preservase, permanentemente, el poder para salir de una relación laboral. *Íd*.

**En armonía con lo antes expuesto, este Tribunal ha establecido que, en Puerto Rico, "existe una clara política pública a favor del derecho de toda persona a obtener empleo, devengar ingresos y renunciar a ese empleo en cualquier momento para dedicarse a otra ocupación".** (Énfasis suplido). *Oriental Financial v. Nieves*, 172 DPR 462, 472-473 (2007). **Sin embargo, hemos dispuesto que este derecho no es absoluto, por lo que puede ser limitado por el propio trabajador.**[6] *Íd.* pág. 473; *Dolphin Int'l of P.R. v. Ryder Truck Lines*, 127 DPR 869, 878 (1991). **Ahora bien, cuando ello ocurre, tales limitaciones exigen un examen particularmente riguroso.**

---

[6] Aunque en ocasiones se ha dispuesto que este derecho es renunciable, somos del criterio que ello no es así. En ese sentido, coincidimos con el Prof. Farinacci Fernós en cuanto a que dicha garantía es "irrenunciable, por lo que opera independientemente de la voluntad individual de las partes". J. Farinacci Fernós, *La carta de derechos*, San Juan, Editorial InterJuris, 2021, pág. 310.

B.

Al respecto, conviene recordar aquí que este Tribunal ha desarrollado una norma muy particular al momento de acercarse a controversias que se dan en el marco de las relaciones obrero-patronales. **En particular, hemos establecido que la legislación laboral debe ser interpretada liberalmente, resolviendo toda duda en favor del obrero o de la obrera, para así cumplir con sus propósitos sociales y reparadores.** *Cordero Jiménez v. UPR*, 188 DPR 129, 139 (2013); *Irizarry v. J&J Cons. Prods. Co., (P.R.), Inc.*, 150 DPR 155, 164 (2000); *Méndez v. F.S.E.*, 140 DPR 375, 380 (1996). **A su vez, y a pesar de que tal norma se tiende a utilizar al momento de interpretar legislación, "[e]n el contexto constitucional, [ésta] adquiere una fuerza aún mayor", por lo que se hace extensiva también a tales escenarios.** (Énfasis suplido). J. Farinacci Fernós, *Hermenéutica puertorriqueña: Cánones de interpretación jurídica*, San Juan, Editorial InterJuris, 2020, pág. 254.

**En ese sentido, cuando corresponde evaluar cláusulas contractuales que restringen la libertad del obrero o de la obrera para escoger o abandonar una ocupación, -- <u>como lo es una cláusula de no competencia</u> --, el análisis judicial debe llevarse a cabo con particular cautela y con apego a las salvaguardas que nuestro ordenamiento ha desarrollado para proteger a la clase trabajadora.**

Tal es el caso de autos. Veamos.

C.

De entrada, debemos tener presente que, de ordinario, los contratos laborales constituyen contratos de adhesión. *Arthur Young & Co. v. Vega III*, 136 DPR 157, 186-188 (1994) (Fuster Berlingeri, opinión concurrente); *Santiago v. Kodak Caribbean, Ltd.*, 129 DPR 763, 776 (1992). En este tipo de contrato, sólo una de las partes dicta las condiciones que ha de aceptar la otra. *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372, 386 (2009); *Zequeira v. CRUV*, 83 DPR 878, 880 (1961). Véase, además, *Suárez Figueroa v. Sabanera Real, Inc.*, 173 DPR 694, 711-712 (2008). Consecuentemente, es norma reiterada que este acuerdo "presenta el fenómeno de una reducción al mínimo de la bilateralidad contractual". *Zequeira v. CRUV*, *supra*, pág. 881. Véase también *C.R.U.V. v. Pena Ubiles*, 95 DPR 311, 314-315 (1967).

Ante tal fenómeno, aunque nuestro ordenamiento jurídico no los prohíbe, sí trata los contratos de adhesión de modo excepcional. En cuanto a esto, la Ley Núm. 55-2020, también conocida como el *Código Civil de Puerto Rico de 2020* (en adelante, "Código Civil de 2020"), 31 LPRA sec. 5311 *et seq.*, señala que las cláusulas de los contratos de adhesión deben interpretarse en contra de la parte que las redacta y en favor de aquella que se vio precisada a aceptar su contenido. Art. 1248 del Código Civil de 2020, 31 LPRA sec. 9802.

**Así pues, cuando estas normas se extrapolan al contexto de las relaciones obrero-patronales, en las que el obrero o la obrera viene obligado a aceptar lo que propone el patrono**

**en el contrato de trabajo, pues éste o ésta no se encuentra en posición real de exigir mejores términos, las cláusulas contenidas en el referido acuerdo deben interpretarse en favor del contratante más débil en el aspecto económico, que en este caso es el empleado.** Así lo ha sentenciado este Tribunal, previamente, en *Arthur Young & Co. v. Vega III*, *supra*, pág. 186 (Opinión concurrente, Fuster Berlingeri), y en *Santiago v. Kodak Caribbean, Ltd.*, *supra*, pág. 776.

Y es, precisamente, en este contexto de desigualdad estructural en el cual deben evaluarse las cláusulas de no competencia. Procedamos a ello.

D.

i.

En términos generales, las cláusulas de no competencia se incorporan en un contrato con el propósito de "restringir que una de las partes se involucre en un negocio, o una actividad, mediante el cual pueda competir con la otra". *Martin's BBQ v. García de Gracia*, 178 DPR 978, 990 (2010). En esa dirección, estas estipulaciones pueden formar parte no sólo de contratos de empleo, sino también de contratos de venta de negocios y franquicias. *Martin's BBQ v. García de Gracia*, *supra*. Véase, también, R. W. Emerson, *Franchise Noncompetes: Their Legal Effect, Practical Impact, and Superior Alternatives*, 50 J. Corp. L. 653, 654-655 (2025).

En el ámbito laboral, las cláusulas de no competencia restringen al obrero o la obrera de aceptar un trabajo o comenzar cierto negocio: (1) en determinada línea de trabajo

o industria; (2) en un área geográfica; y (3) por un periodo de tiempo a partir de la renuncia o separación con el patrono actual. S. Vaheesan & M. Jinoo Buck, *Non-Competes and Other Contracts of Dispossession*, 2022 Mich. St. L. Rev. 113, 119 (2022). En ese sentido, el propósito de este tipo de cláusula es, esencialmente, proteger los intereses comerciales del patrono. *Oriental Financial v. Nieves*, *supra*, pág. 470. Véase, también, *Martin's BBQ v. García de Gracia*, *supra*, pág. 994; *Arthur Young & Co. v. Vega III*, *supra*, pág. 175.[7]

ii.

En el ordenamiento jurídico de Puerto Rico, como regla general, las cláusulas de no competencia se consideran válidas.[8] *Martin's BBQ v. García de Gracia*, *supra*, pág. 990;

---

[7] Véase, además, E. Brendel Mathews, *Forbidden Friending: A Framework for Assessing the Reasonableness of Nonsolicitation Agreements and Determining what Constitutes a Breach on Social Media*, 87 Fordham L. Rev. 1217, 1227 (2018) ("Noncompete clauses ("NCCs") also fall under the category of restrictive covenants. **Because NCCs function to restrict an employee's actions and are intended to protect an employer's business interests**, it follows that NCCs are closely linked to [nonsolicitation agreements]. **NCCs restrict a former employee from working for a competitor of his or her former employer or from starting a business that would compete with that employer upon termination. They can also restrict a current employee from working for or owning an interest in a competing business while still employed.**") (Énfasis suplido); S. C. Kinsey, *Enforceability of Non-Competition Provisions in Executive Employment Agreements: A Fresh Look at New York Law*, 36 N.Y.L. Sch. L. Rev. 427 (1991) ("The restrictions typically provide that the former employee will be restrained from working for a competitor within a certain geographical area and for a specified period of time. **These clauses are designed to protect employers against former employees' conveying to a competitor the knowledge they have gained of their former employer's business.** In some cases, such restrictive covenants also may prevent former employees from taking important customers with them.")(Énfasis suplido).

[8] En los Estados Unidos, no existe un régimen uniforme respecto a las cláusulas de no competencia en el contexto laboral, pues su validez y alcance quedan sujetos a la legislación de cada estado. Como regla general, la mayoría de las jurisdicciones permite su utilización, siempre que cumplan con criterios de razonabilidad. No obstante, algunas jurisdicciones han optado por prohibir este tipo de acuerdos, mientras que otras han limitado su aplicabilidad a determinadas categorías de empleados. Véase, S. M. Hendricks*, Breaking the Bind: Rethinking Non-Compete Agreements in a Federal Framework*, 28 Chap. L. Rev. 241, 247-249

*Oriental Financial v. Nieves*, *supra*, pág. 473; *Arthur Young & Co. v. Vega III*, *supra*, pág. 175. Su validez radica en el principio de libertad contractual, el cual esencialmente dispone que las partes pueden acordar cualquier cláusula contractual que no sea contraria a la ley, a la moral o al orden público. Art. 1232 del Código Civil de 2020, 31 LPRA sec. 9753. Véase, también, *Coop. Sabaneña v. Casiano Rivera*, 184 DPR 169, 173 (2011); *Vélez v. Izquierdo*, 162 DPR 88, 92 (2004).

**Ahora bien, la doctrina contemporánea ha advertido que las cláusulas de no competencia, en el contexto de la relación obrero-patronal, pueden generar desventajas significativas para el trabajador o la trabajadora, algunas de las cuales resulta pertinente examinar aquí.**

**En primer lugar, las cláusulas de no competencia exacerban las desigualdades naturales de la relación obrero-patronal.** Recordemos que estos acuerdos funcionan como contratos de adhesión, por lo que, de ordinario, las y los trabajadores vienen obligados a aceptar dicha limitación a cambio de obtener o mantener la oportunidad de empleo. S. Vaheesan & M. Jinoo Buck, *supra*, págs. 128 y 138. Es decir, en la mayoría de los casos, el obrero o la obrera no tiene oportunidad para negociar una cláusula de no competencia.[9]

---

(2025) y S. Vaheesan & M. Jinoo Buck, *Non-Competes and Other Contracts of Dispossession*, 2022 Mich. St. L. Rev. 113, 120 (2022).

[9] "Scholars studying non-compete clauses have written that 'the evidence . . . indicates that employers present (or employees receive) non-compete proposals as take-it-or-leave-it propositions.'". S. Vaheesan & M. Jinoo Buck, *supra*, pág. 138.

De hecho, por tal naturaleza de adhesión, los acuerdos de no competencia han sido comparados con las cláusulas obligatorias de arbitraje. *Íd*. pág. 138. Asimismo, se ha señalado que algunos patronos tienden a imponer estas cláusulas luego de la aceptación de la oportunidad de trabajo, lo cual limita aún más la posibilidad de algún tipo de negociación por parte del trabajador o de la trabajadora. E. Starr *et al*., *Noncompetes in the U.S. Labor Force*, 64 J.L. & Econ. 53, 56-57 (2021); C. A. Master, *Michigan's Non-Compete Debate: Balancing Employer and Employee Interests*, 15 Ave Maria L. Rev. 191, 203 (2017); R. Arnow-Richman, *Cubewrap Contracts: The Rise of Delayed Term, Standard Form Employment Agreements*, 49 Ariz. L. Rev. 637, 639, 647-651 (2007).

**En segundo lugar, los acuerdos de no competencia limitan la movilidad laboral del trabajador o de la trabajadora, pues evitan que éste o ésta cambie de empleo con la libertad habitual.** S. Vaheesan & M. Jinoo Buck, *supra*, pág. 142; E. Starr *et al*., *supra*, págs. 53-54. En nuestra jurisdicción, -- como ya mencionamos --, tal restricción implica una cortapisa a un derecho de rango constitucional.

iii.

**Consciente de tales pormenores, este Tribunal adoptó, en *Arthur Young & Co. v. Vega III*, *supra*, -- caso normativo en Puerto Rico respecto a las cláusulas de no competencia en contratos de empleo --, un criterio de razonabilidad proveniente del derecho común para evaluar la validez de**

estos acuerdos. **En específico, dispusimos que una cláusula de no competencia es razonable "si protege intereses legítimos del patrono sin imponer una carga excesiva al empleado y sin perjudicar al público en general".** (Énfasis suplido). *Íd.* pág. 167.

Asimismo, enfatizamos que, en jurisdicciones de tradición civilista como la nuestra, estas cláusulas no se consideran inválidas *per se*, sino que su validez depende de que respeten estrictamente las exigencias de buena fe contractual y no excedan aquello que resulte verdaderamente necesario para proteger el interés patronal. *Íd.* págs. 174-175.

**De otra parte, establecimos una serie de requisitos que se requiere que concurran para que una cláusula de no competencia sea válida. En específico, dispusimos los siguientes: (1) que el patrono tenga un interés legítimo que justifique la prohibición; (2) que el alcance de la prohibición corresponda al interés del patrono en cuanto al objeto, término y lugar de restricción o clientes afectados; (3) que el patrono ofrezca una contraprestación a cambio de la firma del acuerdo; (4) que el acuerdo cuente con los elementos esenciales para su validez, a saber, el consentimiento, objeto y causa; y (5) <u>que el mismo se haya realizado por escrito</u>.** *Íd.* págs. 175-177. **Estos requisitos, lejos de ser meros formalismos, constituyen salvaguardas dirigidas a asegurar que la restricción impuesta no exceda los límites que nuestro ordenamiento jurídico permite.**

**Específicamente, y ya más en relación con la controversia que hoy nos ocupa, los requisitos de consentimiento, objeto y causa, y constancia escrita, cumplen la función esencial de asegurar que la limitación al derecho constitucional de escoger y abandonar libremente una ocupación responda a una <u>manifestación clara, libre e inequívoca de voluntad</u> por parte del trabajador o de la trabajadora. Prescindir de tales exigencias, como hoy hace una mayoría de este Tribunal, equivale a vaciar de contenido las protecciones que este Tribunal reconoció en *Arthur Young & Co. v. Vega III*, *supra*.**

En consecuencia, cuando se pretende hacer valer una cláusula de no competencia en favor de un patrono distinto, -- ya sea por una cesión de contrato o por cualquier otra razón que genere tal modificación --, el análisis no puede limitarse a la mera continuidad de la relación laboral o al conocimiento general del cambio de patrono. Por el contrario, resulta indispensable examinar si medió una manifestación nueva, expresa y específica de voluntad mediante la cual el trabajador o la trabajadora consintió a quedar obligado frente a ese tercero.

Por último, cabe mencionar aquí que, "[e]n la medida en que [este tipo de] contratos incumplan con las condiciones anteriores, se considerarán, además de contrarios a la buena fe contractual, violadores del orden público por restringir de forma excesiva e injustificada la libertad de trabajo del empleado y la libertad de selección del público en general".

*Íd.* pág. 177. **Consecuentemente, se declarará nulo todo pacto de no competir que omita estas salvaguardas**. *Íd.*

Es, pues, a la luz de la normativa antes expuesta que, -- desde la disidencia --, procedemos a disponer del caso que nos ocupa.

### III.

Como mencionamos anteriormente, en el presente caso, MCG pretende hacer valer una cláusula de no competencia, -- de la cual no formó parte --, sosteniendo que la señora Maestre Rivera tenía conocimiento del cambio de patrono y que, al no oponerse de forma expresa, consintió a continuar obligada bajo los mismos términos del acuerdo original. A todas luces, tal contención no puede prevalecer.

**Y es que, conforme a la exposición del derecho aplicable que antecede, no albergamos duda alguna de que la cláusula de no competencia aquí en controversia no puede hacerse valer en las circunstancias del caso de autos. Ello es así, pues no surge del expediente que haya mediado una manifestación nueva, expresa y específica de consentimiento por parte de la trabajadora mediante la cual ésta aceptara quedar obligada frente al patrono cesionario, a saber, MCG.**

Nos encontramos, precisamente, ante el tipo de situación que las salvaguardas establecidas en *Arthur Young & Co. v. Vega III*, *supra*, buscan prevenir, entiéndase, la imposición de restricciones al derecho de trabajar sin que medie una manifestación clara, libre e inequívoca de voluntad por parte del obrero o de la obrera. **Permitir que una cláusula de esta**

**naturaleza subsista automáticamente tras una cesión contractual, sin una reiteración expresa por parte del trabajador, equivaldría a vaciar de contenido los requisitos de consentimiento y constancia escrita que este Tribunal reconoció como indispensables para su validez.**

Como si lo anterior no fuese suficiente, en el caso de autos, nos encontramos ante: (1) una profesional de la salud (2) que presta servicios a una población particularmente vulnerable. En ese contexto, la aplicación de la cláusula en controversia no sólo incide sobre el derecho constitucional de la trabajadora a escoger libremente su ocupación y a desvincularse de una relación laboral, sino que también tiene el potencial de afectar la continuidad y calidad de los servicios que reciben los pacientes a su cargo.[10]

**Lo anterior redunda en perjuicio al público en general, consideración que, como discutimos, forma parte integral del criterio de razonabilidad que debe regir la validez de este tipo de acuerdos. De este modo, si ya de por sí las cláusulas de no competencia en el contexto laboral requieren una**

---

[10] De hecho, algunos estados de los Estados Unidos han optado por aumentar el nivel de escrutinio respecto a las cláusulas de no competencia en el contexto de médicos y otros profesionales de la salud. Estas medidas responden a preocupaciones relacionadas con el acceso de los pacientes a servicios médicos y la continuidad en la prestación de dichos servicios. En particular, la literatura ha advertido que este tipo de acuerdos puede incidir en el aumento de los costos de asistencia médica al limitar la disponibilidad de proveedores y propiciar concentraciones de mercado a nivel regional. Asimismo, se ha señalado que las cláusulas de no competencia pueden desalentar a los profesionales de la salud de establecer prácticas independientes. Véanse, S. M. Hendricks, *Breaking the Bind: Rethinking Non-Compete Agreements in a Federal Framework*, 28 Chap. L. Rev. 241, 276-77 (2025) y G. Mattison Megna, *The Doctor Will See You Now-from 100 Miles Away: Navigating Physician Non-Compete Agreements in the Age of Telemedicine*, 2017 Wis. L. Rev. 1007, 1016-1017 (2017).

**evaluación crítica y cautelosa, aquellas que inciden sobre la prestación de servicios de salud deben ser objeto de un escrutinio aún más riguroso.**

En suma, somos del criterio de que el mero conocimiento del cambio de patrono o la continuidad en el empleo no pueden interpretarse, bajo ningún concepto, como una aceptación tácita de una restricción de esta naturaleza. Tal conclusión ignora la realidad de desigualdad estructural que caracteriza las relaciones laborales, en las cuales el trabajador o la trabajadora no siempre se encuentra en posición de objetar o negociar las condiciones impuestas.

Procedía, pues, confirmar la determinación de los foros inferiores. Los errores señalados no fueron cometidos.

IV.

Por ese no ser ese el camino que siguió una mayoría de mis compañeros y compañera en el presente caso, disentimos.

Ángel Colón Pérez
Juez Asociado